LYLE S. HOSODA                3964-0
KOURTNEY H. WONG          10827-0
SPENCER J. LAU               11105-0
HOSODA LAW GROUP, AAL, ALC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaii 96813
Telephone:    (808) 524-3700
Facsimile:    (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com


KRISTINA S. BAEHR          *Pro Hac Vice (pending)*
JAMES BAEHR                   *Pro Hac Vice (pending)*
MARY M. NEUSEL             *Pro Hac Vice (pending)*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 994-6241
Facsimile: (512) 953-7864
Email: kristina@well.law; jim@well.law; maggie@well.law


FREDERICK C. BAKER       *Pro Hac Vice (pending)*
JAMES W. LEDLIE            *Pro Hac Vice (pending)*
KRISTEN HERMIZ             *Pro Hac Vice (pending)*
CYNTHIA A. SOLOMON     *Pro Hac Vice (pending)*
SARA O. COUCH              *Pro Hac Vice (pending)*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com;
scouch@motleyrice.com


*Attorneys for the Plaintiffs*

*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JESSICA WHALEY, AMANDA FEINDT, ELIZABETH THOMPSON-WATSON, BRIAN JESSUP, and DUSTIN WALLACE,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL NO. 1:23-cv-457 (FEDERAL TORT CLAIMS ACT)<br><br><br>COMPLAINT |

## COMPLAINT

In May 2021, federal civilian employees performing a fuel transfer operation in the U.S. Government's massive Red Hill fuel complex near Joint Base Pearl Harbor-Hickam decided to take a shortcut. In violation of their operations orders, the employees misaligned valves and released more than 19,000 gallons of toxic jet fuel and additives into the environment. That fuel was sucked up by an automatic sump pump system and ended up unaccounted for and lodged in retention lines intended to contain used firefighting foam. Months later, in November 2021, a federal civilian employee operating a train cart in the tunnels of the Red Hill facility struck a drooping hand valve of that retention line, breaking the pipe, and blasting thousands of gallons of toxic fuel into the tunnel system. Downhill from that tunnel system lay a public water system that provided the water to around 93,000 people, including military service members assigned to serve their country there. Thousands of gallons of that toxic fuel made its way into the water system, contaminated the water, and harmed the service members and their families.

Neither the federal employees who took the shortcut – nor the one who struck the retention line with the train – were uniformed military personnel. None of them was in the chain of command of any of the plaintiffs in this matter. Neither the specific tortfeasors during their negligence nor the plaintiffs during their injury were performing any military mission, and no issues of military discipline were

ii

implicated by these acts.

Plaintiffs were off duty and on Thanksgiving holiday leave when the contamination reached their homes. None of them was performing a military act when they were contaminated. None of them was acting under official orders as they showered, bathed, drank, and cooked food with the contaminated water.

The contamination occurred while plaintiffs were at their homes. This is where plaintiffs lived with their families while they were off duty. Most of these homes were off base and in areas accessible to the general public.

At the time of the contamination, plaintiffs were performing "a non-military job in what was essentially a civilian context" – in other words, living their normal, private lives at their homes and with their families.[1] None were participating in military or government-sponsored recreation at the time of their injuries.

For its negligent contamination of plaintiffs' water while they were off-duty and performing no military mission, the Government is liable to them under the Federal Tort Claims Act, and no exceptions apply.

---

[1] *Johnson v. United States*, 704 F.2d 1431, 1437 (9th Cir. 1983).

iii

## TABLE OF CONTENTS

**NATURE OF THE CASE** ....................................................................... 1

**PARTIES** ................................................................................................. 1

**FACTUAL BACKGROUND** ............................................................... 1

A. *On May 6, 2021, the negligent "operator error" of a federal officer released nearly 20,000 gallons of fuel into the fire suppression system at Red Hill.* ................................................................................... 4

B. *On November 20, 2021, a federal officer operating a train cart struck and broke a pipe valve that erupted in a blast that injected thousands of gallons of fuel into the Red Hill water system.* .......................................... 5

C. *The Safe Drinking Water Act and EPA regulations required the Navy to warn.* ...................................................................................... 10

D. *After the blast, the Navy failed to warn residents of the danger* ................. 12

E. *The Navy did not announce the leak's impact on the water until December 2, 2021— twelve days after the blast.* .......................................... 15

F. *The Navy took responsibility for the blast and failure to warn.* .................. 16

G. *The Navy knew it was not safely operating the Red Hill fuel tank system* ... 16

H. *Senior officials apologized for the negligence and promised to fix the problem.* ................................................................................... 19

I. *The Navy's operations at Red Hill likely violated additional regulations* ... 20

J. *Affected plaintiffs have suffered extraordinary, compensable harm.* .......... 22

    a. Jessica Whaley ............................................................... 24

    b. Amanda Feindt ............................................................... 25

    c. Elizabeth Thompson-Watson ................................................ 26

    d. Brian Jessup ................................................................... 28

    e. Dustin Wallace ............................................................... 29

**CAUSES OF ACTION** ...........................................................**31**

    COUNT I: NEGLIGENCE.........................................................31

    COUNT II: NEGLIGENT UNDERTAKING ...............................33

    COUNT III: NUISANCE ..........................................................39

    COUNT IV: INFLICTION OF EMOTIONAL DISTRESS .............41

    COUNT V: PREMISES LIABILITY, DUTY TO CONTROL FORCE .............................42

**CAUSATION**.....................................................................**45**

**NO EXCEPTIONS APPLY** ...............................................**47**

**JURISDICTION, VENUE & SERVICE** .............................**48**

**CONDITIONS PRECEDENT** ...........................................**50**

**DAMAGES** .......................................................................**51**

**PRAYER** ..........................................................................**52**

This case arises out of the negligence by the United States of America and its agencies that caused the poisoning of the water supply with jet fuel and other contaminants at Red Hill, Hawaii on or around May 6 and November 20, 2021.

The plaintiffs bring this Complaint under the Federal Torts Claims Act, 28 U.S.C. § 2674.

### NATURE OF THE CASE

1.     This complaint is filed pursuant to the provisions of the Federal Tort Claims Act, Title 28, U.S.C §§ 1346(b), 2671, *et seq.*, against the United States of America for negligence, negligent undertaking, nuisance, infliction of emotional distress, and premises liability resulting in physical and emotional injuries where the government of the United States of America, if a private party, would be liable to the plaintiffs.

### PARTIES

2.     Each of the plaintiffs ingested water provided by the Red Hill shaft that was owned and operated by the United States Department of the Navy during the time frame of the acts or omissions alleged herein.

3.     Defendant is the United States of America.

### FACTUAL BACKGROUND

4.     On at least two separate occasions, on May 6 and November 20, 2021, United States personnel at Red Hill Bulk Fuel Storage Facility (Red Hill Facility)

made negligent errors that released thousands of gallons of jet fuel and other contaminants into the drinking water of families on the Navy water line on the island of O'ahu. Because government personnel then failed to disclose those leaks as required, the plaintiffs continued to ingest jet fuel and became sick from that exposure. The plaintiffs continue to suffer from severe illness, inconvenience, trauma, and fear.

5.    The needless and foreseeable leaks at the Red Hill Facility were caused by a specific series of negligent actions by federal officers. Congress foresaw and passed laws to avoid precisely this harm, and the Navy is and was bound by specific statutes, regulations, orders, and decrees that were ignored or violated. These statutes, regulations, orders, and decrees also constituted undertakings by Congress and the agencies, negligently conducted. The specific nature and extent of those violations will be further delineated through jurisdictional discovery.

6.    The Navy owns and operates the Red Hill Facility on the island of O'ahu, Hawaii to maintain strategic fuel reserves in the Pacific. The facility has been operational since 1943 and consists of 20 steel-lined tanks that measure 100 feet in diameter and 250 feet high and can hold 12.5 million gallons of fuel each. Altogether, these underground storage tanks can store up to 250 million gallons of fuel. The tanks are connected to three pipelines that run 2.5 miles through a

concrete tunnel to fueling piers at Pearl Harbor.

