LYLE S. HOSODA                    3964-0
KOURTNEY H. WONG            10827-0
SPENCER J. LAU                    11105-0
HOSODA LAW GROUP, AAL, ALC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaii 96813
Telephone:   (808) 524-3700
Facsimile:     (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com

KRISTINA S. BAEHR          *Pro Hac Vice*
JAMES BAEHR                   *Pro Hac Vice*
MARY M. NEUSEL              *Pro Hac Vice*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 994-6241
Email: kristina@well.law; jim@well.law; maggie@well.law

FREDERICK C. BAKER        *Pro Hac Vice*
JAMES W. LEDLIE              *Pro Hac Vice*
KRISTEN HERMIZ              *Pro Hac Vice*
CYNTHIA A. SOLOMON       *Pro Hac Vice*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com;

*Attorneys for the Plaintiffs*

*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JESSICA WHALEY, AMANDA FEINDT, ELIZABETH THOMPSON-WATSON, BRIAN JESSUP, and DUSTIN WALLACE,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL NO. 1:23-cv-457<br>(FEDERAL TORT CLAIMS ACT)<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT UNITED STATES' PARTIAL MOTION TO DISMISS COMPLAINT [ECF NO. 21]<br><br>[Non-Hearing Motion]<br>Judge:  Hon. Leslie E. Kobayashi |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT
UNITED STATES' PARTIAL MOTION TO DISMISS COMPLAINT [ECF
NO. 21]**

**TABLE OF CONTENTS**

I.    RELEVANT FACTS ................................................................................1

II.   LEGAL STANDARD ...........................................................................11

III.  DISMISSAL IS NOT WARRANTED.................................................13

    A.   This Court Has Subject-Matter Jurisdiction Over Plaintiffs' Failure-to-Warn Claims Because They Arose from Operational Negligence. ................................................................................14

    B.   The Failure to Warn Claims Can Proceed Under a Premises Liability Cause of Action.................................................................17

    C.   The Government Did Not Have Discretion to Fail to Test Water Samples Appropriately Before and After Flushing. ...........................18

    D.   The Government Did Not Have Discretion to Fail to Properly Flush and Remediate Homes, Including Premise Plumbing. .............21

    E.   The Applicable Federal Policies Are Not Susceptible to the Policy Analysis the DFE Was Designed to Protect Because the Regulations Address Public Safety During an Emergency. ...............24

IV.  CONCLUSION...................................................................................27

## TABLE OF AUTHORITIES

**Cases**

*Andrulonis v. United States*, 952 F.2d 652, 655 (2d Cir. 1991) ..............................25

*ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir. 1987) ....................25

*Bear Med. v. United States*, 241 F.3d 1208 (9th Cir. 2001) ....................... 12, 22, 26

*Berkovitz v. United States*, 486 U.S. 531 (1988) .......................................................11

*Bunting v. United States*, 2020 U.S. Dist. LEXIS 210416 (E.D.N.C. Nov. 10, 2020)

.................................................................................................................................23

*Burgess v. United States*, 375 F. Supp. 3d 796 (E.D. Mich. 2019) .................. 24, 26

*Cabalce v. VSE Corp.*, 914 F. Supp. 2d 1145 (D. Haw. 2012) ...............................12

*Callas' Estate v. United States*, 682 F.2d 613 (7th Cir. 1982) ................................22

*Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287 (9th Cir. 1989)

........................................................................................................................ 25, 26

*Dreier v. United States*, 106 F.3d 844 (9th Cir. 1996) .............................................13

*Eleodoro Garcia, et al., v. United States of America,* No. 19-00658, 2023 WL

8878773 (D. Haw. Dec. 22, 2023).......................................................................12

*Fochtman v. Honolulu Police and Fire Departments,* 65 Haw. 180, 649 P.2d 1114,

(1982).....................................................................................................................20

*Gonzalez v. United States*, 814 F.3d 1022 (9th Cir. 2016) .....................................24

*Green v. United States*, 630 F.3d 1245 (9th Cir. 2011) ...........................................13

*In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 583 F.Supp.2d 758 (E.D. La. 2008) ...................................................................................................25

*In re Yosemite Nat'l Park Hantavirus Litig.*, 2016 WL 758671 (N.D. Cal. Feb. 26, 2016) ...................................................................................................25

*Jones v. United States*, 691 F. Supp. 2d 639 (E.D.N.C. 2010) ................................23

*Lam v. United States*, 979 F.3d 665 (9th Cir. 2020) ...............................................11

*Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014) ..................................................12

*Nanouk v. United States,* 974 F.3d 941 (9th Cir. 2020)............................................25

*Tabieros v. Clark Equip. Co.,* 944 P.2d 1279 (Haw. 1997) .....................................19

*United States v. Gaubert*, 499 U.S. 315 (1991) ................................................. 11, 26

*United States v. Olson*, 546 U.S. 43, 126 S. Ct. 510 L.Ed.2d 306 (2005)..............18

*Walters v. Flint*, 627 F. Supp. 3d 734 (E.D. Mich. 2022) .......................................18

*Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005)........................ 12, 23, 24

*Williams v. United States*, 711 F. Supp. 2d 1195 (D. Haw. 2010) ..........................18

*Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean, Geological Formation,* 524 F.3d 1090 (9th Cir.2008) ......................................................................................13

**Statutes**

28 U.S.C. § 1346(b)(1).............................................................................................11

28 U.S.C. § 2680(a) .................................................................................................11

28 U.S.C. § 2680(h) ...........................................................................................14

33 U.S.C. § 1251 .................................................................................................4

33 U.S.C. §§ 1311 ........................................................................................ 6, 21

40 CFR § 280.12 ..................................................................................... 5, 21, 22

HAR § 11-280.1-1 ............................................................................................4, 5

HRS § 342D-50 ...................................................................................................6

**Other Authorities**

Dr. Brewer Video Report, available at:

   https://www.youtube.com/watch?v=aKpDPX8_Z9k...............................................9

**Rules**

Fed. R. Civ. P. 12(b)(1).......................................................................................12

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT UNITED STATES' PARTIAL MOTION TO DISMISS COMPLAINT [ECF NO. 21]**

The Government seeks to shield itself from responsibility for negligent failures to warn, remediate, and test under the auspices of the Discretionary Function Exception ("DFE") to the Federal Tort Claims Act ("FTCA"). The allegations in the Complaint [ECF No. 1] (and applicable supporting evidence), plead and prove *mandatory* (not discretionary) law, rules, and orders requiring timely and proper warning, remediation, and sampling/testing. These applicable federal policies are not susceptible to the policy analysis the DFE was designed to protect because the regulations address public safety during a contamination emergency. The Government's PMTD should be denied.

## I.    RELEVANT FACTS

1.    On at least two separate occasions, on May 6 and November 20, 2021, the Government made negligent errors that released thousands of gallons of jet fuel and other contaminants into the drinking water. *Id.* ¶4. Instead of promptly and appropriately addressing the harm, the Government conducted an inadequate clean-up and clearing effort. *See id.*

2.    The Government determined the root cause of the May 6 incident to be a "disregard of proper valve sequencing dictated in the specific Operations

Orders," as well as several other factors, all of which could have been prevented by proper adherence to the rules." *Id.* ¶13.

3.    In 2008, the Government entered into an agreement with the State of Hawaii ("State") titled the Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan ("GPP"). The GPP required that the Government implement a rigorous tank maintenance program and continue to research and investigate leaks. *Id.* ¶42.

4.    The Government's internal audit found that it was not in compliance with the GPP. *Id.* ¶43.

5.    In January 2014, an improperly repaired fuel tank leaked up to 27,000 gallons of jet fuel into the facility. *Id.* ¶44.

6.    To prevent additional fuel leaks, the Government entered into an Administrative Order on Consent ("AOC") in 2015 with the State Department of Health ("DOH") and the Environmental Protection Agency ("EPA"). *Id.* ¶45.

7.    The EPA Website states:

In response to the January 2014 fuel release from the facility, EPA and Hawai'i Department of Health (DOH) negotiated an *enforceable agreement*, also known as the 2015 Administrative Order on Consent (AOC), with the U.S. Navy and the Defense Logistics Agency (DLA). The Order requires the Navy and DLA to *take actions*, subject to DOH and EPA approval, to address fuel releases and implement infrastructure improvements to protect human health and the environment."

U.S. Environmental Protection Agency, 2015 Administrative Order on

Consent, (emphasis added) (hereinafter "AOC"), attached as Ex. 1.

8.      The AOC states in relevant part:

Navy and DLA, as the owner and/or operator of the Facility are *subject to requirements regarding response and remediation* in HRS chapter 342L and Hawaii Administrative Rules ("HAR") chapter 11-281 [40 C.F.R. §280 Subpart E] and *are subject to orders which may be necessary to protect the health of persons who are or may be users of a public water system as provided in HRS chapter 340E and the rules promulgated pursuant thereto including, but not limited to, HAR §11-19 and 11-20, and are subject to administrative orders and civil actions which are necessary to address discharges to state waters as provided for in HRS chapter 342D.* (¶5(a)(ix)).

The actions Navy and DLA *have agreed to perform* in accordance with this AOC are necessary to address potential impacts to human health, safety and the environment . . . due to historical, recent and potential future releases at the Facility. (¶5(a)(x)).

In the event that during the performance of this AOC, Navy and/or DLA encounters *any condition or situation that constitutes an emergency situation or may present an immediate threat to human health or the environment, Navy and DLA shall immediately take all appropriate actions to prevent and/or minimize such emergency or threat*, and shall immediately notify the DOH Project Coordinator and the EPA Project Coordinator. Navy and DLA shall take such immediate and appropriate actions in consultation with the DOH Project Coordinator and the EPA Project Coordinator. Navy and DLA shall then submit to DOH and EPA written notification of such emergency or threat at the Site within twenty-four (24) hours of such discovery and, if further action is required, submit a plan to further mitigate the threat within seven (7) days of sending the written notification of the emergency. (¶8(a)(ii)).

*Compliance by Navy and DLA with the terms of this AOC shall not relieve Navy and DLA of their obligations to comply with applicable local, state, or federal laws and regulations.* (¶18(d)).

3

(Emphases added.)