7.    The Red Hill Facility currently stores and dispenses at least three types of fuels – necessary for powering military assets but toxic if imbibed by humans. Fuels currently stored in the tanks include marine diesel for ships and two types of jet fuel, Jet Propellant-5 (JP-5) and Jet Propellant-8 (JP-8). "Chemicals of concern" in these fuels include "total petroleum hydrocarbons (TPH), benzene, toluene, ethylbenzene, xylenes, naphthalene, and methylnaphthalenes" according to the Environmental Protection Agency (EPA).

8.    EPA Region 9 is responsible for monitoring the Red Hill Facility and ensuring compliance with all federal water regulations.

9.    The Navy also owns and operates a water system that pumps water from underground aquifers to provide drinking water to the military community and facilities associated with Joint Base Pearl Harbor-Hickam (JBPHH), including military housing that is run as a public-private venture. Three wells supply the Navy's drinking water system: the Red Hill Shaft, Navy Aiea-Halawa Shaft, and Waiawa Shaft.

10.    The Red Hill Facility sits 100 feet above an aquifer that supplies drinking water to hundreds of thousands of O'ahu residents, according to the EPA.

## A. On May 6, 2021, the negligent "operator error" of a federal officer released nearly 20,000 gallons of fuel into the fire suppression system at Red Hill

11.     On May 6, 2021, a Control Room Operator and civilian United States Government employee at Red Hill failed to follow the required valve opening and closing sequence and released what the Navy then said was approximately 1,618 gallons of jet fuel. An initial command investigation determined that this failure was due to "operator error"—a breach of the standard of care and safety protocol. This safety violation was not discretionary and involved no weighing of policy considerations.

12.     The Navy then claimed the majority of the fuel had been recovered and denied that the leak contaminated any drinking water. But at a December 22, 2021, State of Hawaii Department of Health (DOH) hearing, Captain James Meyer, USN, Commander of the Navy Facilities Engineering Command, revised the estimate of the amount spilled from 1,600 gallons to 19,000 gallons.

13.     The Navy identified the root cause of the May 6 incident to be a "disregard of proper valve sequencing dictated in the specific Operations Orders," as well as several other factors, all of which could have been prevented by proper adherence to the rules.

14.     In an October 27, 2021, interview on Hawaii Public Radio, Captains Gordie Meyer and Albert Hornyak, United States Navy, explained what happened

4

with the May fuel spill. Captain Hornyak noted that, "[e]rrors on the part of the Red Hill system operator was the primary cause of the release… Specifically, the system operator not clos[ing] all of the valves as specified in the Operations Order before beginning a fuel transfer." Interview with Navy Capts. Gordie Meyer and Bert Hornyak, Hawaii Public Radio (Jan. 12, 2022), https://tinyurl.com/MeyerKornyak, *see also* https://fb.watch/fcQOdUe319/. Both men clarified that the acts were committed by government employees, not contractors, with Captain Meyer stating, "The 6 May event was by operators who are government employees…" *Id.* These government employees, however, were not uniformed servicemembers.

15.    An October 2021 Mitigations Report in the wake of the May incident prescribed corrective actions, including proper construction of the pipeline system, safety alarms to be restored and updated to proper working order, and clear instructions to follow the existing rules set forth by the Department of Defense. The operators of the Red Hill facility did not implement the corrective actions outlined in the Mitigations Report. The failure to take the required corrective actions led to devastating results a mere month later in November 2021.

### B. On November 20, 2021, a federal officer operating a train cart struck and broke a pipe valve that erupted in a blast that injected thousands of gallons of fuel into the Red Hill water system

16.    On November 20, 2021, a United States Government employee

operating a train cart struck a fire suppression discharge pipe that contained the

thousands of gallons of fuel and water from the May 6 error. The damage triggered

a catastrophic spill that injected jet fuel into the Red Hill well, the drinking water

source for the plaintiffs.

17.     Although the Navy initially claimed that there was no video coverage

of the event, a source leaked a video:



Civil Beat, *Fuel Leak at the Navy's Red Hill Facility Nov. 20, 2021,* Youtube,

https://www.youtube.com/watch?v=GEGohRlLrSA&t=3s.

18.     Admiral Samuel Paparo, USN, Commander of the U.S. Pacific Fleet,

ordered a command investigation of the incident that was endorsed by him on

January 20, 2022, and on June 13, 2022, by the Vice Chief of Naval Operations.

The report broadly confirmed the findings of the first investigation. S.J. Paparo,

*First Endorsement of RDML Christopher J. Cavanaugh, USN, ltr 5830 of 14 Jan*

*22 w/ encl: Command Investigation into the 6 May 2021 and 20 November 2021*

*Incidents at Red Hill Bulk Fuel Storage Facility*, (Jan. 20, 2022),

https://tinyurl.com/CavanaughReport [hereinafter Cavanaugh Report].

19.    The report confirmed the Navy's culpability under the FTCA for both

incidents. "The Navy is responsible for the 6 May 2021 and 20 November 2021

fuel spills at the Red Hill Bulk Fuel Storage Facility . . . and subsequent water

contamination," the Cavanaugh Report reads. "[H]uman error was the primary

cause" of both fuel spills "which led to as much as 3,322 gallons[2] of fuel

contaminating the Navy drinking water system." *Id.*

20.    The human errors (negligence) were further delineated in the Findings

of Fact and Opinions (emphases added) in the reports:

> Finding of Fact 41: "On 6 May 2021, Red Hill operators *improperly* executed a fuel transfer procedure, resulting in two piping joint ruptures and subsequent JP-5 fuel spill. Although unknown at the time, a fire suppression system sump pump transferred most of the fuel [up to 16,999 gallons] into a retention line, where it remained until 20 November."

> Finding of Fact 174: "On 20 November 2021, the Red Hill rover *inadvertently* struck a fire suppression system retention line drain valve with the passenger cart of a train, cracking the PVC pipe near Adit 3. Although not known at the time, this retention line contained up to

---

[2] This amount was later increased to 5,542 gallons (noted as "unrecovered") in the Cavanaugh Report.

16,999 gallons of JP-5 fuel from the 6 May spill. A portion of this fuel was released to the environment and ultimately entered the Red Hill well and the Navy water distribution system." Appendix C notes: "A total of 3,322 gallons of remain unaccounted for, and some or all of that fuel contaminated the Red Hill well and Navy water distribution system."

Opinion 1: "The proximate cause of the fuel spill on 6 May 2021 was *human error*. The [Control Room Operator] and pump operator took *intentional shortcuts* when transitioning between procedures. Their improper valve operations resulted in drawing a vacuum in the JP-5 line, then rapidly pressurizing it. This pressure surge caused mechanical failure of two piping joints. This opinion is consistent with a root cause analysis conducted by Austin Brockenbrough and Associates, LLC, a private engineering and consulting firm."

Opinion 20. "The proximate cause of the fuel spilled from the fire suppression system retention line on 20 November 2021 was a failure to properly account for the fuel spilled on 6 May 2021 (*human error*) . . ."

Opinion 21: "The Red Hill rover *inadvertently* struck the drain valve hand wheel with the passenger cart of a train, causing the PVC pipe to crack and leak. This train is used to transit the tunnel system and likely contacted the valve hand wheel multiple times, weakening and finally cracking the pipe. FLC Pearl Harbor conducted a preliminary inquiry regarding this event, and the report postulates *excessive speed* may have caused the train to jump. The investigation team assesses it is more likely that the weight of fuel in the 14-inch diameter PVC pipe caused it to sag over time. Worn paint on the hand wheel suggests the train rubbed against it on several occasions…"

Opinion 30: "The proximate cause of contaminated drinking water was a failure to properly respond to the fuel spill on 20 November 2021 (*human error*)."

*Id.*

21.    These Findings of Fact and Opinions establish negligence and lack of due care on the part of government personnel. The operative actions were not

8

discretionary functions—the federal operators had no discretion to "improperly" transfer fuel by violating a required procedure. There was no weighing of policy or intentional decisions here – just negligence on the part of federal employees.