9.      As part of the AOC, the Navy filed Statements of Work to outline its plan to avoid drinking water contamination. One such Statement of Work included the development of a testing system based on a Risk-Based Criteria Development Plan, Investigation and Remediation of Releases and Groundwater Protection and Evaluation. Red Hill Bulk Fuel Storage Facility, Statement of Work (Dec. 11, 2017) (attached as Ex. 2). In it, the Navy identified the need to test for TPH, especially near the Red Hill Shaft where "contaminants such as total petroleum hydrocarbons (TPH), naphthalene, 1- and 2-methylnaphthalene, and toluene have been detected…" *Id.* at 1-7. Three types of TPH are marked as Chemicals of Potential Concern and are the first three such chemicals listed for required monitoring and testing at the Red Hill Well. *Id.* at 3-1.

10.      Federal statutes enacted years after the FTCA, including the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.*, and the Safe Drinking Water Act ("SDWA"), in addition to the AOC, required the Government to comply with specific mandatory federal, state, and local pollution regulations for sampling/testing and remediation of contamination.

11.      New underground storage tank rules became effective in July 2021. *See* HAR § 11-280.1-1 *et. seq.* The Navy was required to notify the DOH within 24 hours of any release. HAR § 13-280.1-50. (An "underground storage tank

4

system" includes connected underground piping. HAR § 11-280.1-13; 40 CFR § 280.12.) The Navy was required to "immediately clean up all spills and overfills in a manner which is protective of human health and the environment as set forth in section 11-280.1-65.3." HAR § 11-280.1-53(a). The Navy was required to:

> *remediate* contaminated soil, groundwater, and surface water at the site to residual concentrations that meet one of the following criteria: (1) Default Tier 1 Screening Levels as presented in Table 1 in subsection (e); or (2) Site-specific action levels as approved by the department.

HAR § 11-280.1-65.3 (emphasis added). Table 1 requires that TPH levels be measured. *Id.*

12.    On November 20, 2021, a train cart within the Red Hill facility struck a retention line, releasing almost 20,000 gallons of fuel into the lower access chamber near the Red Hill Well. Compl. ¶¶ 16-24. Despite multiple known pathways to the environment from a spill in close proximity to the Red Hill Well, the Red Hill Well was not shut off until over a week after the release.

13.    On November 27-28, 2021, residents of military housing neighborhoods began to complain to the Government and the DOH about issues with their water. They reported smelling fuel and seeing sheens. *Id.* ¶23.

14.    On November 28, 2021, despite multiple resident reports that water "smelled of fuel," the Government nevertheless did not issue a Public Notification as required by the SDWA. *Id.* ¶25-28.

5

15.    During its remediation efforts, the Navy opened hydrants that spread contaminated water into residential streets, yards, and storm drains that run into the ocean in violation of the CWA. 33 U.S.C. §§ 1311, 1342(b). The DOH had to issue a cease-and-desist order to the Navy to stop flushing in violation of the CWA and HRS § 342D-50. The United States has admitted "that the DOH instructed the Navy to stop its flushing activities on the basis that the flushing did not comply with DOH flushing guidelines. *See* December 8, 2021 Letter from Kathleen S. Ho, Deputy Director for Environmental Health." United States of America's Answer to Fifth Amended Complaint, ECF No. 256, *Feindt v. United States of America*, No. 1:22-cv-397 (D. Haw. Jan. 25, 2024).

16.    Premises plumbing, such as water heaters, were not fully inspected, remediated, or replaced after the water contamination event.

17.    On February 14, 2022, water in one portion of the Red Hill housing complex was cleared as safe to drink by the DOH. This clearance was based on testing only 10% of the affected homes despite repeated requests from families to test all of the homes.

18.    The Navy's Preliminary Sampling Plan indicated that the purpose of sampling was "for analyses of *petroleum hydrocarbons* [sic] impacts from the Red Hill Shaft." U.S. Navy, *Joint Drinking Water Sampling Plan* at 1 (excerpts attached as Ex. 3). That plan stated that the Navy would "[c]ollect screening water

6

samples from locations where flushing has been tentatively completed . . . *The samples will be analyzed for . . . (TPH-G, TPH-D, TPH-O). Id.* at 1-2.

19.   In September 2022, reports emerged that water samples taken by government personnel from over 1,000 affected homes were "never tested for fuel" and were ultimately discarded. Sophie Cocke, *Hundreds of Water Samples Never Tested for Fuel,* HONOLULU STAR ADVERTISER (Sept. 6, 2022), attached as Ex. 4.

20.   The Government's flushing of its "main distribution system" and family homes "likely diluted" the presence of contaminants and diminished the ability to ascertain the chemical composition in the contaminated water.  *Id.* The Navy ultimately collected water samples from over 1,000 homes, but never tested these samples for "petroleum chemicals. . . . Instead, the Navy did a rough screening of the samples for total organic carbon, which can indicate that the water is contaminated but not with what." *Id.* The Navy then represented these tests on their online database as "non-detect." *Id.* The Navy could have sent the samples that it collected from homes to certified labs for additional testing, but instead said it dumped the water and threw out the vials after one month of storage. *Id.*

21.   The failure to test comprehensively at the time and for the appropriate substance undermined the ability of public health officials to understand the full extent of exposure. As Dr. Roger Brewer of the DOH wrote publicly:

7

> Sample collection and testing by both the Navy and the Hawaiʻi [DOH] during flushing of the drinking water system focused on testing of water anticipated to be clean. These data cannot be assumed to be representative of contaminant types and exposure conditions during the initial contamination period or other episodes when health effects took place. To the authors' knowledge, no sample data collected within the JBPHH system exist that document actual exposure conditions at the time of acute to subchronic health effects experienced by residents.