22.    Moreover, the plastic material of the pipes—in defiance of military mandates for fire suppression systems—contributed to the explosion. The Navy violated the Department of Defense requirement to use steel pipes for fuel transmission. The Unified Facilities Criteria specifications for the Department of Defense's Fire Protection Engineering for Facilities, UFC 3-60-01, Section 9-9.2.1 . . . mandates "schedule 40 steel pipe" for such fire suppression systems like the AFFF system at the Red Hill Facility. Department of Defense Fire Protection Engineering for Facilities, UFC 3-60-01 (8 August 2016 as amended in 2020), https://wbdg.org/FFC/DOD/UFC/ARCHIVES/ufc_3_600_01_2016_c5.pdf. The weaker PVC pipes cracked under the pressure when hit by the cart—ultimately leading to the blast and release of tens of thousands of gallons of jet fuel.

23.    On Thanksgiving weekend, November 27-28, 2021, residents of military housing neighborhoods began to complain to the Navy and the DOH that their water wasn't right. They could smell fuel. They could see a sheen. The water reacted to flames.

24.    But by November 30, ten days after the blast, the Navy had still not advised anyone on their water line that the fuel leak had affected their water source

or warned they should not use the water. The Navy held town halls to address the odor in the water but failed to issue a do not use notice for water system users.

### C. The Safe Drinking Water Act and EPA regulations required the Navy to warn

25.    The Safe Drinking Water Act and EPA regulations required the Navy to issue a Tier 1 public notice within 24 hours of knowledge that the Red Hill Shaft had been contaminated with JP-5 fuel. The federal government has expressly waived sovereign immunity under the Safe Drinking Water Act as an operator of a public water system. 42 U.S.C. §§ 300f-300j (1996); SAFE DRINKING WATER ACT AMENDMENTS OF 1996, 1996 Enacted S. 1316, 104 Enacted S. 1316 ("The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or procedural requirement").

26.    40 CFR §141.201 outlines "General public notification requirements:" "Each owner or operator of a public water system . . . *must* give notice for all violations of national primary drinking water regulations (NPDWR). . ." A Tier 1 public notice is required for NPDWR violations and situations with significant potential to have serious adverse effects on human health as a result of short-term exposure, including:

> "occurrence of a . . . waterborne emergency" (such as . . . a chemical spill or unexpected loading of possible pathogens into the source water that significantly increases the potential for drinking water contamination.

40 CFR §141.201.

27.     The Navy was required to "[p]rovide a public notice as soon as

practical but *no later than 24 hours* after the system learn[ed] of the violation." 40

CFR §141.202(b). The Navy was required to "provide the notice within 24 hours in

a form and manner reasonably calculated to reach all persons served. The form and

manner used by the public water system are to fit the specific situation, but must be

designed to reach residential, transient, and non-transient users of the water

system."

28.     Minimum notice requirements are laid out in the regulation and the

EPA's website:

> *There are 10 required elements in a public notice. Notices must*
> *contain:*
>
> - A description of the violation that occurred, including the contaminant(s) of concern, and  the contaminant level(s);
> - When the violation or situation occurred;
> - The potential health effects (including standard required language);
> - The population at risk, including subpopulations vulnerable if exposed to the contaminant in their drinking water;
> - Whether alternate water supplies need to be used;
> - What the water system is doing to correct the problem;
> - Actions consumers can take;
> - When the system expects a resolution to the problem;
> - How to contact the water system for more information; and
> - Language encouraging broader distribution of the notice.

Public Notification Rule, U.S. Environmental Protection Agency,

https://www.epa.gov/dwreginfo/public-notification-rule (last visited Nov. 3, 2023).

### D. After the blast, the Navy failed to warn residents of the danger

29.    The Navy knew of a chemical spill that "significantly increase[d] the

potential for drinking water contamination" on November 20, 2021. But the Navy

failed to issue a Tier 1 notice to water system customers.

30.    Despite a legal obligation to do so noted by the EPA in their

investigation report, the Navy failed to provide notification to water system

customers in the required timeframe after "confirming the Red Hill Shaft had been

contaminated with JP-5 fuel." *See* Redacted National Enforcement Investigation

Center Civil Investigation Report, Joint Base Pearl Harbor-Hickam Public Water

System, Environmental Protection Agency at 5,

https://tinyurl.com/EPAInvestigation.

31.    On November 21, 2021, the Navy public affairs office issued a media

release regarding the JP-5 fuel spill, stating that "personnel responded to what was

initially assessed as a water leak shortly after 1700 (5:00 pm) on November 20,

2021. This pipe is not connected to the Red Hill Fuel tanks or main fuel pipelines,

all of which are secure. Overnight, the release began to contain some amount of

fuel which increased into Sunday (November 21, 2021) morning. Approximately

14,000 gallons of a mix of water and fuel was contained in the lower tunnel . . .

and has been recovered and transferred to an above-ground storage tank as of midday Sunday. The Navy made initial notification to the DOH Saturday night (November 20, 2021) and is providing updates Sunday. *There are no signs or indication of any releases to the environment and the drinking water remains safe to drink.*" *Id.* at 5 (emphasis added).

32.    On Saturday, November 27, 2021, at 1817 (6:17 p.m.), a JBPHH housing manager received the first customer complaint of a chemical smell in the water. By 0500 (5:00 a.m.) on November 28, 2021, JBPHH housing managers had received 42 customer complaints regarding water quality. *Id.* at 6.

33.    On the evening of Sunday, November 28, 2021, a water sample was collected that "smelled of fuel" and the Red Hill main pump #2 was secured, but the Navy did not notify water customers.

34.    On November 29, the Hawaii DOH put out an advisory to "all Navy water system users avoid using the water for drinking, cooking, or oral hygiene." The advisory covered Aliamanu Military Reservation, Red Hill and Nimitz Elementary schools, and military housing. Officials said that all of the complaints received were from users of the Navy's water system. "As a regulated water system under the jurisdiction of the DOH's Safe Drinking Water Branch, the Navy is responsible for maintaining a safe and reliable source of drinking water to its customers and to provide alternative sources of drinking water for human

consumptive uses as deemed necessary," the advisory said.

35.    On November 29, by contrast, the Navy stated there was "no immediate indication" that the water was unsafe. Captain Erik Spitzer, USN, Commander of Joint Base Pearl Harbor-Hickam, told residents in military housing communities on November 29, "My staff and I are drinking the water on base this morning, and many of my team live in housing and drink and use the water as well."

36.    Ten days after the blast, on November 30, 2021, the Resident Services Office sent an email to families stating that the Navy had not detected petroleum constitutes in the water. They asked that all JBPHH residents flush their water systems. And they stated that they were still investigating the "source" of the odor.

37.    These actions constituted negligent undertaking and failure to warn. The misrepresentations (that the water was safe to drink) were only collateral to the significant operational negligence at play, including the requirement to issue a Tier 1 public notice. These acts are not excepted under the misrepresentation exception. *Holcombe v. United States*, 388 F. Supp. 3d 777, 794 (W.D. Tex. 2019) ("The government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved.") Indeed, the fact that the government chose to misrepresent as to the condition of the water is beside the point. The government had a duty to *warn* affected families

14

of the contamination and failed to do so.

**E. The Navy did not announce the leak's impact on the water until December 2, 2021— twelve days after the blast**

38.     On December 2, 2021, the Navy finally announced that it detected petroleum products in its Red Hill Shaft. Rear Admiral Blake Converse stated "We identified the petroleum products from two different tests. One test was taken on Sunday night shortly after this incident was identified to the Navy. And that test identified trace amounts of very volatile hydrocarbons, which would normally be associated with something like a JP-5 or a diesel fuel," Converse said. The second test found "clear indications of petroleum products in the gas space just above the waterline in the Red Hill well," Converse said. "With both of those, we have pretty conclusive indications that there are volatile petroleum products in the well and we've determined that is the likely source of the contamination of our water distribution system."