DOH, JBPHH JP-5 Exposure Assessment (June 2023), attached as Ex. 5.

22.    Dr. Brewer's report discusses the efficacy of using Total Organic Carbon ("TOC") as a proxy for JP-5 contamination:

> Total Organic Carbon (TOC) . . . was intended to serve as a surrogate for more comprehensive Total Petroleum Hydrocarbon (TPH) and volatile organic compound data that could be used to directly assess health risks but could take up to two weeks to report (USDN 2022a). *Laboratory data for TOC were later determined to be unreliable due to the elevated laboratory detection limit in tapwater (up to 5,000 μg/L) and the inability of the data to identify water that was obviously contaminated with fuel in the field.*

Hawaii Department of Health, *JP-5 Exposure Assessment Update* at 2 (updated Oct. 2, 2023), attached as Ex. 6 ("Exposure Assessment") (emphasis added).

23.    In a video report, Dr. Brewer states that the detection levels used for testing TOC were too high (5 mg/L) to detect JP-5 constituents which left the DOH with, "no data for a contaminated drinking water system." Dr. Brewer states that, "TOC data is totally unreliable" and that, "some samples that were obviously heavily contaminated (with) jet fuel came back non-detect for total organic

8

carbon." Dr. Brewer Video Report, available at:

https://www.youtube.com/watch?v=aKpDPX8_Z9k.

24.   Dr. Brewer also noted "corrosivity of water from hot water heaters. . . possibly due to corrosion of the water heater sacrificial anode by jet fuel. Residents reported that persistent skin rash problems following flushing of the drinking water system disappeared *following replacement of the water heater* at the home." Exposure Assessment at 9.

25.   The 2015 Administrative Order on Consent ("AOC") contains the following relevant terms and conditions regarding sampling and testing:

> Termination of this AOC shall not terminate Navy and DLA's obligation to comply with Sections 10 (Sampling and Access) and 21 (Record Retention) of this AOC
> . . .
> Navy and DLA shall use laboratories that have a documented quality system that complies with the "Uniform Federal Policy for Quality Assurance Project Plans" . . . and the "EPA Requirements for Quality Management Plans for Environmental Data Operations . . .
>
> **40 CFR §280.53 Reporting and clean up of spills and overfills** – Owners and operators of UST systems *must* contain and immediately clean up a spill or overfill and report to the implementing agency within 24 hours, or another reasonable time period specified by the implementing agency, and begin corrective action in accordance with subpart F of this part in the following cases: (1) Spill or overfill of petroleum that results in a release to the environment that exceeds 25 gallons or another reasonable amount specified by the implementing agency, or that causes a sheen on nearby surface water…
>
> **Subpart F - Release Response and Corrective Action for UST Systems Containing Petroleum or Hazardous Substances**

9

**40 CFR §280.60** – **General** - Owners and operators of petroleum or hazardous substance UST systems *must*, in response to a confirmed release from the UST system, comply with the requirements of this subpart . . .

**40 CFR §280.62 – Initial abatement measures and site check** - Unless directed to do otherwise by the implementing agency, owners and operators *must* perform the following abatement measures:

(5) Measure for the presence of a release where contamination is most likely to be present at the UST site, unless the presence and source of the release have been confirmed in accordance with the site check required by § 280.52(b) or the closure site assessment of § 280.72(a). *In selecting sample types, sample locations, and measurement methods, the owner and operator must consider the nature of the stored substance, the type of backfill, depth to groundwater and other factors as appropriate for identifying the presence and source of the release.*

26.    Multiple recent reports by the EPA confirm that petroleum is

*currently still detectable* in the water at homes on the water line.

"[A] report from the Environmental Protection Agency released this week confirmed that there are still detectable levels of fuel in some homes on the Navy water system.

EPA investigators tested four homes of residents complaining of symptoms. Three of them had traces of petroleum in the water . . . In each case, previous Navy testing had shown no traces.

Kevin Knodell, *Fuel Found in Some Homes on Navy Water System, New EPA Report Finds*, Honolulu Star-Advertiser, Dec. 22, 2023, attached as Ex. 7.

29.    The EPA's report flags for particular concern premises plumbing and

calls for "[i]nspection and/or sampling of water heaters and premise plumbing" to

"[i]nvestigate whether flushing, maintenance and/or replacement of the water

10

heaters at affected homes may resolve symptoms." U.S. EPA, *Report on Red Hill Investigation: Drinking Water Complaints*, (Oct. 2023), attached as Ex. 8.

## II.    LEGAL STANDARD

The FTCA provides a limited waiver of the sovereign immunity that Government employees are generally afforded, providing jurisdiction over certain civil actions against the Government. 28 U.S.C. § 1346(b)(1). The DFE limits the FTCA's waiver of immunity and excepts tort claims in which the alleged tortfeasor was performing a discretionary function or duty when the plaintiff was injured. 28 U.S.C. § 2680(a).