39.     Follow up tests were no more encouraging. On December 10, test results from the DOH showed that hydrocarbons associated with diesel fuel were detected at 350 times the level the health department considers safe (the Environmental Action Level). A California lab found 140,000 parts per billion of total petroleum hydrocarbons as diesel or TPH-d. The DOH Environmental Action Level is 400 ppb. The water in the Red Hill shaft also showed gasoline hydrocarbons 66 times higher than the level considered safe. The lab found total

15

petroleum hydrocarbons as gasoline at 20,000 ppb. The Environmental Action Level for TPH-g is 300 ppb.

**F.  The Navy took responsibility for the blast and failure to warn**

40.     Later, the Navy took responsibility for the failures at Red Hill. In January 2022, Admiral Blake Converse said, "I want to start by saying that the Navy caused this problem, we own it, and we're gonna fix it." Later, Admiral Paparo reiterated:

> The Navy is responsible for the 6 May 2021 and 20 November 2021 fuel spills at the Red Hill Bulk Fuel Storage Facility (Red Hill) and subsequent water contamination.

> The Navy has a moral obligation and ethical duty to fix our mistakes, safeguard the environment, and rebuild trust. We must act.

*See* Cavanaugh Report at 127.

**G. The Navy knew it was not safely operating the Red Hill fuel tank system**

41.     The Navy knew that it was not properly operating the Red Hill fuel tank system in a manner that would prevent a fuel leak.

42.     In an effort to mitigate the risk associated with inadvertent releases of fuel from the Red Hill facility, the Navy established an agreement with the State of Hawaii in January 2008: "Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan" (GPP). The GPP documented leaks from various tanks from the 1940s to the 1980s, totaling up to 200,000 gallons of dangerous fuel. The Plan

16

stated:

> In order to mitigate the risk associated with future releases, the U.S. Navy *will*: Implement a rigorous tank maintenance program, and continue to research and investigate a viable leak detection system for the Facility. . .

Department of the Navy, Commander Naval Facilities Engineering Command, Pacific, *Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan: Pearl Harbor Hawaii* (Jan. 2008), https://tinyurl.com/RHFGPP (emphasis added).

43.    The Navy's own audit confirmed that it was not complying with the requirements of the Final Groundwater Protection Plan. Between October 2008 and May 2010, the Navy conducted an audit of the Red Hill facility. In August 2010, the Navy completed its audit report and found "four areas of concern" that included: "groundwater contamination; tank inspection and maintenance requirements and schedule; detection of fuel releases; and completion [non-compliance] of response actions *required* by the GPP." Naval Audit Service, *Audit Report: Department of the Navy Red Hill and Upper Tank Farm Fuel Storage Facilities (Redacted)* at 9 (Aug. 16, 2010) (made available by the Board of Water Supply), https://tinyurl.com/NavyAudit (emphasis added). "Based on the results of the audit work, we determined that the environment and groundwater sources in the Pearl Harbor area have not been sufficiently protected." *Id.* at 11.

17

44.    In January 2014, an improperly repaired fuel tank leaked up to 27,000 gallons of JP-8 jet fuel at the facility. Test results in soil vapor and groundwater in and around the tank indicated a spike in levels of hydrocarbons.

45.    In the wake of this error and in order to prevent additional fuel leaks, the Navy entered into an Administrative Order on Consent (AOC) with agencies including the DOH and the EPA to take steps to ensure that the groundwater resource in the vicinity of the Facility is protected and the Facility is operated and maintained safely—an order that remains in effect to this day.

46.    The "Frequently Asked Questions" in the AOC indicated a full awareness of the threats facing the Red Hill facility:

> What is the likelihood of a future catastrophic release at the Facility?
> . . .
> The most likely catastrophic release scenario would be a piping failure with a release into the lower access tunnel. This vulnerability is being addressed by the Navy and DLA with the installation of oil tight doors in the tunnel system, along with a new fire suppression system to reduce the threat of a release caused by fire. Furthermore, the piping in the lower tunnel system is not buried or concealed and is visually inspected daily.

*Red Hill Bulk Fuel Storage Facility – Frequently Asked Questions*, Environmental Protection Agency, https://tinyurl.com/EPARHFAQ.

47.    A risk assessment report prepared by defendant's own consultant in 2018 described the chances of future fuel releases at the Red Hill facility as:

- Greater than 27% probability of a sudden release of between 1,000 and 30,000 gallons of fuel each year.

- Greater than 34% chance of a sudden release of more than 120,000 gallons from the [Red Hill] in the next 100 years.

NAVFAC Pacific, *Quantitative Risk and Vulnerability Assessment Phase 1: Red Hill Bulk Fuel Storage Facility, NAVSUP FLC Pearl Harbor, HI (PRL)* (November 2021) at pp. 12-29, 14-1, https://tinyurl.com/RHRisk.

### H. Senior officials apologized for the negligence and promised to fix the problem

48.    As the extent of the crisis became undeniable, a series of senior U.S. Government officials apologized and promised to make things right. Captain Spitzer, who had previously told families the water was safe to drink, backtracked and apologized, "I regret I did not tell our families not to drink the water." On December 6, Secretary of the Navy Carlos Del Toro, on a previously scheduled visit to Hawaii for the 80th Anniversary of the attack on Pearl Harbor, toured the facility. He publicly apologized for the crisis and said, "We are committed to rebuilding this trust. We're doing everything we can try to fix the problem." He also finally announced to the public that the Navy had temporarily suspended the use of the fuel tank facility nine days earlier on November 27 – days before they warned residents of any toxic danger to their water.

49.    On December 14, the Deputy Secretary of the Department of Defense, Dr. Kathleen Hicks, visited. "At DoD, we recognize the need to continue to care

for all affected personnel and their families and help them return to their homes in a safe and expeditious manner," she said, "We also recognize we need to double down on our efforts to earn the trust and confidence of the people of Hawaii in our ability to manage this situation. . . I am committed to ensuring the health and well-being for our Service Members, their families, the people of Hawaii, and the environment." Statement by Deputy Secretary of Defense Dr. Kathleen Hicks Following Her Visit to the Red Hill Bulk Storage Facility in Hawaii, (Dec. 14, 2021), https://tinyurl.com/HicksStatement.

### I. The Navy's operations at Red Hill likely violated additional regulations

50.     Upon information and belief, Navy officers violated additional regulations and mandatory requirements at Red Hill. Investigations are ongoing.

51.     Congress foresaw the public health harm posed by hazardous substances such as jet fuel and passed key legislation to prevent toxic exposure. In the 1970s, Congress passed the CWA and the Safe Drinking Water Act (SDWA), 42 U.S.C. §300f et seq, requiring the EPA to establish regulations ensuring clean and safe drinking water for the public. The legislation and implementing regulations are intended to prohibit the discharge of "oil and hazardous substances" into the environment because of the serious and severe threat to public health posed by these substances. *See, e.g.,* 33 U.S.C. § 1321.

52.     The SDWA was established to protect the quality of drinking water in

the U.S. This law focuses on all waters actually or potentially designed for drinking use, whether from above ground or underground sources. The Act authorizes the EPA to establish minimum standards to protect tap water and requires all owners or operators of public water systems to comply with these primary (health-related) standards.

53.     National Primary Drinking Water Regulations (NPDWRs or primary standards) are legally enforceable standards that apply to public water systems. Primary standards protect public health by limiting the levels of contaminants in drinking water. The EPA provides a table listing the Maximum Contaminant Level (MCL) for various chemicals, the highest level of a contaminant that is allowed in drinking water. MCLs are enforceable standards. The MCL sets enforceable limits for benzene (.005 milligrams per liter), toluene (1 milligram per liter), ethylbenzene (0.7 milligrams per liter), xylene (10 milligrams per liter), and other light petroleum distillates.

54.     The State of Hawaii has adopted a State Water Code, codified in Chapter 174C of the Hawaii Revised Statutes, which states in relevant part:

> **Declaration of policy.** (a) It is recognized that the waters of the State are held for the benefit of the citizens of the State. It is declared that the people of the State are beneficiaries and have a right to have the waters protected for their use.

Haw. Rev. Stat. 174C-2.