In deciding whether the DFE applies in an action, a court must answer two questions in the affirmative: (1) Did the relevant "federal statute, regulation, or policy" (collectively, "Federal Policies") allow for discretion?; and (2) Were those Federal Policies susceptible to the policy analysis the DFE was designed to protect? (together, "the DFE Test"). *Lam v. United States*, 979 F.3d 665, 678 (9th Cir. 2020); *see also*, *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (providing that the DFE applies where the "challenged conduct involves an element of judgment," and where "that judgment is of the kind that the discretionary function exception was designed to shield"); *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (same). The applicable Federal, State and Local laws, rules and the AOC are required to be read "in their totality and how they fit

together to determine if they are discretionary or mandatory." *Eleodoro Garcia, et al., v. United States of America,* No. 19-00658, 2023 WL 8878773, at 20 (D. Haw. Dec. 22, 2023).

"When the discretionary function exception is invoked, the Government bears the burden of establishing that the discretionary function exception applies." *Cabalce v. VSE Corp.*, 914 F. Supp. 2d 1145, 1157–58 (D. Haw. 2012) (citing *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005).; *Bear Med. v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001)).

For purposes of this PMTD, the Government does not dispute the factual allegations but argues that its conduct was discretionary and thus excepted, a facial challenge. When analyzing a DFE challenge as a facial challenge, "the Ninth Circuit has explicitly held that all of the factual allegations in the plaintiff's complaint are to be taken as true." *See Garcia,* at 4 (internal citations omitted). Here, accepting the [Plaintiffs'] allegations as true and drawing all reasonable inferences in [their] favor, a court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "On a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), proof of jurisdictional facts may be supplied by affidavit, declaration, or any other evidence properly before the court, in addition to the pleadings challenged by the motion." *Green v. United States*, 630

12

F.3d 1245, 1248 n.3 (9th Cir. 2011) (citation omitted). When considering items outside the pleadings, the district court "resolve[s] all disputes of fact in favor of the non-movant." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996).

"As a general rule, when '[t]he question of jurisdiction and the merits of [the] action are intertwined,' dismissal for lack of subject matter jurisdiction is improper." *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean, Geological Formation,* 524 F.3d 1090, 1094 (9th Cir.2008) (quoting *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). This occurs when, as here, "a party's right to recovery rests upon the interpretation of a federal statute that provides both the basis for the court's subject matter jurisdiction and the plaintiff's claim for relief." *Id.* (citations omitted).

## III.    DISMISSAL IS NOT WARRANTED

Plaintiffs' claims for negligence specifically include allegations that federal officers: (1) "failed to warn residents that the leaks had occurred in violation of federal and state law," *id.* ¶ 92(f); (2) "failed to take corrective action," *id.* ¶ 92(b), (e), (h) and (3) "failed to test water samples for petroleum and destroyed water samples from affected homes," *id.* ¶¶ 467(j), 481(k). The applicable laws, rules and AOC were mandatory and required the Government to warn, remediate, test, and

sample consistent with standards and public policy; the Government's conduct is

not excepted by the DFE.

### A. This Court Has Subject-Matter Jurisdiction Over Plaintiffs' Failure-to-Warn Claims Because They Arose from Operational Negligence.[1]

Plaintiffs' failure to warn claims are not subject to the misrepresentation

exception because they arise from the Government's negligent performance of an

operational task. While the FTCA includes certain exceptions and excludes "[a]ny

claim arising out of . . . misrepresentation, deceit, or interference with contract

rights . . . ." 28 U.S.C. § 2680(h), it does not exclude operational failures such as

the Government's failure to issue a Safe Drinking Water Act public notification.

In *Block v. Neal*, the Supreme Court held that the misrepresentation

exception did not apply because plaintiffs' claims were not "in essence" about

misstatements—they were about the Government failing to supervise and inspect

plaintiff's home. 460 U.S. 289, 296-97 (1983) ("the Government's misstatements

are not essential to plaintiffs' negligence claim."). Where, as here, the case is

fundamentally about the Government's negligence in performing operational tasks,

---

[1] Plaintiffs seek to preserve their argument. This Court ruled on a similar argument in the *Feindt* matter. Order Granting in Part and Denying in Part Defendant's Partial Motion to Dismiss Fourth Amended Complaint, Dkt. No. 227, *Feindt v. United States of America*, No. 1:22-cv-397 (D. Haw. Jan. 11, 2024)("*Feindt* Order").

rather than reliance on the communication of information, the misrepresentation exception to the FTCA does not apply. *Guild v. United States*, 685 F.2d 324, 325 (9th Cir. 1982); *accord Mundy v. United States*, 983 F.2d 950, 952 (9th Cir. 1993) (reversing dismissal of negligence claim regarding "operational task" of "processing a requested security clearance" because the Government's communication was only "collaterally involved" in the injury).

Here, the essence of Plaintiffs' negligence claims is that the Government failed to use due care in performing operational tasks at Red Hill, both for the fuel facility it operated and for the public drinking water system that it also operated. It is beyond dispute that on May 6, 2021, and November 20, 2021, federal officers violated mandatory regulations and operations orders that caused the release of thousands of gallons of jet fuel into the environment. But Plaintiffs' complaint also alleges that the Government negligently operated the drinking water system in defiance of mandatory, operational tasks.