55.     Hawaii law also regulates potable water. The Hawaii Department of

21

Health Rules Relating to Hawaii Potable Water Systems (Hawaii Administrative Rules [HAR] Title 11, Chapter 20) set forth Maximum Contaminant Levels of certain chemicals in public and private drinking water systems. These MCLs are analogous to the National Primary Drinking Water regulations but additional substances are regulated.

56.     Federal and State programs for the management of underground storage tanks such as Red Hill were first published in the 1980s. In January 2000, the State of Hawaii promulgated rules requiring owners and operators of such facilities to report suspected or confirmed releases from USTs.

57.     All of these regulations provide mandatory requirements for federal agencies and federal officers, and the extent of the Navy's violations at Red Hill will be subject to discovery.

## J.  Affected plaintiffs have suffered extraordinary, compensable harm

58.     The Navy's jet fuel leaks—and conduct thereafter—have resulted in extraordinary inconvenience, illness, economic injury, and fear for each of the affected families. As set forth below, these plaintiffs have experienced trauma not only from the poisoning but also from the aftermath. They were forced back into the homes that made them sick, only to render many of them ill again. Some families then spent their life savings or gave up important careers to uproot their families and move off the island or off the water line. And for many, the search for

22

medical care has been a wild goose chase, as Navy officials continue to proclaim that there is no long term-harm.

59.    Initial reported symptoms for these families were wide ranging, including abdominal issues, anxiety, exhaustion, headaches, muscle and joint pain, skin issues (rashes, blisters, dry skin). Many of these physical symptoms have persisted over time, and over 94% of families reported still struggling with anxiety.

60.    The symptoms these families identified track closely with the symptoms reported in a survey conducted by the Centers for Disease Control:

> Most participants reported experiencing one or more new or worsened symptoms after the incident (1,980; 87%), many of whom reported symptoms lasting ≥30 days (1,493; 75%). The largest percentages of reported symptoms were those related to the nervous system (62%), followed by the gastrointestinal system (58%), skin (58%), ear, nose, and throat (47%), mental health (46%), eyes (42%), and respiratory system (31%).

Alyssa N. Troeschel, et al. *Notes from the Field: Self-Reported Health Symptoms Following Petroleum Contamination of a Drinking Water System — Oahu, Hawaii, November 2021–February 2022*. MMWR Morb Mortal Wkly Rep 2022;71:718–719. DOI: http://dx.doi.org/10.15585/mmwr.mm7121a4external icon.

61.    A follow-up survey conducted in September 2022 found continuing problems. 41% of respondents "reported an existing condition that had worsened," "31% reported a new diagnosis" and "25% reported a new diagnosis with no pre-

existing condition." Mahealani Richardson, *Alarming new CDC survey shows 'worse health' among those impacted by Red Hill fuel spills*, HAWAII NEWS NOW, (Nov. 9, 2022), https://tinyurl.com/CDCRDSurvey. 80% of respondents reported health symptoms in the previous 30 days, and 65% had "high or very high confidence" the symptoms relate to the water contamination. Navy Water Contamination Follow-Up Survey Results, https://tinyurl.com/CDCFollowUp.

62.     Plaintiffs and their families are at increased risk of future medical conditions associated with the components present in their contaminated drinking water and will require, at a minimum, medical monitoring.

### a.  Jessica Whaley

63.     Then Army Colonel Jessica Whaley, her husband, and their four (4) children moved into the Aliamanu Military Reservation military housing community, a community located off base, in May of 2021. A family with special needs, Colonel Whaley and her husband had been intentional about the family's health needs, safety, and home life.

64.     During the Thanksgiving holiday, Colonel Whaley had no idea the family's haven had been poisoned by the Navy's jet fuel leak. A medical professional, Colonel Whaley could never pinpoint an obvious cause for the unprecedented health changes she experienced around the time of the contamination.

65.    In November and December 2021, her family experienced symptoms of exposure, with Colonel Whaley's symptoms so severe she reported to an emergency department. Joint pain that began after her exposure has continued. Dental problems have become more common for her entire family who previously had no concerns at all.

66.    As the family sought respite from their contaminated military home, it was during their three-month displacement that Colonel Whaley and her family faced multiple traumatic familial events that would live with them forever. As a medical provider, she watched her personal and professional life become unrecognizable. The ability to relax between hospital shifts proved impossible.

67.    With the trust and faith she once held in her government poisoned, Colonel Whaley made the determination to place the health and safety of her family above the career she loved. Despite a recent promotion, she is in the process of retirement. The family returned to the mainland in October 2023.

68.    Her medical knowledge has become a blessing and a curse, as distance from the island has done little to quell neither her continued fears of future health issues nor the families lingering fear of re exposure.

### b.  Amanda Feindt

69.    Army Major Amanda Feindt, her husband, and their two children were poisoned in their Ford Island military housing home by the Navy's

contaminated water.

70.    While on Thanksgiving holiday leave Major Feindt was unaware of the fuel spill and the silent impact it was having on her family's health. Throughout the end of November and early December, Major Feindt received emails that failed to identify her neighborhood as contaminated. For weeks the family continued to use the water in their home for drinking, bathing, and cooking.

71.    In December the Feindt family, Major Feindt included, struggled with symptoms that resulted in multiple military hospital visits: acute symptoms such as nausea, vomiting, and diarrhea. Major Feindt was given a battery of tests that were denied to her own family.

72.    After months of displacement, in May of 2022, the Feindt family transferred off of the island after immense effort and financial and professional sacrifice. New health problems, mental anguish, and fears of future harm have persisted and have prevented her family from returning to normalcy. The impact of her exposure dashed her dreams of finishing her military career as the leader she was trained and hoped to be.

### c.  Elizabeth Thompson-Watson

73.    Army Chief Warrant Officer Elizabeth Thompson-Watson, her husband, and their child lived in the Halsey Terrace military housing community – off-base military housing. With retirement on the horizon, the family hoped to stay

in Hawaii until her military career came to an end.

74.     Chief Thompson-Watson spent her Thanksgiving holiday leave with no knowledge of the jet fuel leak. She unknowingly used contaminated water to cook, shower, and clean with. In late November she learned her family's safety had been compromised. The family stopped consumption of the water on their own accord.

75.     Chief Thompson-Watson's family was displaced for three months. All the while she played a critical role on the Army's Veterinary Services response team, as they provided food protection and support to the military and veteran community. For months she faced the unique challenge of responding to a public health crisis in her community, and her own family.

76.     In March of 2022, after their neighborhood was deemed "safe," the family returned to their military home. After their exposure, health issues and stress compounded. A new skin growth on her husband was determined to have a medium risk of cancer. Later, she was diagnosed with an autoimmune disease and chronic migraines. Both, along with respiratory issues, have continued despite multiple avenues of treatment.

77.     Aspirations of an easy transition into retirement in Hawaii became marred by the water crisis and her new health conditions. Her migraines have drastically changed her ability to focus at work. The medication needed to

effectively treat Chief Thompson-Watson's autoimmune disease would make her non-deployable and force her into an early retirement.

78.    In the summer of 2023, the family returned to the mainland, no longer willing to fight to stay in the very place they hoped to retire. With nineteen years in service, the choice to retire was once her own to make. Now she must choose between her career and her health. She is troubled by her fears of what else the future holds for the health of her family, and whether she will receive aid for any harm caused.

### d.  Brian Jessup

79.    During his final duty station before retirement, Navy diver Chief Petty Officer Brian Jessup, his wife, and their four (4) children lived off-base in the Radford Terrace military housing community. With no immediate guidance about the jet fuel leak, Chief Jessup spent his Thanksgiving holiday leave period unaware that he and his family had been exposed to fuel-contaminated water.

80.    In late November, Chief Jessup learned of the fuel leak from his wife. He trusted that had the Navy's water supply been compromised, the Navy would have notified affected households. Around that same time, he received an email from a base official that stated there were no concerns about the safety of the Navy's drinking water.

81.    Chief Jessup suffered from skin reactions/burning, headaches, and eye

28

irritation. He reported his health issues to his military healthcare team. Gastrointestinal changes that developed while living in Hawaii continue to affect him.