One of those mandatory, operational tasks for the operator of a public drinking water system is the issuance of a public notification within 24 hours under certain circumstances. Compl. ¶¶ 25-28.

Any other interpretation of the misrepresentation exception "would encourage the government to shield itself completely from tort liability by adding misrepresentations to whatever otherwise actionable torts it commits."

15

*Block*, 460 U.S. at 296-97. In fact, the Government could never be held responsible for failing to issue a Safe Drinking Water Act notification – which inevitably involves communication – if all failures of communication fall under the misrepresentation exception. As asserted, the Government has expressly waived sovereign immunity under the Safe Drinking Water Act. 42 U.S.C. §§ 300f-300j (1996).

In this case, the failure to warn alleged as part of Counts I, II, & V primarily allege operational negligence, and only secondarily allege misrepresentations. The court in *Burgess* relied upon the same reasoning to reject the Government's motion to dismiss under the misrepresentation exception, because "the gravamen of Plaintiff's complaint is that the EPA was negligent in its performance of operational tasks, that being to respond to residents' complaints and provide them with guidance." *Burgess v. United States*, 375 F. Supp. 3d 796, 817 (E.D. Mich. 2019). The court held that the misrepresentation exception was "inapplicable." *Id.* It is just as inapplicable here.

*Holcombe v. United States* is also highly instructive. 388 F. Supp. 3d 777 (W.D. Tex. 2019) In *Holcombe*, plaintiffs' family members were killed or injured in a church at Sutherland Springs, TX because the Government failed to report prior court-martial convictions to the gun purchase background check system as they were required to do. The Government argued that the misrepresentation

16

exception barred plaintiffs' claims. The court rejected the argument. *Id.* at 795; *see also*, *Estate of Rideout v. United States*, No. 22cv278-JO-WVG, 2023 U.S. Dist. LEXIS 122928 (S.D. Cal. 2023) (failure to report mental incompetency by the Government was an operational task not barred by the misrepresentation exception).

Here, the Government failed to perform an operational duty – issuing a Safe Drinking Water Act public notification – that it was required to perform just as it was required to report a disqualifying status to the gun background check system. In both cases, these failures could be typified as failures of communication or failures to warn. But because they are, at essence, operational requirements, they are not barred by the misrepresentation exception.

## B. The Failure to Warn Claims Can Proceed Under a Premises Liability Cause of Action.

As this Court recently ruled in the *Feindt* Order, the Government can be held liable under the FTCA for the failure to warn of a known hazard through a premises liability theory. Under Hawaii law "a lessor has a duty to warn a lessee of dangerous conditions known to the lessor but not known or obvious to the lessee, even when the dangerous condition exists in an area not controlled by the lessor." *Hao v. Campbell Estate*, 76 Hawaii 77, 81, 869 P.2d 216, 220 (1994) (citing *Kole v. AMFAC, Inc.,* 69 Haw. 530, 750 P.2d 929 (1988)).

17

In this case, Plaintiffs have alleged a premises liability claim – since the Government owned and operated the fuel facility, the water system, and the land upon which Plaintiffs resided. The Government was better suited to know of the risk to Plaintiffs posed by the fuel leaks into the water system, and to warn them of it. As this Court held in *Feindt*, the Restatement permits recovery under such a theory.

**C. The Government Did Not Have Discretion to Fail to Test Water Samples Appropriately Before and After Flushing.**

Plaintiffs' failure to test and remediate counts are encompassed under its counts for Negligence and Negligent Undertaking. Under Hawaii law, "Good Samaritan" negligence liability arises when one voluntarily undertakes a duty, and then fails to perform with care. *Williams v. United States*, 711 F. Supp. 2d 1195, 1207 (D. Haw. 2010).  The Supreme Court has repeatedly found that the United States can be held liable under the Federal Tort Claims Act if a private person would face good Samaritan liability under state law. *United States v. Olson*, 546 U.S. 43, 126 S. Ct. 510, 163 L.Ed.2d 306 (2005).

Once the Government makes the decision to act to remediate, it is liable if it does so negligently. For example, in *Walters v. Flint,* the court held that the plaintiffs' FTCA claims against the EPA survived the EPA's motion to dismiss. 627 F. Supp. 3d 734 (E.D. Mich. 2022). The plaintiffs successfully argued that the

EPA, in accordance with Michigan's Good Samaritan law, did not fall within the DFE because once the Government undertook to remediate the water contamination for Flint's residents, it did so negligently.

"Hawaii case law relating to the voluntary assumption of a duty or undertaking has generally followed the Restatement (Second) of Torts (1965)." *Tabieros v. Clark Equip. Co.,* 944 P.2d 1279, 1301–02 (Haw. 1997). The Restatement provides that "One who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person . . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm." The Restatement (Second) of Torts § 324A (1965).

Here, the Government, by having established regulations regarding the Navy's response and remediation of "fuel releases" at the Red Hill Facility and requiring that "Navy and DLA [] immediately take all appropriate actions to prevent and/or minimize [a] emergency or threat [*to human health or the environment*]" created a good Samaritan duty, which the Government is required to carry out in a careful manner.