82.    For months, the family acquired potable water for consumption, hygiene, and household chores as they continued to live in their contaminated home. After testing deemed the water in his home "safe," his family's suffering continued. In search of stability and safety, Chief Jessup was forced to make a final decision about his upcoming retirement. The Jessup family returned to the mainland in the summer of 2022 without him.

83.    It would be nearly five months, during which he lived in his work office before the family reunited. The knowledge that his military career placed his family in harm's way, and caused a non-deployment related separation, created guilt and new apprehension about what the future holds for the health of now retired Chief Jessup and his family as he starts a new career serving his community in law enforcement.

### e.  Dustin Wallace

84.    Petty Officer First Class Dustin Wallace, United States Navy, his wife, and their two children (9 and 10) lived in the Radford Terrace military housing community, off base and accessible by civilians. Over the week of Thanksgiving, while on holiday leave, Petty Officer Wallace and his family felt

sick. The night of Thanksgiving, he and his family experienced nausea, vomiting, and diarrhea. He noticed a fuel-like smell and taste from faucets in his home, but the family had not yet received notification of the Navy's fuel leak.

85.    As toxic water flowed through their home, and the family suffered from constant health concerns, they continued their normal use. In late November, when he and his wife noticed a sheen on their water the family stopped consumption of it.

86.    From December 3 until mid-March, the family was displaced. The family of four lived for approximately ninety days in one small hotel room. Petty Officer Wallace experienced a drastic change in his health: afflicted with constant migraines, severe acid reflux, and a deterioration of his vision. Doctors warned him of a higher risk of eventual blindness.

87.    On the days that his children felt sick, they missed school for two to three days at a time. Multiple days, Petty Officer Wallace witnessed his daughter doubled over in pain and she was not always able to attend school. Instead of exhibiting compassion and understanding, the military opened up a truancy case against Petty Officer Wallace and his wife. Petty Officer Wallace reported to the Fleet & Family Support Services and explained the situation – the water contamination, the illnesses. Officials assured him the case was resolved and closed. But, back in Tennessee, Petty Officer Wallace has been informed that the

case has re-opened. He and his wife have had to conduct intrusive mental health evaluations. His command now treats him like a child neglecter all because of the military's contamination of his water.

88.    After he observed the walk back of the initial official base guidance that the water was safe, the foundation of trust built during years of proud service to the Navy has completely eroded. He is burdened with guilt that his career forced him to spend months away from his children who were ultimately contaminated by his employer. But it is the fear of what that exposure means for the family's future health that continues to haunt him.

## CAUSES OF ACTION

### COUNT I: NEGLIGENCE

89.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

90.    The United States owns and operates the Red Hill Bulk Fuel Storage Facility.

91.    The United States had a duty to exercise reasonable care in the operation and maintenance of the Red Hill Bulk Fuel Storage Facility.

92.    Federal officers breached the duty to exercise ordinary care at Red Hill in at least the following respects:

a. Officers failed to adhere to the proper valve sequencing in May 2021;

31

b.  Officers failed to implement mandatory corrective actions after the May 2021 leak and prior leaks;

c.  Officers violated mandatory provisions of the Safe Drinking Water Act;

d.  Officers failed to install or replace pipes with mandatory steel piping;

e.  Officers knew or should have known of the fuel buildup in the PVC piping between May and November 2021 and failed to take corrective action;

f.  Officers failed to warn residents that the leaks had occurred in violation of federal and state law;

g.  Officers ordered junior servicemembers to flush hazardous fuel into groundwater without a permit and in violation of federal and state law;

h.  Officers knew that maintenance failures had compromised Red Hill and failed to take corrective action to prevent harm;

i.  Officers failed to test water samples for petroleum and destroyed water samples from affected homes; and

j.  Various other safety violations and breaches to be determined upon discovery.

93.    As a direct and proximate result of defendant's breach of duty of care, the plaintiffs have been injured.

32

94.    As a direct and proximate result of the negligence of defendant and its officers, the plaintiffs suffered substantial injuries and damages, including severe mental and emotional distress.

95.    As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered special damages and will require testing/medical monitoring to be determined by expert testimony.

96.    Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate the plaintiffs for the negligence of the United States.

COUNT II: NEGLIGENT UNDERTAKING

97.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

98.    "The Supreme Court has repeatedly found that the United States can be held liable under the Federal Tort Claims Act if a private person would face good Samaritan liability under state law." *Williams v. United States*, 711 F. Supp. 2d 1195, 1207 (D. Haw. 2010) (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955)).

99.    Hawaii state law recognizes liability related "to the voluntary assumption of a duty or undertaking." *Id.*

100.   The Navy voluntarily undertook the responsibility to provide safe

drinking water to all those on the Navy water line on Oʻahu. Having undertaken that responsibility, the Navy was required to do so with reasonable care.

101.   Furthermore, federal law and "regulations can give rise to a state-law duty under the good Samaritan doctrine. *Id.* at 1208.

102.   The United States Congress voluntarily undertook the creation of laws such as the Safe Drinking Water Act and the Clean Water Act to avoid the foreseeable harms of toxic water contamination. United States agencies such as the Environmental Protection Agency and the Department of Defense undertook to establish specific regulations, orders, and decrees to implement those laws and avoid harms to public drinking water systems, including:

    a.  Establishing "specific Operations Orders" to conduct appropriate valve opening and closing sequencing to avoid fuel spills.

    b.  Mandating the use of "schedule 40 steel pipe" instead of PVC plastic piping for fire suppression systems like the Red Hill system under the Unified Facilities Criteria specifications for the Department of Defense's Fire Protection Engineering for Facilities, UFC 3-60-01, Section 9-9.2.1.

    c.  Requiring the issuance of a Tier 1 public notice "no later than 24 hours" after learning of violations of the national primary drinking water regulations with "significant potential to have serious adverse

effects on human health" as required by 40 CFR §141.201.

d. Prohibiting the "discharge of any pollutant into waters of the United States" without authorization under 33 U.S.C. § 1311(a).

103. Furthermore, the Department of Defense explicitly undertook to pursue "corrective actions" on multiple occasions regarding water contamination at Red Hill, including:

a. Establishing a Final Groundwater Protection Plan with the State of Hawaii in 2008 to "mitigate the risk associated with future releases" from the fuel tanks, including plans to "implement a rigorous tank maintenance program" and "research and investigate a viable leak detection system."

b. Entering into an Administrative Order on Consent in 2014 with agencies including the Hawaii Department of Health and the EPA to take steps to ensure that the groundwater resource in the vicinity of the Facility is protected and the Facility is operated and maintained safely, with a specific focus on a "catastrophic release scenario" involving "a piping failure with a release into the lower access tunnel" that was "being addressed by the Navy and [Defense Logistics Agency]."

c. Undertaking in a 2021 Mitigations Report the proper construction of the pipeline system, safety alarms to be restored and updated to proper

35

working order, and clear instructions to follow the existing rules set

forth by the Department of Defense (October 2021 Mitigations

Report).

d. After the fuel blast, frequently stating that it accepted responsibility for

failures at Red Hill and undertook to "fix" them.

    i. In January 2022 Admiral Converse stated, "the Navy caused this

      problem, we own it, and we're gonna fix it."

    ii. On December 6, Secretary of the Navy Carlos Del Toro,

      publicly apologized for the crisis and said, "We are committed

      to rebuilding this trust. We're doing everything we can try to fix

      the problem."

    iii. On December 14, 2021, Deputy Secretary of Defense Dr.

      Kathleen Hicks stated, "I am committed to ensuring the health

      and well-being for our Service Members, their families, the

      people of Hawaii, and the environment."

104.   Follow up audits and reports show that these undertakings were

conducted negligently:

a. The Navy's audit confirmed it was not complying with the

requirements of the Final Groundwater Protection Plan by finding

"four areas of concern" including "groundwater contamination; tank

inspection and maintenance requirements and schedule; detection of fuel releases; and completion [non-compliance] of response actions required by the GPP." This audit led to additional commitments in the audit itself to the undertaking to "sufficiently" protect the environment and groundwater sources.

b. The Cavanaugh and Waters Reports show that these undertakings were conducted negligently, and the Navy again undertook to fix the problems: "The Navy has a moral obligation and ethical duty to fix our mistakes, safeguard the environment, and rebuild trust. We must act."