Hawaii courts have also noted that "if there is no duty to come to the assistance of a person in difficulty or peril, there is at least a duty to avoid any

19

affirmative acts which makes his situation worse." *Fochtman v. Honolulu Police and Fire Departments,* 65 Haw. 180, 183, 649 P.2d 1114, 1116 (1982). The affirmative acts of the Government, in its initial flushing process, increased the risk of harm to Plaintiffs by exposing them to toxic fumes and contaminating the soil and groundwater at Plaintiffs' residences in defiance of the DOH.

Once the Government exercised its discretion to test water samples, it was obligated to use due care to test according to a reasonable standard of care. In this case, the Government's Statement of Work in the Administrative Order on Consent and the Joint Drinking Water Sampling Plan make clear that (1) the Government knew that TPH was the primary "chemical of concern" from a Red Hill release, (2) the Government planned to test for it, and (3) the Government had the capability to test for it. Instead of doing so systematically after the 2021 fuel release, it chose not to do so. This failure led to foreseeable difficulties of public health officials such as Dr. Brewer to be able to assess the scope of the contamination and Plaintiffs' exposure to these harmful chemicals. It also complicated assessing the efficacy of remediation, as the testing data was "unreliable." *See* Exposure Assessment at 2. As the recent EPA report demonstrates, however, the homes remain contaminated with TPH.

20

**D. The Government Did Not Have Discretion to Fail to Properly Flush and Remediate Homes, Including Premise Plumbing.**

Statutes, regulations, and the AOC contain mandatory requirements for the Government to properly and timely remediate homes. Federal and state statutes specifically prohibited the discharge of any pollutant into waters of the United States that are not authorized by a permit. *See* 33 U.S.C. §§ 1311, 1342(b); HRS § 342D-50. The operative words "shall" and "must" appear consistently throughout the applicable Federal Policies. For example, "[u]nless directed to do otherwise by the implementing agency, owners and operators *must . . .* : prevent further migration of the released substance into surrounding soils and groundwater." 40 C.F.R. § 280.62. The Government is also required to "[c]onduct free product removal in a manner that minimizes the spread of contamination into previously uncontaminated zones by using recovery and disposal techniques appropriate to the hydrogeologic conditions at the site, and that properly treats, discharges or disposes of recovery byproducts in compliance with applicable local, state, and federal regulations." 40 CFR. § 280.64. The Government was required to follow these rules under the Administrative Order on Consent, which obligated the Navy "to comply with applicable local, state, or federal laws and regulations." AOC ¶18(d).

21

First, the Government's remedial flushing program violated these clear mandates. The Government flushed contaminated water directly into yards in violation of the CWA and Hawaii Revised Statutes Chapter 342D-50 until it was ordered to stop by the DOH – as the Government admitted in its *Feindt* Answer. This constitutes open violation of a clear, operational mandate.

Similarly, the Government's failure to replace piping and water heaters also violated standards. As Dr. Brewer noted, residents continued to report contamination in water heaters, causing harm. Despite its legal obligations that made clear it "*must* contain and immediately clean up a spill," 40 CFR §280.53, and that it must "[c]onduct free product removal in a manner that minimizes the spread of contamination" in 40 C.F.R. § 280.64. The recent EPA report reveals that TPH and premises plumbing is impacting residents with rashes precisely because proper flushing and plumbing remediation *still* has not occurred.

These continuing failures are not discretionary. It is impossible to square the mandatory requirements with releasing contaminated water onto Plaintiffs' yards and into public drains or ignoring continuing harm to Plaintiffs from their water heaters. While the Government may have had discretion to create a flushing plan, the Government had no discretion to carry out its alleged "flushing" negligently or in violation of the clear mandates. *Callas' Estate v. United States*, 682 F.2d 613, 624 (7th Cir. 1982) (explaining that "the government has no discretion to carry out

22

its policies negligently"); *Bear Medicine*, 241 F.3d at 1216-17 ("'The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not.'").

The DFE does not apply in FTCA cases when manuals, directives, and statutes identify a threat and require action. *See Jones v. United States*, 691 F. Supp. 2d 639, 642-43 (E.D.N.C. 2010) *see also, Bunting v. United States*, 2020 U.S. Dist. LEXIS 210416, at *6-8 (E.D.N.C. Nov. 10, 2020); *Whisnant*, 400 F.3d at 1182-83.

For example, in *Jones*, the court rejected a DFE argument regarding contaminated drinking water at Camp Lejeune. The "Navy had notice of the presence and toxicity of the chemicals at issue in the water supply of Camp Lejeune. And specific instructions were in place regarding the types of chemicals that Plaintiff alleges were responsible for her injuries." *Jones*, 691 F. Supp. 2d at 643. In these circumstances, the DFE did not apply.

So too here. The Navy had notice of the presence and toxicity of JP5 and its chemical constituents – TPH – in the water system. Directives, regulations, and statutes regarding these types of chemical and the threat they posed to Plaintiffs were available and applicable. Prompt, effective testing and remediation was required. As a result, the first prong of the discretionary function test is not met. As set forth below, neither is the second prong.