105.   The United States, through Congress and its agencies, rendered these services because Congress and the agencies recognized that they were necessary for the protection of individuals like the plaintiffs.

106.   Federal officers breached the duty to exercise ordinary care after an undertaking in at least the following respects:

a. Officers failed to adhere to the proper valve sequencing in May 2021;

b. Officers failed to implement mandatory corrective actions after the May 2021 leak and prior leaks;

c. Officers violated mandatory provisions of the Safe Drinking Water Act;

d. Officers failed to install or replace pipes with mandatory steel piping;

e.  Officers knew or should have known of the fuel buildup in the PVC piping between May and November 2021 and failed to take corrective action;

f.  Officers failed to warn residents that the leaks had occurred in violation of federal and state law;

g.  Officers ordered junior servicemembers to flush hazardous fuel into groundwater without a permit and in violation of federal and state law;

h.  Officers knew that maintenance failures had compromised Red Hill and failed to take corrective action to prevent harm;

i.  Officers failed to properly remediate affected homes;

j.  Officers failed to test water samples for petroleum and destroyed water samples from affected homes; and

k.  Various other safety violations and breaches to be determined upon discovery.

107.  As a direct and proximate result of defendant's breach of duty of care, the plaintiffs have been injured.

108.  As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered substantial injuries and damages, including severe mental and emotional distress.

109.  As a direct and proximate result of the negligence of defendant and its

officials, the plaintiffs suffered special damages and will require testing/medical monitoring to be determined by expert testimony.

110.    Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate the plaintiffs for the negligence of the United States.

COUNT III: NUISANCE

111.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

112.    Plaintiffs are, or during some or all of the pertinent times were, in lawful possession of their properties on the Red Hill Navy water line, and used them, or had the right to use them, as residences or for other legitimate uses.

113.    The United States owned and materially controlled the Red Hill Bulk Fuel Storage Facility in close proximity to the plaintiffs' properties and the water well that provided water to the plaintiffs' properties.

114.    The United States is liable for creating a condition at the plaintiffs' residences that interfered with their right to use and enjoy those properties. The officers' conduct in operating the Red Hill Bulk Fuel Storage Facility thereby caused a nuisance to the plaintiffs.

115.    The plaintiffs' right to use and enjoy their properties has been impaired by the United States allowing fuel to leak from the Red Hill Bulk Fuel

39

Storage Facility into its water well, contaminating the water delivered to the plaintiffs' properties.

116.   The nuisance caused by the United States has substantially impaired the plaintiffs' use and enjoyment of their property, has caused inconvenience, decreased quality of life, exacerbated physical and mental discomfort, and led to reasonable fear of disease and adverse health effects.

117.   The United States has engaged in improper or negligent operation of the Red Hill Bulk Fuel Storage Facility, causing harm to the plaintiffs.

118.   Defendant's conduct has been unreasonable. Reasonable persons, generally, looking at defendant's conduct, the problems caused by it, and by the nature of the harm to the plaintiffs' properties and health, would consider defendant's conduct to be unreasonable.

119.   The invasions, harms, and injuries complained of herein by the plaintiffs are substantial invasions, harms, and injuries to the plaintiffs' health, both physical and mental.

120.   The United States had full knowledge during some or all of the pertinent times when the Red Hill Bulk Fuel Storage Facility leaked fuel into the water supply and caused nuisance injury and harm to the plaintiffs.

121.    The United States knew or should have known that leaking fuel into the water supply would invade the plaintiffs' properties and substantially impair

the plaintiffs' health and use and enjoyment of their properties.

122.   While knowing that practicable technologies and methods are available to abate fuel leaks, defendant has failed to abate the causes of nuisance.

123.   Defendant's conduct described above constitutes a series of recurring abatable nuisance, which defendant has failed to remedy within a reasonable period of time, and for which defendant is liable.

124.   As a result of defendant's liability for recurring abatable nuisance, the plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

## COUNT IV: INFLICTION OF EMOTIONAL DISTRESS

125.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

126.   By its acts and omissions, the United States caused fuel to leak into the water system and injure residents, which thereby caused the plaintiffs worry, anxiety, anguish, suffering, and grief.

127.   The United States knew that the Red Hill facility has a history of fuel leak water contamination, and that it was probable that additional leaks would occur and cause substantial damage if it did not act.

128.   The United States must now pay for the exact consequences that it knew would happen and for which it accepted the risk.

41

129.   Plaintiffs, as well as their children, spouses, and other occupants of their homes, have suffered, are suffering, and will continue to suffer because of the defendant's acts and omissions.

130.   Defendant's conduct was a substantial factor in causing the plaintiffs' severe emotional distress.

131.   Plaintiffs have been damaged in an amount to be proven at the time of trial.

COUNT V: PREMISES LIABILITY, DUTY TO CONTROL FORCE

132.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

133.   The United States is the occupier, owner, and possessor of the following premises: the Red Hill Bulk Fuel Storage Facility, the water system, and the housing which Plaintiffs leased and resided upon. While generally, "a landowner is not liable for injuries occurring after a lessee takes possession of the land," there are two well established exceptions:

134.   A lessor may be liable for a known but hidden condition. And a lessor may also be liable for nuisance emanations "that invade an individual's property from another location" and "interfere with an individual's right to use and enjoy land." *Mitchell v. United States*, No. 11-00088 HG-KSC, 2011 U.S. Dist. LEXIS 103409, at *18-21 (D. Haw. Sep. 9, 2011) (citing *Renz v. 33rd Dist. Agricultural*

*Assn.*, 39 Cal. App. 4th 61, 46 Cal. Rptr. 2d 67 (Cal. Ct. App. 1995)).

135.   As an occupier, owner, and possessor of land, the United States has a duty to use reasonable care for the safety of all persons reasonably anticipated to be on the premises.

136.   By its acts and omissions, the United States failed to use reasonable care for the safety of persons reasonably anticipated to be on the premises it controlled.

137.   By its acts and omissions, the government failed to warn of a known but latent hazardous condition.

138.   By its acts and omissions, the United States created a nuisance that invaded plaintiffs' property and interfered with their right to use and enjoy the land.

139.   "[T]o prove [a] claim for premises liability under Hawaii law, [plaintiff] must prove by a preponderance of the evidence that a condition existed . . . which posed an unreasonable risk of harm, and that Defendant failed to take reasonable steps to eliminate that risk or to adequately warn visitors about it." *Paredes v. United States*, No. 19-00161 WRP, 2022 U.S. Dist. LEXIS 63535, at *18 (D. Haw. Feb. 24, 2022).

140.   A condition existed which posed an unreasonable risk of harm. The United States contaminated plaintiffs' water system with fuel and other

43

contaminants. That contamination was known to the government but latent to others.

141.   The United States failed to take reasonable steps to eliminate that risk or to adequately warn residents about it. The government failed to warn residents of the May 2021 leak altogether. And the government waited *twelve days* to disclose the blast that occurred on November 20, 2021. And then, while the government disclosed the presence of JP-5, the government failed to disclose the presence of harmful additives like antifreeze.

142.   The United States knew or should have known of the hazard or defect that caused the injury.

143.   The United States was also in immediate control of a force—jet fuel at Red Hill Bulk Fuel Storage Facility and contaminated water in its drinking water system—that it knew or had reason to know was in dangerous proximity to persons on the land that it possessed, including Plaintiffs.

144.   The United States failed to control the force to prevent it from doing harm to plaintiffs.

145.   The United States failed to give a warning which was reasonably adequate to enable plaintiffs to protect themselves. The government could have avoided medical harm to the plaintiffs had the government disclosed the leaks and warned residents not to drink, bathe in, or otherwise use contaminated water.