23

**E. The Applicable Federal Policies Are Not Susceptible to the Policy Analysis the DFE Was Designed to Protect Because the Regulations Address Public Safety During an Emergency.**

The Federal Policies at issue here – appropriate warning, testing, and prompt and thorough remediation to protect public health – are not susceptible to policy analysis that the DFE was designed to protect. The Flint water contamination decisions, *Burgess*, is instructive. *See Burgess*, 375 F. Supp. 3d at 816 . Once there was a finding of lead levels over the federal limit and the state was not taking appropriate action, the EPA should have intervened. Furthermore, the court held that there were no countervailing policy considerations that could justify the delay: "This Court similarly cannot conceive of a public policy consideration that could be legitimately balanced against the need to warn and protect an entire community from involuntary and continued poisoning." *Id.*.

Similarly here, the Government's failures to warn and protect cannot be legitimately balanced against any discernable public policy consideration. *The Government's reliance on the emergency nature of the crisis cannot logically provide a countervailing public policy, as the policies at issue were themselves designed for just such emergencies*. They are the precise policy choices already made by Congress and regulators to respond to emergencies like this. The Ninth Circuit has applied *Whisnant* to hold the government liable for "'a failure to effectuate policy choices already made," and "largely in cases involving public

24

health and safety…" *Gonzalez v. United States*, 814 F.3d 1022, 1034–35 (9th Cir.

2016) (quoting *Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287,

290 (9th Cir. 1989)); *Nanouk v. United States,* 974 F.3d 941, 950 (9th Cir. 2020)

(once the government reached that decision, its failure to conduct the clean-up in a

timely manner thereafter was "not the result of a policy choice," but "simply a

failure to effectuate policy choices already made."). *See also Andrulonis v. United*

*States*, 952 F.2d 652, 655 (2d Cir. 1991)  (federal scientist's failure to warn

bacteriologist of the hazards associated with rabies vaccine being used in

laboratory experiments did not implicate any policy of the federal agency); *In re*

*FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 583 F.Supp.2d 758, 782-84 (E.D.

La. 2008) (concluding that FEMA's response (or lack thereof) after learning of

unsafe levels of formaldehyde in temporary housing provided to victims of

Hurricanes Katrina and Rita was guided by fear of litigation, which was not a

permissible exercise of policy judgment); *In re Yosemite Nat'l Park Hantavirus*

*Litig.*, 2016 WL 758671, at \*22 (N.D. Cal. Feb. 26, 2016) (finding that the United

States failed to explain how considerations of access, conservation, and resources

played into National Park Services' decision to delay notification to visitors of

park of possible risk of exposure to a disease during their visit); *ARA Leisure*

*Services v. United States*, 831 F.2d 193, 195 (9th Cir. 1987) (holding, where

"challenged governmental activity involves safety considerations under an

25

established policy rather than the balancing of competing public policy

considerations, the rationale for the [discretionary function] exception falls away").

Claims based on a theory that the United States negligently "perform[ed] its

retained safety functions" are not barred by the DFE. *See Camozzi*, 866 F.2d at

289-90. This principle was explained by the Ninth Circuit in *Bear Medicine*:

> The Government cannot claim that both the decision to take safety
> measures and the negligent implementation of those measures are
> protected policy decisions. This argument would essentially allow the
> Government to administratively immunize itself from tort liability
> under applicable state law as a matter of policy.

241 F.3d at 1215.

Here, the Government's inaction and remediation errors following the 2021

incidents were not due to valid policy considerations, and were not policy choices

Congress intended to shield under the DFE. Such "challenged actions are not the

kind of conduct that can be said to be grounded in the policy of the regulatory

regime," *Gaubert*, 499 U.S. at 325.

As Judge Parker's decision in *Burgess* concluded, even though the EPA's

decision about "whether and how to respond to citizen complaints was

discretionary," "once the Government decided to act, it was required to do so

without negligence." The Government's failure to conduct the clean-up and/or the

remediation in a proper and effective manner thereafter was "not the result of a

policy choice," but "simply a failure to effectuate policy choices already made."

26

## IV.   CONCLUSION

Based upon the foregoing, Plaintiffs respectfully request that this Honorable

Court deny the Government's Partial Motion to Dismiss in all respects.


DATED:  Honolulu, Hawaii, January 30, 2024.

/s/ Lyle S. Hosoda
LYLE S. HOSODA
KOURTNEY H. WONG
SPENCER J. LAU

/s/ Kristina S. Baehr
KRISTINA S. BAEHR
JAMES BAEHR
MARY M. NEUSEL

/s/ Frederick C. Baker
FREDERICK C. BAKER
CYNTHIA A. SOLOMON
JAMES W. LEDLIE
KRISTEN HERMIZ

*Attorneys for Plaintiffs*

27

## COMPLIANCE WITH LR7.4(e)

I hereby certify that Plaintiffs' Memorandum in Opposition to Defendant United States' Partial Motion to Dismiss Complaint [ECF No. 21] has 6,230 words, in compliance with the 6,250 word limit set forth in LR7.4(b).  The word count was generated using Microsoft Word.

*/s/ Kristina S. Baehr*
Kristina S. Baehr

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed and served on counsel of record via the U.S. District Court's CM/ECF electronic filing system.

*/s/ Kristina S. Baehr*
Kristina S. Baehr