146.   As a direct and proximate result of defendant's breach of duty of care to those on its premises and in dangerous proximity to the force controlled by the United States, the plaintiffs have been injured.

147.   As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered substantial injuries and damages, including severe mental and emotional distress.

148.   As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered special damages and will require testing/medical monitoring to be determined by expert testimony.

149.   Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate the plaintiffs for the negligence of the United States.

150.   Defendant's conduct described above constitutes premises liability, for which the United States is liable.

151.   As a result of defendant's premises liability, the plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

CAUSATION

152.   But for the conduct of the federal officers at Red Hill, the plaintiff families would not have suffered inconvenience, illness, economic injury, and fear.

153.   As a general matter, the ingestion of jet fuel and its contaminants

45

causes medical harm. Fuel is composed of toxic hydrocarbons that are highly dangerous to the human body. The Agency for Toxic Substances and Disease Registry (ATSDR) of the United States Department of Health and Human Services describes the long-lasting health effects of exposure to fuel chemicals. Such exposure can occur by breathing air in an area where an accident or leak of these jet fuels has occurred, touching contaminated soil, swimming in waters where jet fuels have been spilled, living near a hazardous waste site where jet fuels are disposed or, most directly, drinking such fuel.

154.   In the near-term, symptoms of such exposure regularly include headaches, fatigue, nausea, drowsiness, irritation of the throat and stomach, difficulty breathing, fever, and vomiting. In the long term, permanent damage to the central nervous system can result, as well as pneumonia, cancer, decreased immune response, decreased neurological function, impaired hearing, and skin alteration. Drinking too much jet fuel can lead to unconsciousness and death. Affected organ systems include the respiratory tract, gastrointestinal tract, nervous system, liver, kidneys, reproductive system, and harm to a developing fetus— miscarriages have been reported. Benzene, just one of the chemicals the EPA identified as present in the Red Hill fuel, causes chronic conditions such as aplastic

anemia, leukemia, and potentially multiple myeloma.[3]

155.   Specifically, each plaintiff has suffered inconvenience and life disruption, economic injury, illness, and fear and trauma.

156.   Each plaintiff is also at increased risk of future medical harm and will need medical monitoring for the associated long-term illnesses.

NO EXCEPTIONS APPLY

157.   None of the plaintiffs' claims asserted herein are subject to any of the exceptions to sovereign immunity found in 28 U.S.C § 2680.

158.   None of the negligent acts described herein were discretionary or subject to policy analysis.

---

[3] Benzene featured prominently as a substance present in another military water contamination case: the Camp Lejeune water contamination crisis. From the 1950s through the 1980s, people living or working at the U.S. Marine Corps Base Camp Lejeune, North Carolina, were exposed to drinking water contaminated with industrial solvents, including benzene. For those exposed to that contaminated water, the Department of Veterans Affairs now considers the following health conditions to be presumptively connected to their service:

- Adult leukemia
- Aplastic anemia and other myelodysplastic syndromes
- Bladder cancer
- Kidney cancer
- Liver cancer
- Multiple myeloma
- Non-Hodgkin's lymphoma
- Parkinson's disease

159.   None of the acts or omissions described herein are protected by the misrepresentation exception.

160.   The United States, including the US Navy and its employees, failed to meet the required reporting obligations as described herein.

161.   The United States, including the US Navy and its employees, failed to exercise due care in the execution of its duties under the required report obligations described herein.

JURISDICTION, VENUE & SERVICE

162.   This Federal District Court has federal-question jurisdiction because this action is brought pursuant to and in compliance with the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

163.   Venue is proper in this district pursuant to 28 U.S.C. § 1402(b) because the United States is a defendant, and this is the judicial district where the acts or omissions complained of in this complaint occurred.

164.   The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure. Service is affected by serving a copy of the Summons and Complaint on the United States Attorney for the District of Hawaii by certified mail, return receipt requested at her office:

> United States Attorney's Office
> ATTN: Civil Process Clerk

48

> 300 Ala Moana Blvd # 6-100
> Honolulu, HI 96850

165.   Service is also affected by serving a copy of the Summons and

Complaint on Merrick Garland, Attorney General of the United States, by certified

mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

### LIABILITY OF THE UNITED STATES

166.   This case is commenced and prosecuted against the United States of

America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort

Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. §

2674 because the personal injuries and resulting damages of which the Complaint

is made were proximately caused by the negligence, wrongful acts or omissions of

representatives, employees, or agents of the United States of America working for

the United States Department of the Navy, Army, or Defense, while acting within

the scope of their office, employment, or agency under circumstances where the

United States of America, if a private person, would be liable to the plaintiffs in the

same manner and to the same extent as a private individual.

167.   Through the Federal Torts Claim Act, the United States has waived its

sovereign immunity for the acts and omissions described here. *E.g.*, *Evans v.*

*United States*, 876 F.3d 375, 380 (1st Cir. 2017), *cert. denied*, 139 S. Ct. 81 (2018).

168.   The defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Red Hill Bulk Fuel Facility and staffed its facilities and vehicles with its agents, servants, and employees.

CONDITIONS PRECEDENT

169.   Pursuant to 28 U.S.C. § 2675(a), all plaintiffs timely presented their claims to the United States by submitting Forms SF-95 to the Vice Admiral Darse E. Crandall, Office of the Judge Advocate General, Tort Claims Unit Norfolk, 9620 Maryland Avenue, Suite 205, Norfolk, Virginia 23511-2949, via electronic email (tortclaimsunit@us.navy.mil), on March 30, 2023 and April 21, 2023. *See* Forms SF-95 for claims, attached as Exhibit A.

170.   Receipt of the March claims (Amanda Feindt, Brian Jessup, and Jessica Whaley) and April claims (Elizabeth Thompson-Watson and Dustin Wallace) were not acknowledged by the Navy.

171.   As of November 9, 2023 more than six (6) months elapsed since the claims were presented to defendant and defendant has not made a final disposition of the plaintiffs' claims. Accordingly, the claims of the plaintiffs are deemed denied pursuant to 28 U.S.C. § 2675(a).

172.   Plaintiffs have exhausted their administrative remedies under the

Federal Tort Claims Act and have fully complied with the statutory prerequisites for bringing this tort action against the United States.

DAMAGES

173.   As a result of the negligence of federal employees, agents, or representatives, the plaintiffs have sustained damages and injuries including:

    a.  Past and future physical pain and suffering;

    b.  Past and future mental anguish and emotional distress;

    c.  Past and future medical, healthcare, and attendant care expenses;

    d.  Past and future lost income and of earning capacity;

    e.  Past and future physical impairment;

    f.  Past and future loss of enjoyment and quality of life;

    g.  Past and future loss of enjoyment of property;

    h.  Increased risk of future harm and medical monitoring for life;

    i.  Loss of life expectancy;

    j.  Nuisance damages, including inconvenience, illness, and fear;

    k.  Out of pocket expenses;

    l.  Loss of personal property;

    m. Costs;

    n.  Prejudgment and post-judgment interest as provided by law, at the maximum legal rate; and

51

o.   Such other and further relief to which the plaintiffs may be justly

entitled.

PRAYER

WHEREFORE, plaintiffs pray that this Court:

a.   Award the plaintiffs compensatory damages, in an amount to be

determined at trial;

b.   Award the plaintiffs pre-judgment and post-judgment interest and any

other costs, expenses, or fees to which they may be entitled by law;

and

c.   Grant the plaintiffs such other and further relief as this Court deems

just and proper.

DATED:  Honolulu, Hawaii, November 9, 2023.

*Lyle S. Hosoda*

Lyle S. Hosoda                     /s/ Kristina S. Baehr
LYLE S. HOSODA                KRISTINA S. BAEHR
KOURTNEY H. WONG          JAMES BAEHR
SPENCER J. LAU                    MARY M. NEUSEL

                                             /s/ Frederick C. Baker
                                             FREDERICK C. BAKER
                                             JAMES W. LEDLIE
                                             KRISTEN HERMIZ
                                             CYNTHIA A. SOLOMON
                                             SARA O. COUCH

*Attorneys for Plaintiffs*

52