ELLIOT ENOKI #1528
Executive Assistant U.S. Attorney
District of Hawaii
Attorney for the United States, Acting
under Authority Conferred by 28 U.S.C. § 515
SYDNEY SPECTOR #11232
Assistant U.S. Attorney

J. PATRICK GLYNN, Director
CHRISTINA FALK, Assistant Director
CAROLINE STANTON, Trial Attorney
Environmental Tort Litigation
Civil Division, U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
(202) 307-0554
caroline.w.stanton@usdoj.gov

*Attorneys for the United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR. et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL NO. 22-cv-00397-LEK-KJM<br><br>THE UNITED STATES'<br>CLOSING ARGUMENT BRIEF;<br>CERTIFICATE OF SERVICE<br><br>TRIAL DATE:  April 29, 2024<br>TIME: 8:30 a.m.<br>JUDGE:  Hon. Leslie E. Kobayashi |

**THE UNITED STATES' CLOSING ARGUMENT BRIEF**

## TABLE OF CONTENTS

Table of Contents ..................................................................................... ii

Table of Authorities ..................................................................................v

Introduction ..............................................................................................1

Argument...................................................................................................4

I. The November 2021 Spill Quickly Exited the System and Did Not Reach the Western Portion of the System Where the Feindts Lived. ..................................4

   A. Dr. Rosenfeld's Opinions, Including the Well-Mixed Model, Should Be Disregarded as They Rely on Incomplete Facts and Conjecture...................5

     1. The Well-Mixed Model Disregards a Basic, Undisputed Fact—Water Left the JBPHH Water System........................................................7

     2. Dr. Rosenfeld's Decision to Calibrate His Model Using Only Cherry-Picked Data 500 Days After the November 2021 Spill Renders His Well-Mixed Model Unreliable. ...........................................................9

   B. Dr. Grayman's Modeling, Which Underwent More Rigorous Validation, Shows that the November 2021 Spill Quickly Exited the System and Did Not Reach Ford Island. ...................................................................12

     1. Contamination from the November 2021 Spill Did Not Reach the Western Portions of the JBPHH Water System. ......................................13

     2. Dr. Grayman Has Extensive Water Modeling Experience and His Model Brackets the Range of Uncertainty of Water Concentrations. .................18

II. Plaintiffs Failed to Demonstrate That Their Physical Injuries and Impairment Were Caused by Toxic Exposure. ......................................................21

   A. Plaintiffs Fail to Prove Specific Causation for their Alleged Acute Injuries. 25

     1. Specific Causation Cannot Be Found on Temporality Alone, and Plaintiffs' Claimed Injuries Are Inconsistent with the Temporal Relationship to Their Exposure. ..........................................................27

     2. The Bellwether Plaintiffs' Doses of JP-5 Were Not Capable of Causing Adverse Health Effects.....................................................................31

     3. Plaintiffs' Expert Fails to Rule Out Other Likely Causes of Plaintiffs' Alleged Acute Symptoms.....................................................................35

   B. Plaintiffs Have Not Proven that Their Alleged Long-Term Injuries Were Caused by the November 2021 Spill. ..........................................................36

III. Reasonable Emotional Distress Is Limited in Duration. ................................42

IV. Plaintiffs Have Not Satisfied Their Burden with Respect to their Special Damages Claims for Future Health Costs, Tutoring Costs and Lost Wages. ......50

  A. Plaintiffs Have Not Proven Causation for Mrs. Freeman's Driver. ............51

  B. Plaintiffs Have Not Proven that the November 2021 Spill Caused Their Claimed Future Mental Health Services and Tutoring Costs. ....................51

  C. Mr. Feindt and Mrs. Freeman Have Not Lost Wages Attributable to the November 2021 spill. ...................................................................................57

    1. Mr. Feindt Has Not Proven That He Lost $93,009 in Wages. ................58

      a. Mr. Feindt's Month of Unemployment December 2021 to January 2022 Was Not Caused by the November 2021 Spill. ..........................59

      b. Mr. Feindt's Lost Wages in Colorado Also Were Not Caused by the November 2021 Spill. ..........................................................................59

    2. Mrs. Freeman's Lost Wages Were Not Caused by the November 2021 Spill. ..........................................................................................................62

V. Plaintiffs' Damages Must Be Apportioned Among All Causes of Their Injuries. ...............................................................................................................65

  A. *Montalvo* Apportionment Applies to All Causes—Even Preexisting Ones— and all Damages—Even Emotional Distress. ...............................................65

  B. Other Causes of the Bellwether Plaintiffs' Alleged Physical Symptoms....70

  C. Other Causes for the Bellwether Plaintiffs' Emotional Distress ................72

    1. Other Causes for Mr. Feindt's Emotional Distress ................................72

    2. Other Causes for Mrs. Dietz's Emotional Distress ................................75

    3. Other Causes of Mrs. Jessup's Emotional Distress ................................77

    4. Other Causes for the Jessup Children's Emotional Distress ..................79

    5. Other Causes of Other Bellwether Plaintiffs' Emotional Distress..........83

VI. The United States Is Entitled to Offsets for Payments It Has Made—or for Which It Is Reasonably Probable That It Will Make—to Plaintiffs. ...................86

  A. Tricare is Not a Collateral Source and the United States Has Satisfied the Requirements for Offset of Reasonably Probable Future Payments. ..........87

  B. The United States' Per Diem Payments Should Offset—and the Free Hotel Benefit Should Mitigate—Any Award for Inconvenience and Annoyance. 97

VII. Compensatory Damages: The United States' Rationale ...............................99

    A. Impairment and Pain and Suffering (Past and Future) .............................102

    B. Loss of Enjoyment ...................................................................................103

    C. Mental Anguish and Emotional Distress .................................................106

    D. Mental Health Treatment and Tutoring ...................................................111

    E. Lost Wages ...............................................................................................112

    F. Per Diem Offsets ......................................................................................112

Conclusion .......................................................................................................112

Certificate of Service .......................................................................................114

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abarca v. Franklin Cnty. Water Dist.,*
  761 F. Supp. 2d 1007 (E.D. Cal. 2011) ............................................................10
*Ayers v. Jackson Tp.*
  106 N.J. 557............................................................................................. 104, 111
*Bernard v. Char*,
  903 P.2d 676 (Haw. App. 1995)..........................................................................26
*Brooks v. United States*,
  337 U.S. 49 (1949) ..............................................................................................86
*Broecker v. Hanes*, *16 Idaho Verd. Stlmnt. Rpts. 14*,
  2015 WL 10015309 (Or. Cir. Ct. Dec. 2015)....................................................101
*Bynum v. Magno*,
  101 P.3d 1149 (Haw. 2004)...................................................................... 50, 86, 99
*Campano v. United States*,
  CIVIL NO. 15-00439 KSC, 2018 WL 1182571 (D. Haw. Mar. 7, 2018) ..........92
*Campano v. United States*,
  2018 WL 4346879 (D. Hawai'i, 2018) ...............................................................91
*Carter v. U.S.,*
  725 F.Supp.2d 346 (E.D.N.Y., 2010) ...................................................... 106, 107
*Cartwright v. Home Depot U.S.A., Inc.*,
  936 F. Supp. 900 (M.D. Fla. 1996) .....................................................................27
*Clausen v. M/V NEW CARISSA*,
  339 F.3d 1049 (9th Cir. 2003)...................................................................... 27, 35
*Collier v. Simpson Paper Co.*,
  133 F.3d 926, 1997 WL 812253 (Table)..............................................................45
*Collins v. Willocks Constr. Corp.*,
  JVR No. 479331, 2001 WL 36113300 (Sept. 2001)................................ 101, 103
*Crescenta Valley Water Dist. v. Exxon Mobile Corp.*,
  No. CV 07-2630-JST (ANX), 2013 WL 12116333 (C.D. Cal. Jan. 8, 2013)...7, 8,
  10
*Daniels–Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010).............................................................................93
*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ..................................................................... 22, 56

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ......................................................................12
*Dempsey v. United States*,
  32 F.3d 1490 (11th Cir. 1994)......................................................89
*Doe Parents No. 1 v. State Dep't of Educ.*,
  100 Haw. 34, 58 P.3d 545 (2002)................................................49
*Dykzeul v. Charter Commc'ns, Inc.*,
  No. CV185826DSFGJSX, 2021 WL 4522545 (C.D. Cal. Feb. 3, 2021) ...........62
*EVO Brands, LLC v. Al Khalifa Group LLC*,
  657 F. Supp. 3d 1312 (C.D. Cal. 2023)................................................93
*Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*,
  172 P.3d 1021 (Haw. 2007).......................................................... 25, 39
*Finestone v. Fla. Power & Light Co.*,
  No. 03-14040-CIV, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006)..........................11
*Galbreath v. United States*,
  Civil No. CV 20-00373 LEK-KJM, 2022 WL 18717579
  (D. Haw. Feb. 17, 2022) .......................................................... 91, 92
*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .......................................................... 8, 12, 56
*Goodin v. Fid. Nat. Title Ins. Co.*,
  No. CIV.07-00074-DAE-BMK, 2008 WL 4173530 (D. Haw. Sept. 9, 2008) ....43
*Goodin v. Fid. Nat. Title Ins. Co.*,
  370 Fed. Appx 789 (C.A. 9 (Hawai'i), 2010) ......................................................43
*Green v. Costco Wholesale Corp.*,
  JVR No. 165705, 1995 WL 778684 (October 1995) .......................................103
*Gretzinger v. Univ. of Hawaii*,
  156 F.3d 1236 (Table), 1998 WL 403357 (9th Cir. July 7, 1998) ............... 68, 69
*Hambrook v. Smith*,
  2016 WL 4408991 (D. Hawai'i, 2016) .......................................................... 108
*Harvey v. United States*, Civil Action No. 3:09CV122-S,
  2013 WL 2898785 (W.D. Ky. June 13, 2013) ......................................................89
*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir. 1999)......................................................36
*Henricksen v. ConocoPhillips Co.*,
  605 F. Supp. 2d 1142 (E.D. Wash. 2009) .......................................... 22, 32, 35
*Holcombe v. United Stated.*,
  584 F. Supp. 3d 225 (W.D. Tex., 2022)..........................................107
*In re Hanford Nuclear Rsrv. Litig.*,
  292 F.3d 1124 (9th Cir. 2002)..........................................................22

vi

*In re Hawaii Fed. Asbestos Cases*,
   734 F. Supp. 1563 (D. Haw. 1990) ........................................................ 43, 45
*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*,
   424 F. Supp. 3d 781 (N.D. Cal. 2020)........................................................38
*John & Jane Roes, 1-100 v. FHP, Inc.*,
   91 Haw. 470, 985 P.2d 661 (1999)........................................ 43, 44, 46, 48
*Kaho'ohanohano v. Dep't of Hum. Servs., State of Haw.*,
   178 P.3d 538 (2008) ........................................................................... 49, 50
*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ..................................................................................53
*Lake v. Ohana Mil. Cmtys., LLC*,
   No. CV 16-00555 LEK, 2019 WL 4794536 (D. Haw. Sept. 30, 2019)..............26
*Larsen v. Pacesetter Sys., Inc.*,
   837 P.2d 1273 (Haw. 1992)......................................................................26
*Lawson v. United States*,
   454 F. Supp. 2d 373 (D. Md. 2006) ..........................................................87
*LeClercq v. The Lockformer Co.*, No. 00 C,
   7164, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005) ....................................11
*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ..................................................................3
*McCook v. Unum Life Ins. Co. of Am.*,
   463 F. Supp. 3d 729 (E.D. La. 2020)........................................................41
*Mew Sun Leong v. Honolulu Rapid Transit Co.*,
   472 P.2d 505 (Haw. 1970)........................................................................88
*Montalvo v. Lapez*,
   884 P.2d 345 (Haw. 1994)................................................................ passim
*Mueller v. Department of Public Safety*,
   2021 WL 5138428 (D.Hawai'i, 2021) ........................................ 67, 68, 69, 70
*Murphy v. United States*,
   Civil No. 06-00304 BMK, 2009 WL 454627 (D. Haw. Feb. 23, 2009) .............87
*Nurse v. United States*,
   226 F.3d 996 (9th Cir. 2000) ....................................................................99
*O'Grady v. State*,
   398 P.3d 625 (Haw. 2017)..........................................................................4
*Omalza v. Safeway Stores, Inc.*,
   JVR No. 121922, 1993 WL 598827 (May 1993)..........................................103
*Paeschke v. Gen. Motors LLC*,
   No. 4:16-CV-5050-LRS, 2017 WL 5632442 (E.D. Wash. Oct. 11, 2017)... 27, 28

*Perales v. Gary Blum, M.D.*,
  140 Haw. 417, 400 P.3d 618 (Table), 2017 WL 3822016
  (Haw. Ct. App. 2017) ................................................. 57, 58, 60, 63
*Platt v. Holland Am. Line Inc.*,
  No. 2:20-CV-00062-JHC, 2023 WL 2938172
  (W.D. Wash. Apr. 13, 2023) .............................................. 27
*Ramsey v. Consol. Rail Corp.*,
  111 F. Supp. 2d 1030 (N.D. Ind. 2000) ................................. 11
*Raymond v. Wilcox Memorial Hospital.*,
  2019 WL 3022187 (D. Hawai'i, 2019) ............................... 69,70
*Reimer v. Kuki'o Golf & Beach Club, Inc.*,
  No. CIV. 12-00408 LEK-BM, 2014 WL 1643260 (D. Haw. Apr. 22, 2014).....61,
  82, 106
*Repub. Party of N.M. V. Balderas,*
  No. 11-cv-900-WJ-KBM, 2021 WL 5578869 ............................ 52
*Rodrigues v. State*,
  52 Haw. 156, 472 P.2d 509 (1970).................................... 42
*Rosen v. Unilever U.S., Inc.*,
  No. C 09-02563 JW, 2010 WL 4807100 (N.D. Cal. May 3, 2010) .............. 5
*San Bernardino Cnty. v. Ins. Co. of State of Pennsylvania*,
  No. CV 21-01978 PSG (AS), 2024 WL 1137959 (C.D. Cal. Feb. 27, 2024)......10
*Schmidt v. United States*
  2020 WL 12947480 (W.D. Tex., 2020)................................ 108
*Short v. United States*,
  908 F.Supp. 227 (D. Vt. 1995) ..................................... 89
*Siverson v. United States*,
  710 F.2d 557 (9th Cir. 1983) ...................................... 88
*Smith v. Bisso Marine, LLC*,
  No. 6:14-cv-00697, 2017 WL 6887122 (W.D. La. 2017).................. 41
*Smith v. Ill. Dep't of Transp.*,
  936 F.3d 554 (7th Cir. 2019) ...................................... 53
*State v. Davis*,
  499 P.2d 663 (Haw. 1970).......................................... 43
*State v. Davis*,
  370 F. App'x 788 (9th Cir. 2010) .................................. 43
*Summers v. Missouri Pac. R.R. Sys.*,
  897 F. Supp. 533 (E.D. Okla. 1995)................................. 40
Summers v. Missouri Pac. R.R. Sys.,
  132 F.3d 599 (10th Cir. 1997) ..................................... 41

*Tabieros v. Clark Equip. Co.*,
  944 P.2d 1279 (Haw. 1997)....................................................... 61, 106
*Warren v. United States*,
  669 F.Supp.3d 987 (D.Hawai'i, 2023) ........................................ 89, 92
*Weite v. Momohara*,
  240 P.3d 899 (Haw. Ct. App. 2010) ...............................................70


## Statutes

10 U.S.C. § 632(a)(3)........................................................................90
28 U.S.C. § 2674..............................................................................99
37 U.S.C. § 405(b) ...........................................................................97
37 U.S.C. § 405(d)(1)(A) ............................................................. 97, 99


## Rules

Fed. R. Evid. 201(d)..........................................................................93
Fed. R. Evid. 702 ........................................................................ 12, 38


## Regulations

32 C.F.R. § 199.4(c)(3)(ix) ...............................................................91


## Other Authorities

Charles Alan Wright and Arthur R. Miller. *Federal Practice
  and Procedure 2d ed.* ...................................................................52
David L. Eaton, Scientific Judgement and Toxic Torts - A Primer in Toxicology
  for Judges and Lawyers .................................................................22
Federal Judicial Center, Michael D. Green. *Reference Guide on Epidemiology* in
  *Reference Manual on Scientific Evidence 3d ed.*........................... 28, 29
Federal Judicial Center, Paul S. Appelbaum. *Reference Guide on Mental Health
  Evidence* in *Reference Manual on Scientific Evidence 3d ed.* ............................54
TriCare Policy Manual, 6010.60-M, April 2015, Change 125................................90

## INTRODUCTION

The United States takes responsibility for the November 2021 jet fuel (JP-5) spill at the Red Hill Bulk Fuel Facility and the legally cognizable harm it caused those living on Joint Base Pearl Harbor-Hickam (JBPHH) whose water system was impacted by the spill, including the 17 Bellwether Plaintiffs. *See, e.g.*, ECF Nos. 98 & 200 (stipulations regarding negligence and nuisance). That is why, within days of the spill, the United States offered the Bellwether Plaintiffs (and thousands of others) free alternative water, free alternative housing (hotels), and thousands of dollars in per diem payments to defer the costs of meals and other incidentals. The November 2021 spill and resulting advisory not to use the water certainly impacted the Bellwether Plaintiffs. The United States recognizes that the Bellwether Plaintiffs experienced stress, anxiety, and worry in the days after they learned about the November 2021 fuel spill, and these harms entitle them to compensatory damages. But the November 2021 spill did not cause many of the other physical and psychological injuries the Bellwethers Plaintiffs claim, including those that pre-dated the spill. Therefore, Plaintiffs' proposed damage figures miss the mark.

The trial record and applicable law do not support the Bellwether Plaintiffs' position that everyone—regardless of location, duration of exposure, preexisting conditions, or other traumas—received the same dose, suffered physical injuries, and has long-lasting psychological harm from the November 2021 spill. First,

contamination from the November 2021 spill did not reach the western portion of the JBPHH water system (such as, Ford Island), as evidenced by (1) Dr. Grayman's water modeling, (2) that the Feindts (who lived farthest from Red Hill on Ford Island) waited a week longer than other Bellwether Plaintiffs to cease drinking the water and did not detect a problem with their water before doing so; and (3) Mrs. Witt's testimony (who, of the Bellwether Plaintiffs, lived the second farthest from Red Hill) that she also never smelled petroleum in her water.

Second, that humans can detect low levels of petroleum in water—coupled with notices and warnings in press releases, news media, and social media—thankfully limited the potential exposure of Bellwether Plaintiffs who lived in the eastern portion of the water system to a few days at most (and even shorter, as they testified that they stopped consuming the water upon detecting the presence of petroleum). This short duration and the speed at which JP-5 exits the body (1-2.5 days) limits the duration of physical symptoms possibly caused by the spill.

Third, Plaintiffs ask this Court to find, by a preponderance of the evidence, that all of their injuries were caused by the November 2021 spill, despite their failure to present admissible expert testimony necessary to establish causation or to otherwise adhere to accepted scientific methodology regarding causation. Plaintiffs instead rely on temporality alone, ignore other required causation factors, and ask this Court to accept the "*post hoc ergo propter hoc* fallacy . . . assuming that

because a biological injury occurred after a spill, it must have been caused by the spill." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) (internal citation omitted). Plaintiffs then extend this fallacy to all their other categories of claimed damages, including emotional distress tied to these alleged physical harms. Just as Plaintiffs' physical injuries must be supported by sound scientific reasoning, any emotional distress must be reasonable in light of the actual risk of physical harm.

Fourth, Plaintiffs fail to apportion any of their alleged damages among the many additional causes of both the physical and psychological symptoms suffered by Plaintiffs. Such an approach fails to abide by the binding rule in *Montalvo v. Lapez*, 884 P.2d 345, 77 Haw. 282, (Haw. 1994), and inflates their damage calculations.

In contrast, the United States details herein a damages framework that better reflects the injuries caused by the November 2021 spill, the differences amongst the Bellwether Plaintiffs, the alternative causes of their alleged physical and psychological symptoms, and awards in comparable cases. The United States' approach also more readily can be applied to resolve the thousands of additional Plaintiffs' cases in this docket, as compared to Plaintiffs' approach that fails to provide any discernable or objective method for differentiating among the variously situated Plaintiffs. *See* Order Granting United States Mot. to Consolidate

(ECF No. 413) 9 (Ordering the parties to "work in good faith to use the Bellwether

Cases to resolve issues common to all cases and to evaluate similar claims.").

## ARGUMENT

Plaintiffs' bear the burden to demonstrate that the Government's negligence

was the legal cause of their alleged injuries. *O'Grady v. State*, 140 Haw. 36, 398

P.3d 625, 636 (Haw. 2017). Under Hawaii law, Plaintiffs may only meet this

burden by demonstrating "by a preponderance of the evidence, that the defendant's

conduct was a substantial factor in bringing about the harm." *Id.* at 636. "A

substantial factor is one that a reasonable person would consider to have

contributed to the harm." *Id*. at 635.

## I.    The November 2021 Spill Quickly Exited the System and Did Not Reach the Western Portion of the System Where the Feindts Lived.

The parties' water modeling experts—Dr. Walter Grayman (United States)

and Dr. Paul Rosenfeld (Plaintiffs)—agree that the jet fuel from the November

2021 spill began to enter the JBPHH water system around November 27, 2021,

which is when the first water quality complaints were received. Grayman Decl.

(ECF No. 376-1) ¶¶ 28–36; April 30, 2024 Tr. 92:17–22 (Day 1 under Dr.

Rosenfeld's model is November 27, 2021).[1] They disagree, however, as to what

---

[1] In this respect, Drs. Grayman and Rosenfeld disagree with Plaintiffs' other
expert, Dr. Joseph Hughes, who assumed the jet fuel entered the system on
November 21, 2021. Hughes Decl. (ECF No. 369) ¶¶ 37, 40; ECF No. 369-32 (Tab

happened to the jet fuel once it entered the system. For the reasons set forth below, the Court should disregard Dr. Rosenfeld's opinion that concentrations were the same throughout the system and instead credit Dr. Grayman's modeling that shows that concentrations quickly moved through the eastern portions of the system and that the western portions closer to the unaffected and larger water source—the Waiawa Well—were unaffected.

### A. Dr. Rosenfeld's Opinions, Including the Well-Mixed Model, Should Be Disregarded as They Rely on Incomplete Facts and Conjecture.

Dr. Rosenfeld's opinions are unhelpful to the trier of fact and should not be credited. First, his well-mixed model does not independently confirm that concentrations within the water system were at equilibrium on December 6, 2021 (Day 10 of his model), but rather assumes that is the case. May 7, 2021 Tr. 20:11–21:2; *see also Rosen v. Unilever U.S., Inc.*, No. C 09-02563 JW, 2010 WL 4807100, at *5 (N.D. Cal. May 3, 2010) ("The fallacy of *petitio principii* or begging the question, is committed when one attempts to establish a basis for a conclusion by constructing a premise that assumes that the conclusion has already been established.").

---

29) (showing estimated concentrations entering the system from November 21, 2021, to when the Red Hill Well shutdown on November 29, 2021). But Dr. Hughes' analysis did not include analysis of sampling data within the system, April 30, 2024 Tr. 51:12-17, and he agreed that his focus was not on what occurred within the drinking water system, *id.* 54:1–3.

In practice, this assumption strains credulity. For example, it results in the same concentrations at Pearl City Peninsula and AMR Housing on December 6, 2021 and thereafter, despite (1) Pearl City Peninsula being located immediately south of the unaffected Waiawa Well that operated continuously and provided over twice the daily volume of water into the system; and (2) AMR Housing being located closer to the impacted Red Hill Well that operated only intermittently and was shut-down on November 30 (and therefore was not contributing flow for the seven days prior to December 6, 2021). May 7, 2021 Tr. 22:14–24:23; *see also* May 8, 2024 Tr. 71:13–72:14 (Dr. Grayman's critique of Dr. Rosenfeld's well-mixed model); Grayman Decl. ¶¶ 54–59 (same).

Second, neither Dr. Rosenfeld nor Dr. Steven Bird (Plaintiffs' toxicologist) relies on Dr. Rosenfeld's modeling results to calculate the dose to which the Bellwether Plaintiffs were allegedly exposed. May 3, 2024 Tr. 14:20–16:15 (Dr. Bird did not calculate dose based on Dr. Rosenfeld's concentrations); April 30, 2024 Tr. 84:14–25 (confirming Dr. Rosenfeld did not calculate a dose). In other words, Plaintiffs do nothing with the numerical output from Dr. Rosenfeld's model. Perhaps that is because Dr. Rosenfeld offers no opinions on the concentrations within the system before December 6, 2021, May 7, 2024 Tr. 21:3–18, which was after all but the Feindts ceased drinking the water, *see infra* at 14 & n.3.

Finally, even if the Court were inclined to consider Dr. Rosenfeld's well-mixed model opinions, it should not do so due to two substantial methodological flaws: (1) the model does not account for water leaving the system; and (2) Dr. Rosenfeld cherry-picked data, ignoring over 3,500 inconsistent sample results. Each are fatal to Dr. Rosenfeld's modeling opinions.

### 1. The Well-Mixed Model Disregards a Basic, Undisputed Fact— Water Left the JBPHH Water System.

To answer the question of what concentrations of jet fuel exited the water system and to which the Bellwether Plaintiffs were exposed, Dr. Rosenfeld's well-mixed model inexplicably assumes that no water or jet fuel left the system during the modeling period. April 30, 2024 Tr. 86:22–87:10. In fact, approximately 20-25 million gallons of water exited the system each day, *see* Mitchell Decl. (ECF No. 373-1) ¶ 15; DX-3236, which means over 10 billion gallons of water are unaccounted for during the 500-day duration of Dr. Rosenfeld's model.

Dr. Rosenfeld's failure to account for the undisputed fact that a substantial volume of water exited the system each day renders his entire methodology unreliable. *Crescenta Valley Water Dist. v. Exxon Mobile Corp.*, No. CV 07-2630-JST (ANX), 2013 WL 12116333, at *6 (C.D. Cal. Jan. 8, 2013) (rejecting modeling work when it disregarded undisputed factual data). It is as if Dr. Rosenfeld was asked to balance a budget and he chose to do so by only looking at income (inflow) and not expenses (outflow).

7

Moreover, Dr. Rosenfeld's attempt to defend his failure to account for millions of gallons of water leaving the system daily as being "conservative" is not credible. Rosenfeld Decl. (ECF No. 374) ¶ 60, n.54; April 30, 2024 Tr. 87:20–88:23; *see also Crescenta*, 2013 WL 12116333, at *6 ("[I]t is unclear how reducing the source contribution over time could bring about the same results as maintaining a continuous stream of source contribution . . . the Court cannot rely solely on Dr. Wheatcraft's word to verify his methodology."). The November 2021 spill was limited in both volume and time in which it could have entered the water system. April 30, 2024 Tr. 88:24–91:9. Therefore, contrary to other applications of the well-mixed model, the November 2021 spill was not a limitless source that continuously replenished contamination that exited the system. Grayman Decl. ¶ 58; *see also id.* ¶¶ 54–57 & 59; May 8, 2024 Tr.71:13–73:22.

Dr. Rosenfeld's logic in this regard does not withstand scrutiny. He did not to provide his calculations for how his results would change if he accounted for water leaving the system and instead provided only his assertion in a conclusory footnote. *Compare* April 30, 2024 Tr. 91:10–14 & Rosenfeld Decl. ¶ 60, n.54, *with Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

8

**2. Dr. Rosenfeld's Decision to Calibrate His Model Using Only Cherry-Picked Data 500 Days After the November 2021 Spill Renders His Well-Mixed Model Unreliable.**

The Court should also disregard Dr. Rosenfeld's opinions because he cherry-picked the sampling data that he used to calibrate his model, ignoring hundreds of sample results collected during the immediate aftermath of the November 2021 spill and thousands more taken between Day 10 and Day 500. April 30, 2024 Tr. 99:23–101:4 (Dr. Rosenfeld admitting that he did not compare his model results to sampling results collected at Days 50, 100, 150, and 300 from his model). Dr. Rosenfeld offers no explanation for his failure to conduct such an analysis, and the comparison of Dr. Rosenfeld's model predictions with the actual sampling results demonstrates irreconcilable conflict. *See id.* 94:4-24, 101:5–106:11 (Dr. Rosenfeld acknowledging sampling results collected in November and December 2021 (before and after Day 10 of his model), and around Days 50, 100, 150, and 300 of his model were not consistent with his model's predictions). Dr. Rosenfeld had access to all these data; indeed, many were in the very chart he testified that he relied upon in this case for his expert report and trial declaration. *Id.* 98:3–15. He chose to disregard them.

"A well-calibrated model is one that can replicate real-world conditions. . . . 'an expert must test of 'calibrate' a model to align the model predictions with field observations' . . . 'A half-calibrated model is, by definition, inadequately calibrated

and excluded under Daubert.'" *Crescenta*, 2013 WL 12116333, at *5 (quoting

*Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1072 (E.D. Cal.

2011), cited on other grounds in Order Den. Pls.' Mot. to Exclude Op. and Test. of

United States' Experts (ECF No. 416) 14 & 15)); *accord San Bernardino Cnty. v.

Ins. Co. of State of Pa.*, No. CV 21-01978 PSG (AS), 2024 WL 1137959, at *5–6

(C.D. Cal. Feb. 27, 2024). "Although it is undisputed that modeling is not an exact

science, the sheer volume of non-detects followed by a lack of calibration or

adjustment raises serious concerns." *Abarca*, 761 F. Supp. 2d at 1074; *id.* at 1060

n.55 ("The importance of calibrating model results to actual data is not limited to

the field of groundwater modeling.") (collecting cases).

     In total, Dr. Rosenfeld ignored at least over 3,500 sample results during the

duration of his model in favor of averaging an unspecified number of results on or

around Day 500.[2] *Compare* Rosenfeld Decl. p. 38 (chart) and ¶ 60 (asserting that

the model is "validated by the mass balance calculation results for the

concentrations 500 days after the November Incident"), *with* JX-0044 (over 160

drinking water samples collected from within the JBPHH water system in

November and December 2021); April 30, 2024 Tr. 94:4–25 (all results shown in

JX-0044 inconsistent with Dr. Rosenfeld's model); *id.* at 101:5–106:11 (all low-

---

[2] As Ms. Eng testified, low level detects such as those Dr. Rosenfeld relies upon
around Day 500 have since been confirmed to not be from jet fuel. May 7, 2024 Tr.
83:10–17 & 85:4–87:8.

level detects from January 2022 to May 2022—346 in total—in DX-3245

inconsistent with Dr. Rosenfeld's model); *id*. at 107:3–110:2 (3,188 non-detect

results from May to September 2022 also inconsistent with Dr. Rosenfeld's

model).

Courts have excluded modeling opinions that, like Dr. Rosenfeld's,

inexplicably ignore relevant sample results that defy the model, including because

disregarding such data suggested an effort to reach a predetermined conclusion.

*E.g.*, *LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979, at *4

(N.D. Ill. Apr. 28, 2005) (excluding modeling that ignored 17 non-detect results:

the "failure to discuss the import of, or even mention, these material facts in [the

experts'] reports amounts to 'cherry-pick[ing] the facts he considered to render his

opinion, and such selective use of facts fail [s] to satisfy the scientific method and

*Daubert*,'" "undermin[ing] the reliability of [the expert's] entire opinion in this

matter"); *Ramsey v. Consol. Rail Corp.*, 111 F. Supp. 2d 1030, 1037–38 (N.D. Ind.

2000) (excluding modeling that was inconsistent with 12 non-detect results, as the

"record provides no basis for the court to find that methodology based on reliable

principles simply allows all twelve tests to be discounted in their entirety");

*Finestone v. Fla. Power & Light Co.*, No. 03-14040-CIV, 2006 WL 267330, at

*12–13 (S.D. Fla. Jan. 6, 2006) (excluding an expert's opinions that disregarded

non-detect sample because the opinions "cannot stand next to the actual data

retrieved from the site and surrounding environment," and therefore their "false assumptions make [the expert's] methodology unreliable"). Dr. Rosenfeld's failure to calibrate his model to real-world sampling data provides yet another reason his opinions should not be credited.

For all these reasons, Dr. Rosenfeld's well-mixed model is divorced from the facts of this case. It is unhelpful to the trier of fact and unreliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute.") (citation omitted); *Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). The Court should therefore disregard Dr. Rosenfeld's opinions.

### B. Dr. Grayman's Modeling, Which Underwent More Rigorous Validation, Shows that the November 2021 Spill Quickly Exited the System and Did Not Reach Ford Island.

In contrast, Dr. Grayman's modeling work in this case was the result of extensive validation and calibration, including:

(1) Field measurements (pressure loggers and fluoride tracer study), Grayman Decl. ¶ 23;

(2) Comparison between measured and modeled tank level data, *id.* ¶ 24(b)(i) & (ii);

(3) Comparison between measured and modeled total production volume, *id.* ¶ 24(b)(iii);

(4) Comparison between the model results and the actual sample results collected by the Navy within the system immediately after the November 2021 spill, *id.* ¶ 41(b);

(5) Comparison between the model results and the actual sample results collected by the HDOH within the system immediately after the November 2021 spill, *id.* ¶ 41(c);

(6) Comparison between the model results and the actual sample results collected by the Navy from tanks, *id.* ¶ 41(d) & (e); and

(7) Comparison between the model results and actual samples results from repeatedly sampled locations within the system located near the Bellwethers' residences, *id.* ¶ 41(f).

*See also* May 8, 2024 Tr. 42:14–45:1 & 63:13–67:23 (Dr. Grayman testifying further as to those calibration and validation efforts). The resulting model demonstrated that contamination quickly entered and exited the affected portions of the system and did not reach the western portion of the system. Grayman Decl. ¶¶ 31–32, 53; May 8, 2024 Tr. 45:4–47:9, 59:13–61:22.

### 1. Contamination from the November 2021 Spill Did Not Reach the Western Portions of the JBPHH Water System.

Dr. Grayman's modeling showed that concentrations within the system were not uniform and that, in fact, Ford Island (where the Feindts lived) and other western portions of the system did not receive contaminated water from the Red Hill Well because they were closer to the unaffected Waiawa Well that provided most of the flow into the system. May 8, 2024 Tr. 53:15–61:22 (Dr. Grayman

13

narrating the demonstrative video of his model and explaining the flow from the
Waiawa Well prevented water from the Red Hill Well reaching Ford Island). This
also explains why the Feindts only stopped drinking their water for drinking and
any other purpose after they received an Army notice to do so on December 9,
2021, A. Feindt Decl. (ECF No. 393) ¶ 25; P. Feindt Decl. (ECF No. 392) ¶ 21—a
week or more after the other Bellwethers ceased usage[3]—and why the Feindts
never noticed any odor, sheen, or other water quality issue prior to moving to a
hotel on December 13, 2021. *See* April 29, 2024 Tr. 183:2-4 (Major Feindt
testifying that they did not report any issues regarding sheen, odor, or taste).
Clearly, contrary to Dr. Rosenfeld's assumption, Ford Island was not the same as
the rest of the system.

---

[3] May 1, 2024 Tr. 28:15–29:7 (Dietz family ceased drinking the water the evening
of November 28, 2021, and stopped using the water for all other purposes on
November 29, 2021); Aubart Decl. (ECF No. 389) ¶¶ 27–28 (ceased drinking the
water on November 28, 2021, and, starting on November 30, 2021, stopped using
water to brush teeth, minimized showers at home (showering instead at the
government-provided hotel room); April 30, 2021 Tr. 128:23–130:2 (Jessup family
ceased drinking the water evening of November 28, 2021); S. Jessup Decl. ¶ 14
("We made a conscious decision to stop using the tap water and to use bottled
water"); K. Freeman Decl. (ECF No. 401) ¶ 9 (family stopped drinking the water
on November 29, 2021); April 29, 2024 Tr. 115:23–116:6 (Mrs. Freeman ceased
drinking the water on November 29, 2021, and all Freemans ceased all other uses
no later than December 3, 2021); Witt Decl. ¶¶ 12 & 26 (ceased using tap water
"for drinking, cooking, and brushing [] teeth" on December 1, 2021, after seeing
the Hawaii Department of Health's advisory online, and thereafter took "very short
showers"); April 30, 2024 Tr. 174:5–12 (Mrs. Witt was out of town until
November 28, 2021).

In their closing brief, Plaintiffs attempt to dispute this. ECF No. 595 ("Pls.

Br.") 19-23. First, Plaintiffs' contention that the system is interconnected fails to

address Dr. Grayman's point that the force from the Waiawa Well "served as a

barrier," blocking water from the Red Hill Well from reaching the western portions

of the water system, including Ford Island. May 8, 2024 Tr. 59:13-61:22. Second,

Plaintiffs selectively quote PX-1210, but PX-1210 actually supports Dr.

Grayman's view. PX-1210 at PX-1210_0050 (reverse flow from the east onto Ford

Island "highly suspect" and, if it occurred, the source of the water still "would

likely" have been water from the Waiawa Well).[4] Third, as discussed further

below, the anecdotal reports of sheen cannot bear the weight Plaintiffs place on it

for several reasons. *See infra* at 16–17. Fourth, the map of reported medical issues

(Pls.' Br. 22) proves little, as it does not establish that these reported health effects

were caused by water contamination, especially since (1) this time period

"coincided with the surge of cases of the COVID-19 Delta variant in Hawaii," PX-

2216 (S. Miko et al., *Cmty. Health Impacts after a Jet Fuel Leak Contaminated a*

*Drinking Water System: Oahu, Haw., Nov. 2021*, 21 J. Water Health 956 (Jul.

---

[4] PX-1210 also states that, at that time, the Navy could not at that time "rule[] out
with 100% certainty" that under extreme conditions Red Hill Well water could
reach Ford Island and further analysis of the data was necessary to determine
whether flow reversed from the east to the Ford Island bridge transmission line
(Zone B1 to A2). PX-1210_0050. Dr. Grayman's subsequent analysis of the water
data and modeling did, however, rule out that possibility.

2023) ("Miko Study") at PX-2216_0012; (2) intense media coverage may have impacted reporting, *id.*; and (3) it includes locations not on the JBPHH water system, and therefore could not have been caused by the water contamination (thereby demonstrating the unreliably of this purported metric), *compare* Pls.' Br. 22, *with* JX-0048 (showing the extent of the water system); *see also* Mitchell Decl. ¶¶ 25–27 (noting that water complaints were received from residences not connected to the JBPHH water system, and therefore incapable of being impacted by the November 2021 spill). Fifth, the long-term, low-level detects relied upon by Dr. Rosenfeld were not from jet fuel, and therefore do not prove that water impacted by the November 2021 spill reached Ford Island. May 7, 2024 Tr. 83:10–17 & 85:4–87:8.

There are several problems with Plaintiffs' reliance on anecdotal reports of sheen to the near exclusion of actual sample results. *See supra* at 9–12 (Dr. Rosenfeld disregards over 3,500 sample results that conflict with his model). For one, unlike actual sample results generated by a laboratory, anecdotal reports of sheen are not verifiable.[5] In addition, even if the observer in fact saw a sheen, that does not mean it was caused by jet fuel (as opposed to other sources, such as coffee

---

[5] Ms. Keller did not verify the sheen reports, including whether they were truthful, whether what was reported was in fact from jet fuel, whether the residence was on the water line, and when the sheen was in fact observed versus when it was reported. *See* April 29, 2024 Tr. 48:25-50:24.

16

oils, cooking grease, or dishwashing residue). As noted above, Plaintiffs'

compilation of sheen reports includes residences that were not on the JBPHH water

system, and therefore could not have been caused by the November 2021 spill. *See*

*also supra* 16 & n.5. Likewise, Mrs. Dietz's 2023 reports of sheen in her water

were determined not to be caused by jet fuel, May 1, 2024 Tr. 31:10–32:8, just like

various low level detects in the system, May 7, 2024 Tr. 83:10–17 & 85:4–87:8.

Anecdotal reports of sheen simply are not a reliable measure of whether and the

extent to which water from the Red Hill Well reached a particular portion of the

system.

Dr. Grayman's opinion that contaminated water did not reach the western

portions of the system, including Ford Island, Iroquois Point, and Pearl City

Peninsula, also explains why the Feindts' timeline differs so much from those of

the other Bellwether Plaintiffs. *See supra* at 14 & n.3. The Feindts failure to detect

a petroleum odor in their water prior to ceasing their water usage corroborates Dr.

Grayman's opinion that contaminated water from the Red Hill Well did not reach

Ford Island. *See also* Prueitt Decl. (ECF No. 332-1) ¶ 105 (humans smell

hydrocarbons in water at levels below that cause even short-term health effects);

PX-2412 (Navy and Marine Corps. Pub. Health Ctr., Tech. Mem., Rev. June 2023)

at PX-2412_0002 n.2 (noting the low odor threshold for petroleum).

So too does the testimony of Mrs. Witt—who lived farther west than the other non-Feindt Bellwethers, *see* ECF No. 548-1 (Water System Flushing Zone Map showing Bellwethers' residences)— that she never detected a petroleum odor in her drinking water, April 30, 2024 Tr. 177:24-25.

### 2. Dr. Grayman Has Extensive Water Modeling Experience and His Model Brackets the Range of Uncertainty of Water Concentrations.

The Court should once again reject Plaintiffs' arguments from its *Daubert* challenge of Dr. Grayman, including challenges to Dr. Grayman's experience. *Compare* Pls.' Br. 23-27, *with* Order Denying Plaintiffs' Mot. to Exclude Op. and Test of United States' Experts (ECF No. 416) 11-18 (denying Plaintiffs' *Daubert*); *see also* United States' Opp'n to Plaintiffs' *Daubert* (ECF No. 301) 6–25 (responding to these arguments). As Dr. Grayman explained at trial, he has successfully used the modeling software he used in this case (EPANET) in other two-phase flow cases where, as here, the second phase is a small percentage of the total flow (0.005% per Dr. Hughes, Plaintiffs' expert). *See* May 8, 2024 Tr.41:8–42:13 (Dr. Grayman's testimony); April 30, 2024 Tr. 39:18-21 (Dr. Hughes's testimony).[6] Dr. Grayman has extensive water modeling experience. Grayman Decl. ¶¶ 3–8, 10–11, 16, 18–19, 58; May 8, 2024 Tr. 72:19–24.

---

[6] Likewise, Plaintiffs' expert, Dr. Rosenfeld, only modeled a single phase. April 30, 2024 Tr. 86:1–21.

Plaintiffs' remaining challenges to Dr. Grayman's opinions fare no better. Plaintiffs criticize Dr. Grayman for not running a non-detect scenario. Pls'. Br. 23–24. But this critique faults Dr. Grayman for making a Plaintiff-friendly assumption by modeling a higher concentration (2,000 µg/L) as the lowest starting point. Notably, Plaintiffs only take issue with this lowest starting concentration, *id.* at 25–26, but are silent as to the other three that Dr. Grayman explained bracketed the uncertainty as to the starting concentrations that entered the system, May 8, 2024 Tr. 62:12–17; Grayman Decl. ¶¶ 37-38. That is likely because these other three starting values result in concentration in the water system sufficient to create a sheen, which is Plaintiffs' main critique. May 8, 2024 Tr. 29:4–31:12, 68:19–69:12.

Finally, Plaintiffs selectively quote and misconstrue PX-2412, *see* Pls.' Br. 26, because it confirms Dr. Grayman's modeling and approach in this case. For example, it cautions against using the November and December 2021 sampling data for exposure assessment because concentrations could have varied spatially and temporally, PX-2412 at PX-2412_0026-28,[7] but Dr. Grayman's starting concentrations all greatly exceeded these non-detect or low-level detects by over 6-fold (2,000 µg/L) to over 280-fold (85,250 µg/L), Grayman Decl. ¶¶ 37-38 &

---

[7] The authors of PX-2412 were also concerned that, because these samples were collected from outdoor spigots and hose bibs, they may have been *more contaminated* than indoor locations, such as faucets. PX-2412 at PX-2412_0024.

41(b)-(d). Perhaps this criticism would have carried some weight, if Dr. Grayman just modeled—and the United States' other experts (i.e., Drs. Burgoon, Prueitt, Kosnett, and Durrani) just relied upon—the non-detect and low-level sample results to calculate the Bellwethers' exposures. But they did not do so and instead used higher concentrations (including those over two orders of magnitude greater). Therefore, this criticism rings hollow. Plaintiffs also gloss over how the report that they rely upon (PX-2412) supports Dr. Grayman's modeling and the United States' positions in this case, including:

(1) "The available data demonstrate a lack of a JBPHH system-wide impact associated with JP-5 fuel"—i.e., the entire system was not impacted by the November 2021 spill, PX-2412 at PX-2412_0020; *accord id*. at PX-2412_0015; *see also id. at* PX-2412_0026 ("The neighborhoods/zones most likely impacted by JP-5 fuel are the neighborhoods/zones closest to the Red Hill Shaft.").

(2) "By the time sample collection began, the Red Hill Shaft had been taken offline and the JBPHH system was supplied with clean drinking water from the Waiawa Shaft and Navy Aiea Halawa Shaft," which resulted in "approximately 11 to 14 million gallons of clean drinking water was being supplied to the JBPHH system each day (NAVFAC HI). After 29 November 2021, the JP-5 fuel remaining in the JBPHH system was diluted and/or flushed daily by clean drinking water from the Waiawa Shaft and the Navy Aiea Halawa Shaft. [] By 29 November 2021, it is expected that there was limited JP-5 fuel contamination remaining in the JBPHH system." *Id.* at PX-2412_0023; *accord id.* at PX-2412_0027.

20

(3) "JBPHH users likely smelled JP-5 as soon as it entered the JBPHH system.[8] The first report of fuel-like odors occurred on 28 November 2021 and is likely the date JP-5 fuel entered the JBPHH system." *Id.* at PX-2412_0002.

(4) "JBPHH system users were likely not exposed to JP-5 fuel until 28 November 2021 and exposure was likely limited to a few days (e.g., 28 November and 29 November 2021)." *Id.* at PX-2412_0002.

*     *     *

In conclusion, the Court should disregard Dr. Rosenfeld's conclusions and instead credit Dr. Grayman's modeling opinions, including as to the range of water concentrations at the Bellwether Plaintiffs' residences and that contamination from the November 2021 spill did not reach the western portions of the system, including Ford Island, Iroquois Point, and Pearl City Peninsula.

## II.    Plaintiffs Failed to Demonstrate That Their Physical Injuries and Impairment Were Caused by Toxic Exposure.

Even assuming the Bellwether Plaintiffs were exposed to contamination from the November 2021 spill, they still must prove that their exposure caused their alleged injuries. Causation of physical injury in toxic tort cases is typically discussed in terms of both general and specific causation. General causation refers to "whether the substance at issue had the capacity to cause the harm alleged,"

---

[8] "People are very sensitive to fuel odors. The odor threshold for Jet Fuels (represented by kerosene) (i.e., the lowest concentration of a chemical detected by the human sense of smell) is as low as 82 parts per billion (ppb) (Agency for Toxic Substances and Disease Registry [ATSDR 2017])." PX-2412_0002 n.2.

21

while specific causation "refers to whether a specific individual suffers from a particular ailment as a result of exposure to a substance." *In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002). In other words, Plaintiffs must show "not merely that [the alleged exposure] increased the likelihood of injury, but that it more likely than not caused *their* injuries." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1320 (9th Cir. 1995) (applying California tort law); Order Granting in Part and Den. in Part Def.'s Mot. to Exclude Ops. and Test. of Dr. Steven Bird ("Bird Order") (ECF No. 410) 15 (concluding that this California standard is "virtually identical to" the Hawaii standard).

As this Court has noted, specific causation for Plaintiffs' alleged acute injuries thus requires consideration of four separate elements:

> In determining whether an alleged chemical exposure caused a particular disease or illness, an expert must establish the following criteria: (1) the toxic substance at issue must have been demonstrated to cause in humans the disease or illness suffered by the plaintiff; (2) the individual must have been exposed to a sufficient amount of the substance in question to elicit the health effect in question; (3) the chronological relationship between exposure and effect must be biologically plausible; and (4) the likelihood that the chemical caused the disease or illness in an individual should be considered in the context of other known causes. *See* David L. Eaton, Scientific Judgment and Toxic Torts – A Primer in Toxicology for Judges and Lawyers, 12 J.L. & Pol'y 5, 38–40 (2003) ("Eaton").

Bird Order 15-16 (quoting *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1156 (E.D. Wash. 2009)).

Under Ninth Circuit precedent, statistical evidence showing that exposure to

a toxin more than doubled risk of a particular health effect may be probative of specific causation. *Id*. at 15. Here, Plaintiffs have not provided an epidemiological study indicating that the relative risk of any particular health effect is 2.0. *See* Bird Order 14-15 ("Dr. Bird opined that the strength of association factor was a risk factor of more than 1.0, which is far short of the risk factor of 2.0 that is probative of specific causation."). For this reason and after trial, the Court concluded that: "Plaintiffs do not provide the requisite expert epidemiological testimony necessary to support causation evidence for claims of future damages formerly sought by Plaintiffs, such as future physical impairment; increased risk of future harm and medical monitoring for life; loss of life expectancy, and thus these alleged damages are not part of the claims and damages in this trial." Court Order Directing Post-Trial Briefing ("Post Trial Br. Order") (ECF No. 587) at 2. As discussed below, they have otherwise failed to prove specific causation for their other alleged physical injuries.

Before turning to these points, it is critical to remember that the duration of the Bellwether Plaintiffs' exposure in this case was, at most, a matter of days. The first complaint of a petroleum odor or taste in the water system was November 27, 2021 (this is also the day Plaintiffs begin their water model). JX-0028 at JX-0028_00038 (¶ 217) ("earliest report" received 6:30pm November 27, 2021); April 30, 2024 Tr. 112:25-113:1 (Day 1 of Dr. Rosenfeld's model is November 27,

23

2021). The next day (November 28th), the Aubart, Dietz, and Jessup Bellwethers detected the presence of petroleum in their water, and therefore ceased consuming it. *See supra* at 14 & n.3. The following day (November 29th), the Freeman Bellwethers also detected the presence of petroleum in their water, and therefore ceased consuming it. *See supra id.* The same day (November 29th), the Hawaii Department of Health (HDOH) issued a public health advisory not to consume or use the JBPHH water ("Health Advisory"). JX-0005 (HDOH Health Advisory) at JX-0005_00001.[9] Mrs. Witt ceased two days later on December 1, 2021, after seeing the Health Advisory, even though she never smelled petroleum in her water. *See supra* 14 & n.3; April 30, 2024 Tr. 174:5–8 (Mrs. Witt was out of town until November 28, 2021); *id.* 177:24–25 (Mrs. Witt never smelled petroleum in her water). The Feindt Bellwethers—located the farthest from Red Hill and the closest to an unaffected water source—ceased consuming or using the water on December 9, 2021, after seeing a flyer and detecting no issues with their drinking water before then. P. Feindt Decl. ¶ 21; A. Feindt Decl. ¶ 25; April 29, 2024 Tr. 183:25–184:12. This timeline is critical not only to the causation arguments, but also when

---

[9] *See also* DX-3003 at DX-3003_00001 (same warning from HDOH on December 1, 2021); DX-3004 at DX-3004_00002 (same warning from HDOH on December 3, 2021); JX-0003 at JX-0023_00003 (same warning from HDOH on December 6, 2021); DC-3005 at DX-3005_00001 (same warning from HDOH on December 8, 2021); JX-0024 at JX-0024_00002 (same warning from HDOH on December 10, 2021)

this Court considers the damages to award. *See infra* at 98–111.

### A. Plaintiffs Fail to Prove Specific Causation for their Alleged Acute Injuries.

Plaintiffs seek compensation for a wide array of acute physical effects that they allege were caused by the November 21, 2021 fuel release, but offer no reliable causation analysis to support such a conclusion.[10]

As a threshold matter, Plaintiffs seek to recover for dozens of alleged acute symptoms for which they offer no expert testimony on causation. *See* Ex. A., Summary of Bellwether Pls.' Claimed Acute Injuries at 1–2, 4, 6, 8–10, 15–21, 24–28, 30, 32–33; *see also Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 116 Haw. 277, 172 P.3d 1021, 1043-44 (Haw. 2007) (in complex cases, where the "causal relationship between the violation of a duty and an injury" are beyond the "everyday experience, observations, and judgment" of the factfinder,

---

[10] Plaintiffs incorrectly assert that the Government's medical experts "offered no opinion on acute injury." Pls.' Br. 50–51. Dr. Kosnett and Dr. Durrani's declarations opine extensively on many of the acute symptoms Dr. Bird ascribes to Plaintiffs. *See* Kosnett Decl. ¶¶ 41–280 (discussing specific causation of the adult Plaintiffs' claimed health effects); Durrani Decl. (ECF No. 384-1) ¶¶ 28–172 (discussing specific causation for each of the minor Plaintiffs' claimed health effects). Plaintiffs' argument that Dr. Kosnett's and Dr. Durrani's opinions are "irrelevant" were overruled by the Court. *See* May 9, 2024 Tr. 46:4–5 (regarding Dr. Durrani: "The Court: So I've reviewed the objections. They are overruled. You can bring that up in cross-examination."); May 10, 2024 Tr. 21–11 (regarding Dr. Kosnett: "The Court: . . . I'm going to overrule the objection, but I think it's fair play for cross-examination . . ."). Plaintiffs then strategically elected to waive cross examination for both Dr. Kosnett and Dr. Durrani.

Hawaii law requires expert testimony to prove causation) (quoting *Bernard v. Char*, 79 Haw. 371903 P.2d 676, 682 (Haw. App. 1995)); *accord Lake v. Ohana Mil. Cmtys., LLC*, No. CV 16-00555 LEK, 2019 WL 4794536, at *17 (D. Haw. Sept. 30, 2019) *vacated on other grounds,* 14 F.4th 993 (9th Cir. 2021); *see also Larsen v. Pacesetter Sys., Inc.*, 74 Haw. 1, 837 P.2d 1273, 1295 (Haw. 1992) ("Expert testimony is necessary . . . where an injury is subjective in character and of such nature that a layperson cannot with reasonable certainty know whether there will be future pain and suffering."). Plaintiffs thus cannot recover for any of these injuries.

Plaintiffs instead ask this Court to find causation on the basis that (1) general causation of certain health effects is not disputed[11] and (2) Plaintiffs complained of these health effects shortly after the spill. *See* Pls.' Br. 5 (arguing that it is "less necessary" for the Court to consider factors other than temporality), *id.* at 50

---

[11] Plaintiffs devote several pages of their brief to discussion of reports and studies concerning non-plaintiffs' complaints of health effects resulting from alleged exposure to JP-5 as evidence of causation. *See* Pls'. Br. 22–23, 29–33. Such evidence is immaterial to the issue before the Court, as the United States does not dispute that, at sufficient dose and duration, exposure to JP-5 could cause certain health effects, such as headaches, gastrointestinal symptoms such as nausea or diarrhea, or skin rashes. *See, e.g.*, Kosnett Decl. ¶¶ 50 (headache); 191 (gastrointestinal symptoms); 237 (skin irritation); DX-3076 (Dec. 5, 2021 Guidance to Health Providers) at DX-3076_00001 ("Many factors determine whether a person can be harmed by petroleum products, *including the dose (how much), the duration (for how long)*, the route of exposure, and the state of health of the individual.") (emphasis added).

(arguing that specific causation must be found "given the temporality of their acute symptoms"). Such an approach fails to consider all required factors of specific causation, and Plaintiffs fail to carry their burden to demonstrate that exposure to JP-5 was the cause of their claimed physical injuries.

### 1. Specific Causation Cannot Be Found on Temporality Alone, and Plaintiffs' Claimed Injuries Are Inconsistent with the Temporal Relationship to Their Exposure.

As a threshold matter, Plaintiffs are simply incorrect on the law. "[A] temporal relationship often will not on its own suffice to show causation." *Platt v. Holland Am. Line Inc.*, No. 2:20-CV-00062-JHC, 2023 WL 2938172, at *7 (W.D. Wash. Apr. 13, 2023). "It is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Rule] 702." *Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900, 906 (M.D. Fla. 1996) (collecting cases). Temporality must be considered as only one of a "constellation of factors" in conducting a differential diagnosis, *Platt*, 2023 WL 2938172, at *7 (citation omitted), and Plaintiffs must also offer "specific reasons for ruling out" other potential causes, *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1061 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003). Plaintiffs rely on *Paeschke v. General Motors* to assert that a full specific causation analysis is not necessary for acute symptoms because "where there is a sudden or immediate onset of

27

symptoms, non-expert evidence in combination with expert testimony suggesting a possible cause is sufficient for a [factfinder] to infer causation." Pls.' Br. 5 (quoting *Paeschke v. Gen. Motors LLC*, No. 4:16-CV-5050-LRS, 2017 WL 5632442, at *6 (E.D. Wash. Oct. 11, 2017). But such an argument fails to acknowledge the full context of the *Paeschke* decision, in which the Court specifically noted that such circumstantial inferences were appropriate in determining whether heated seats caused burns because "unlike a complex toxic tort, the subject matter here is not complex" and that in toxic tort cases—such as the instant case—"issues pertaining to toxin exposure, dose, and epidemiological evidence make the task of proving causation more complex." *Id*; *see also* Michael D. Green, *Ref. Guide on Epidemiology* in *Ref. Manual on Scientific Evid*. 549, 601-02 (Fed. Jud. Ctr., 2011 3d ed.)[12] (noting that when "a substantial proportion of the disease is due to unknown causes, temporal relationship provides little beyond satisfying the requirement that cause precede effect.").

Furthermore, the evidence belies Plaintiffs' assertion that their claimed injuries had a "sudden and immediate onset" after their November 2021 exposure. Plaintiffs' own testimony indicates that they began experiencing their claimed symptoms *days befor*e Dr. Rosenfeld and Dr. Grayman agree the contaminated water could have reached any homes. *Compare* S. Jessup Decl. (ECF No. 396)

---

[12] Available on Westlaw at RMSCIEVID 549.

¶ 10 (family began experiencing symptoms the "week of November 22, before Thanksgiving"); R. Dietz Decl. (ECF No. 391) ¶ 10 (family began experiencing symptoms "[i]n the days leading up to Thanksgiving [November 25, 2021]"); May 3, 2024 Tr. 92:1–11 (K. Aubart admitting that his symptoms began sometime between November 9, 2021 and November 23, 2021); PX-2252 (Pls.' P. Feindt, Jr. Composite Med. R.) at PX-2252_0154 (symptoms began on November 22, 2021), *with* Grayman Decl. ¶¶ 28–36 (contaminated water gradually begins entering the system on November 26, 2021); April 30, 2024 Tr. 92:17–22 (Dr. Rosenfeld testifying that Day 1 of his model is November 27, 2021). *See* Ref. Guide on Epidemiology at 601 ("If an exposure causes disease, the exposure must occur before the disease develops. If the exposure occurs after the disease develops, it cannot have caused the diseased.").

Further, many of the "acute" symptoms that Dr. Bird opines were caused by the spill did not commence until months later. For example, Richelle Dietz's rashes developed in February 2022, two months after she stopped bathing with her home's tap water. Kosnett Decl. ¶ 97 (ECF No. 382-1) ("There is no known toxicological mode of action by which ≤ 4 days of bathing with water containing highly dilute (≤0.1 to 1%) TPH-d in late November 2021 would have caused atopic dermatitis that prominently appeared and persisted beginning in February 2022."). Patrick Feindt, Jr.'s chronic pain commenced in May 2022, after he had moved to

Colorado and nearly 6 months after he stopped using household water for all purposes. *Id*. at ¶ 147 ("There is no established toxicological or pharmacological mode of action that would link brief exposure to JP-5 that ended in December 2021 to the onset of neuropathic pain that abruptly emerged in May, 2022 and has since persisted."). Similarly, many of Plaintiffs' claimed acute injuries predate the November 2021 spill, such as Patrick Feindt, Jr.'s abdominal pain, diarrhea, vomiting, and bloating (onset in May of 2021, *see* April 29, 2024 Tr. 211:5–24); P.G.F.'s cough (onset May of 2021, *see id.* 213:11–14); and N.F.'s muscle and joint pain (onset in September of 2021, *id.* 109:12–17) and abdominal issues (onset October 2021 and resulting in a trip to the hospital, *id.* 109:18–110:3). The attached Exhibit A further details the lack of temporal relationship between each of Plaintiff's alleged acute symptoms and the November 20, 2021 fuel spill.

The duration of Plaintiffs' alleged acute symptoms is similarly inconsistent with a causal connection to exposure to JP-5. Dr. Diana Felton, the Hawaii Department of Health's toxicologist, testified that the half-life of JP-5 is 4-12 hours and that basic principles of toxicology indicate that it would be completely processed from the human body within five half-lives. Felton Dep. (ECF No. 361-1) 70:2–71:14. Accordingly, JP-5 would be "completely gone" from the human body within 1-2.5 days of cessation of exposure. *Id*.

> Symptoms related to petroleum hydrocarbons in drinking water should resolve rapidly (within 1-2 days) of cessation of exposure. Symptoms

> that do not improve may be an indication for further revaluation and
> work-up for other causes.

JX-0041 (Dr. Felton's Dec. 9, 2021 Guidance to Health Care Providers) at JX-

0041_00002–03. Thus, acute symptoms of JP-5 exposure would rapidly onset and

resolve within 1-2 days of Plaintiffs' cessation of exposure.[13] Many of Plaintiffs'

alleged short-term injuries, however, continued for months after they stopped using

the water, such as P.G.F.'s chronic cough (continued through April 2024, *see* Bird

Decl. (ECF No. 490-1) ¶ 110(f)), the Freeman children's abdominal pain (persist

"to this day," *see id.* at ¶¶ 120(d) & 122(f)), and Mr. Aubart's headaches and

"brain fog" (continued until at least July 2023, Bird Decl. ¶ 106(c)); *see also* Ex. A

at , 5–6, 8, 10, 12, 14, 16, 17–20, 23–24, 26, 28–29, 33. As noted by Dr. Felton, the

continuation of these symptoms, after cessation of exposure, indicates that the

alleged symptoms were not in fact caused by their alleged exposure to jet fuel.

### 2. The Bellwether Plaintiffs' Doses of JP-5 Were Not Capable of Causing Adverse Health Effects.

Plaintiffs' causation analysis is devoid of any discussion of each Plaintiffs'

exposure to JP-5, or even any acknowledgement that the level of exposure varied

among the 17 Bellwethers or the nearly 100,000 individuals on the water line.

Plaintiffs instead summarily assert that each Bellwether Plaintiff was "exposed at

---

[13] Even Dr. Bird acknowledged that acute symptoms would last at most for
"weeks," depending on how long each Plaintiff continued to use the contaminated
water. May 3, 2024 Tr. 47:10-48:4.

levels sufficient to cause medical injury," Pls.' Br. 37, but fail to offer any

evidence of what level of exposure is "sufficient." "[T]he boundaries of allowable

expert testimony are not so wide as to permit an expert to testify as to specific

causation without having any measurements of a plaintiffs' exposure to the

allegedly harmful substance." *Henricksen*, 605 F. Supp. 2d at 1157.

  Both the United States and Plaintiffs rely on the Agency for Toxic

Substances and Disease Registry (ATSDR) Toxicological Profile for JP-5, JP-8,

and Jet A Fuels (DX-3230; PX-2186). This profile includes a minimal risk level

(MRL) for acute exposure to JP-8 of 3 mg/kg/day. DX-3230 (ATSDR Tox Profile)

at DX-3230_00041. This MRL is "an estimate of the daily human exposure to a

hazardous substance that is likely to be without appreciable risk of adverse effects

(noncarcinogenic) over a specified duration of exposure." *Id*. at DX-3230_0034.

"ATSDR establishes the MRL by identifying the lowest dose for any endpoint

relevant to human health that has been found to have No Observed Adverse Effects

(NOAEL) in animals and humans, and then decreasing that dose by uncertainty

factors, or safety factors, which may range from 10-fold to several thousand-fold."

Kosnett Decl. ¶ 28. "Thus, as ATSDR emphasizes, 'Exposure to a level above the

MRL does not mean that adverse health effects will occur.'" *Id*. (quoting DX-3230

at DX-3230_00283). "MRLs developed by ATSDR are considered safe doses, as

opposed to doses that are a threshold for toxicity to appear." *Id.* Even at the highest

starting concentration modeled by Dr. Grayman (which exceeds Plaintiffs' own

starting concentration by over a factor of two, *see* April 30, 2024 Tr.56:1–11),

none of the Bellwether Plaintiffs exceed or even meet the MRL safe dose. Kosnett

Decl. ¶ 53; Kosnett Demonstrative Ex. D (ECF No. 382-5); *see also* Prueitt Decl.

(ECF No. 332) ¶¶ 110-55 and exhibits cited therein (calculating doses for each

Bellwether Plaintiff and comparing them to the relevant doses associated with

health effects).

      In contrast to the Plaintiffs, the United States undertook extensive efforts to

estimate each Bellwether Plaintiff's estimated dose using rigorous scientific

processes. First, as discussed above, Dr. Grayman modeled the flow of JP-5

throughout the JPBHH water system and estimated the concentration of JP-5 at

various points, including the Bellwether Plaintiffs' residences. *E.g.*, Grayman Decl.

¶¶ 37–44. Second, Dr. Lyle Burgoon used those estimates of water concentration

along with data regarding floor plans and air flow to estimate the air concentration

at each Plaintiffs' residence. Burgoon Decl. (ECF No. 358-1) ¶¶ 10–67. Dr. Prueitt

then used these estimates to calculate ingestion, inhalation, and dermal doses for

each Plaintiff, which (as the United States' experts testified) are all well below the

MRL safe doses estimated by the ATSDR and values at which health effects were

observed in the scientific literature, including those relied upon by ATSDR and

other regulatory bodies. *See* Kosnett Decl. ¶¶ 53 (Kevin Aubart); 91 (Richelle

Dietz); 140 (Patrick Feindt, Jr.); 193 (Nastasia Freeman); 233 (Sheena Jessup); 273

(Elizabeth Witt); Kosnett Demonstrative Ex. D (ECF No. 382-5); Prueitt Decl. ¶¶

110–55 and exhibits cited therein.

Plaintiffs, in contrast, argue that estimates of dose are not possible due to the

lack of real-time water sampling, *see* Pls.' Br. 37, but that argument fails to

account for the available data. Dr. Bird acknowledged that an individual's

ingestion dose of JP-5 could be calculated from (1) concentration of JP-5 in the

water; (2) volume of water consumed; and (3) body weight, and that data for all

three variables was in fact available to him, including from Plaintiffs' own expert

Dr. Paul Rosenfeld. May 3, 2024 Tr. 15:13–16:9. Pursuant to Plaintiffs' own

estimates, a concentration of 6,532 ug/L would have been present across the water

distribution system by December 6, 2021. Pls.' Br. 16. But such a concentration,

while high enough to form a sheen, would still be within the range modeled by Dr.

Grayman, and therefore was converted into doses by Dr. Prueitt, which were then

analyzed by both Drs. Prueitt and Kosnett who determined that they were not high

enough to cause adverse health effects. *See supra* at 32–34.

Dr. Bird seeks to escape this conclusion by disavowing any reliance on Dr.

Rosenfeld's estimates, testifying that it would be "inappropriate" to rely upon Dr.

Rosenfeld's numbers to estimate Plaintiffs' exposure. May 3, 2024 Tr. 15:3–9. In

short, Plaintiffs simultaneously ask this Court to find Dr. Rosenfeld's estimates

reliable for purposes of determining who was exposed, but unreliable to determine
how much JP-5 they were exposed to. Plaintiffs should not be permitted to
selectively rely on only the portions of their expert's conclusions that fit their
desired outcome and ignore those that do not.

### 3. Plaintiffs' Expert Fails to Rule Out Other Likely Causes of Plaintiffs' Alleged Acute Symptoms.

Like the requirement for a determination of the dose of Plaintiffs' exposure,
evaluation of potential alternative causes of Plaintiff's injuries is an essential
element of specific causation. Bird Order 15-16 (quoting *Henricksen*, 605 F. Supp.
2d at 1156). When performing this analysis (also known as a differential
diagnosis), the expert must consider other potential causes and "must provide
reasons for rejecting alternative hypotheses 'using scientific methods and
procedures and the elimination of those hypotheses must be founded on more than
subjective beliefs or unsupported speculation.'" *Clausen v. M/V NEW CARISSA*,
339 F.3d 1049, 1058 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25,
2003) (internal quotations omitted).

Plaintiffs' medical expert, Dr. Bird, did not testify regarding a single
alternative cause for any of the dozens of acute health effects he opines each
Bellwether Plaintiff suffered as a result of their alleged exposure. *See* May 3, 2024
Tr. 25:8–11 ("Q: But your report and declaration don't include a discussion of
which other causes you considered and why you found them not applicable,

correct? A: I would generally agree with that."). In fact, Dr. Bird also failed to rule

out other potential causes of Plaintiffs' symptoms identified in real-time by treating

providers. *Id*. at 25:12–27:9 (acknowledging that he did not rule out alternative

causes identified by treating physicians of P.R.F. or P.G.F.'s vomiting and

diarrhea). As Dr. Bird acknowledged, "No standard clinical case definition for JP-

5-related toxicity exists, which made it difficult to distinguish between health

effects attributable to JP-5 and those attributable to another cause." *Id.* at 60:2-6

(quoting PX-2216 (Miko Study) at PX-2216_0012). Indeed, the fuel spill

coincided with the surge of the Covid Delta variant in Hawaii, PX-2216_0012,

many of the alleged symptoms are also common Covid symptoms, and Dr. Bird

testified that many of the Plaintiffs developed Covid after the December 2021

holidays. May 3, 3024 Tr. 60:7-13. "Where a defendant points to a plausible

alternative cause and the doctor offers no explanation for why he or she has

concluded that was not the sole cause, that doctor's methodology is unreliable."

*Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999) (internal citation

omitted).

### B. Plaintiffs Have Not Proven that Their Alleged Long-Term Injuries Were Caused by the November 2021 Spill.

This Court has previously held that Dr. Bird's opinions "do not adequately

support the leap to specific causation of long-term illnesses." Bird Order 21. As a

result, Plaintiffs lack the requisite expert testimony to demonstrate specific

causation for long-term health effects. *Id*.; *see also* Post-Trial Br. Order 2

("Plaintiffs do not provide the requisite expert epidemiological testimony

necessary to support causation evidence for claims of future damages formerly

sought by Plaintiffs, such as future physical impairment; increased risk of future

harm and medical monitoring for life; loss of life expectancy, and thus these

alleged damages are not part of the claims and damages in this trial."").

Accordingly, Plaintiffs' efforts to recover for alleged "acute" symptoms that lasted

for months or years are inconsistent with both scientific evidence and this Court's

prior orders. *See* Ex. A. at 2, 5–6, 8, 10, 12, 14, 16, 17–18, 23–24, 26, 28–29, 31,

33.

Plaintiffs nevertheless seek damages for long-term injuries for Bellwether

Plaintiffs Beau Jessup, Nastasia Freeman, and D.F., none of which are recoverable

in light of the lack of expert testimony in support of causation. *See* Pls.' Br. 58

(seeking $200,000 for Mrs. Freeman's alleged "future pain and suffering" and

$100,000 for physical impairment "due to her neurological injury"), 104 (seeking

$100,000 for physical impairment for Beau Jessup's tremor); ECF No. 595-1 (Ex.

A to Pls.' Br.) at 6 (seeking $75,000 for pain and suffering for D.F. due, in part, to

tremors).

Plaintiffs apparently rely on the testimony of neurologist Dr. Kristin

Andruska to support these claims of specific causation. *See* Pls.' Br. 41-42.

37

However, Dr. Andruska is not an epidemiologist or toxicologist and thus lacks the

requisite expertise to make specific causation findings regarding toxic exposure.

While Plaintiffs argue that Dr. Andruska reviewed epidemiological studies,

"[w]hether the agents cause the outcomes, however, ordinarily cannot be proven by

epidemiological studies alone; an evaluation of causation requires epidemiologists

to exercise judgment about the import of those studies and to consider them in

context." *See* Bird Order 12 (quoting *In re Viagra (Sildenafil Citrate) & Cialis

(Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 794 (N.D. Cal. 2020)). As Dr.

Andruska admitted, she is not a toxicologist, she "has no opinions as a

toxicologist," did not conduct a toxicity assessment for Mrs. Freeman, did not

conduct a Bradford Hill analysis, and did not compare Mrs. Freeman's dose of JP-

5 to the dose required to produce long-term neurological effects. *See* May 3, 2024

Tr. 123:5–126:4. Accordingly, she lacks both the knowledge and the qualifications

necessary to render an opinion on toxicological causation of Mrs. Freeman's

claimed neurological injuries. *See* Fed. R. Evid. P. 702*; see also* April 29, 2024 Tr.

94:13–19 (The Court: "I don't think a neurologist is the type of expert that you can

bring forth to opine as to causation; that is, the jet fuel and the levels and the

exposure caused a long-term condition. . . . [O]n causation, I cannot accept [Dr.

Andruska's] testimony as a neurologist where you need an epidemiologist to

testify.").[14]

Furthermore, Dr. Andruska does not offer any opinions regarding any

Plaintiff other than Mrs. Freeman, including Beau Jessup and D.F. *See* May 3,

2024 Tr. 123:1-4. Plaintiffs do not cite any expert testimony to support their claim

that Beau Jessup's or D.F.'s tremor is the result of exposure to JP-5, and thus fail

to meet their burden. *See Exotics Hawaii-Kona*, 172 P.3d at 1043–44 (in complex

cases, where the "causal relationship between the violation of a duty and an injury"

are beyond the "everyday experience, observations, and judgment" of the

factfinder, Hawaii law requires expert testimony to prove causation) (internal

citation omitted).

Plaintiffs' reliance on Dr. Storage to support Mrs. Freeman's claims fares no

better, as he is not a toxicologist and is unfamiliar with the Bradford Hill criteria.

---

[14] The Plaintiffs claim Mrs. Freeman was diagnosed with vestibular dysfunction.
Pl. Br. 54; Pl. Br. Ex. 1 at 1. Mrs. Freeman claims her diagnosis was from Walter
Reed but there are no records supporting that. Gordon Decl. (ECF No. 345-1)
¶ 26bb. Dr. Andruska claims she was diagnosed via a computerized dynamic
posturography testing, May 3, 2024 131:24–132:17, but her testimony fails to offer
any pincites to any records. As Dr. Gordon notes, Gordon Decl. ¶ 26bb, Mrs.
Freeman never had the recommended videonystagmography (VNG) testing from
her ENT. *See* PX-2255 at PX-2255_1455 ("could consider VNG"). Dr. Andruska
does not claim otherwise. Dr. Andruska appears to be the only physician who has
indicated that Mrs. Freeman has vestibular dysfunction, but Dr. Andruska is not
Mrs. Freeman's treating provider and admitted that she is not making any
independent diagnoses of Mrs. Freeman. May 3, 2024 at Tr. 120:23–25; *see also
id.* 121:7–122:17 (Dr. Andruska met with Mrs. Freeman once for 80 minutes over
Zoom and did not perform an in-person neurological exam)

May 1, 2024 Tr. 70:20–22, 71:21–73:13. He also did not estimate Mrs. Freeman's

dose of JP-5 or compare it to levels in the scientific literature known to cause

adverse health effects. *Id.* 73:16–24. He instead relies solely on temporality, which

the case law (*see supra* at 27–31) and this Court have noted may demonstrate

association, but not causation, May 1, 2024 Tr. 73:5–13. In other words, just as the

Court excluded Dr. Bird's opinions on toxicological causation of long-term injuries

because he "does not adequately support the leap to specific causation of long-term

illnesses," it should likewise disregard Dr. Storage's opinions regarding the

toxicological cause of Mrs. Freeman's alleged long-term injuries, Bird Order 21

(excluding Dr. Bird's opinions on long-term illnesses).

Similarly, Dr. Storage opines that the "emotional trauma secondary to the

toxic exposure" caused physiological changes to Mrs. Freeman's brain." May 1,

2024 Tr. 94:19–21. Those opinions are likewise unsupported by any recognized

methodology. Dr. Storage's use of the SPECT brain scan (*id.* 100:12–23) are

insufficient to bridge this causation gap, especially given that: (1) Dr. Storage

confirmed that one cannot diagnose a patient based on a SPECT scan alone, *id.*

89:11–15; (2) Dr. Storage was unable to answer basic foundational questions

regarding Mrs. Freeman's SPECT scan, *id.* 89:25–91:12, and (3) numerous other

courts have questioned the reliability of SPECT scans in establishing causation,

*see, e.g.*, *Summers v. Missouri Pac. R.R. Sys.*, 897 F. Supp. 533, 540 (E.D. Okla.

40

1995) (SPECT scans "have been the subject of much criticism by the scientific community as not having met acceptable scientific levels of methodology and criteria"), *aff'd,* 132 F.3d 599 (10th Cir. 1997); *McCook v. Unum Life Ins. Co. of Am.*, 463 F. Supp. 3d 729, 740 (E.D. La. 2020) ("SPECT results by themselves may not satisfy causation."); *Smith v. Bisso Marine, LLC*, No. 6:14-cv-00697, 2017 WL 6887122, at *1 (W.D. La. 2017) ("this Court finds that the SPECT scan is a tool that can show a change in blood flow but does not establish causation"). One of Mrs. Freeman's treating providers informed her of the dubious nature of Dr. Storage's use of SPECT scans.[15]

Assuming Plaintiffs could prove causation, which they cannot, Dr. Gordon found no organic (*i.e.*, physical) neurological injury. Mrs. Freeman has an extensive and complex neurological history beginning in childhood and pre-dating the November 2021 spill. *See* Gordon Decl. (ECF No. 345-1) ¶¶ 25–27.[16] She

_____

[15] PX-2255 at PX-2255_0704 (October 19, 2022 medical record: Mrs. Freeman "also reports having engaged Amen Clinic, and had MR SPECT, with not-unexpected (for that clinic) concern for toxicity and traumatic-brain-injury. Provided pt perspective that for any element of traumatic-brain-injury, there is no validated medication/treatment/intervention that would be expected to speed-recovery or translate into better recovery (though Amen clinic undoubtedly will profess otherwise)."

[16] *See also* PX-2255 at PX-2255_0035 (May 2, 2016 medical record: notes history of seizures and lightheadedness (syncope) and that increasing of late); PX-2255_0228 (October 24, 2017 medical record: reports tingling of hands and mouth); PX-2255_0231 & _235 (October 24, 2017 medical record: recounts daily excruciating headaches for 3 weeks, as well as "mental fogginess, word-finding

began having "seizures" that presented a bit differently in October 2021 prior to the November 2021 spill. April 29, 2024 at Tr. 105:22-24; 136:1-16. Walter Reed found these spells to be psychogenic and caused by the psychological process. Gordon Decl. ¶¶ 20, 26o. As noted, *supra* at 38 n.14, Mrs. Freeman was not diagnosed with vestibular dysfunction. Mrs. Freeman simply does not have a long term organic neurological problem from the exposure. Gordon Decl. ¶ 52.

For all these reasons, Plaintiffs have not satisfied their burden of proving that the November 2021 spill toxicologically caused their alleged physical injuries, including acute symptoms.

## III. Reasonable Emotional Distress Is Limited in Duration.

Under Hawaii law, emotional distress and mental anguish are recoverable "where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Rodrigues v. State*, 52 Haw. 156, 173, 472 P.2d 509, 520 (1970). Although a plaintiff need not show physical manifestation to recover for negligent infliction of emotional distress, Hawaii courts require that a showing that the claimed mental stress is that which "a reasonable person" would experience as a result of "an

---

difficulty, forgetfulness"); PX-2255_0164 (November 12, 2017: reports worsening, "excruciating" headaches); PX-2255_0221 (November 13, 2017 medical record: reports horizontal eye movement every other day lasting 45 seconds and beginning in 2013).

actual, direct, imminent, and potentially life-endangering threat to his or her

physical safety." *John & Jane Roes, 1-100 v. FHP, Inc.*, 91 Haw. 470, 476, 985

P.2d 661, 666 (1999). Plaintiffs bear the burden to provide evidence to "guarantee

the genuineness and seriousness of the claim," and mere "speculative worry" is not

recoverable. *Id.* at 667. Fear of "future events which may or may not have had their

genesis in the defendants' alleged wrongdoing in the past . . . can hardly be

characterized as *general* mental anguish for harm caused in the past by

defendants." *In re Hawaii Fed. Asbestos Cases*, 734 F. Supp. 1563, 1569 (D. Haw.

1990) (emphasis in original); *see also Goodin v. Fid. Nat. Title Ins. Co.*, No.

CIV.07-00074-DAE-BMK, 2008 WL 4173530, at *3 (D. Haw. Sept. 9, 2008)

("Mere fear of contingent injury which may never occur, and the happening of

which is speculative and uncertain, is not a showing of damage.") (quoting *State v.

Davis*,53 Haw. 582, 499 P.2d 663, 670 (Haw. 1970)), *aff'd,* 370 F. App'x 789 (9th

Cir. 2010). Similarly, fear of future health effects "based on self-serving

declarations is not compensable absent an underlying compensable harm." *In re

Hawaii Fed. Asbestos Cases*, 734 F. Supp. at 1569.

   The United States recognizes that the Bellwether Plaintiffs experienced

stress, anxiety, and worry in the days after they learned about the November 2021

fuel spill. *See* May 13, 2024 Tr. 25:19-26:15. Dr. Eric Smith, a Clinical and

Forensic Psychologist, evaluated Plaintiffs in connection to their emotional distress

and psychological injury claims. As this Court discerned, Dr. Smith opined that he

would have expected the Bellwether Plaintiffs to experience emotional distress,

fear, anxiety, anger, resentment, etc., following the November 2021 spill. *See id.* at

29:21–30:9.

But there is a difference between the reasonable emotional duress the

Bellwether Plaintiffs experienced in the immediate aftermath of the November

2021 spill and long-lasting attributable psychological injury and emotional distress

they now claim. Particularly where, as here, there is no medical or scientific

evidence to support the Bellwether Plaintiffs' professed fears of contracting a

myriad of injuries and prolonged concerns about non-attributable symptoms. *See*

*John & Jane Roes, 1-100*, 985 P.2d at 666. Although Plaintiffs argue that they

have experienced "significant psychological distress and mental health conditions

such as PTSD, anxiety disorders, and depression," *see* Pls.' Br. 47, as detailed

below, many of the fears and concerns they now point to as the cause of their

ongoing anxiety and depression are tied to preexisting or simultaneously occurring

traumas.

For example, Patrick Feindt, Jr., testified that his emotional distress stems in

part from concerns about current and future health problems, as well as on ongoing

fear of cancer. *See* P. Feindt Decl. ¶ 101; April 30, 2024 Tr. 29:10–15. Plaintiffs

similarly point to Sheena Jessup's fears that her children have developed long-term

44

neurological or hormonal condition, as described in her concerns related to B.J.J., *id.* at 150:21–151:5, or Beau Jessup's tremor, *id.* at 153:12-154:18. The same applies to Richelle Dietz's fears of cancer and trying to link every ailment – including thyroid issues and rashes that manifested months after the November 2021 fuel spill – as proof of ongoing emotional distress, R. Dietz Decl. ¶¶ 70, 74-76. *See* Pls. Br. 124–25. However, neither scientific literature nor the Bellwether Plaintiffs medical records demonstrate a causal link between these speculative harms and exposure to JP-5 in such limited dose and duration. *See supra* 21–42. Consequently, the Court should not award ongoing emotional distress damages for them. *See, e.g.*, *In re Hawaii Fed. Asbestos Cases*, 734 F. Supp. 1563, 1569 (D. Haw. 1990) ("Although plaintiffs claim fear of cancer in the present, such fear relates to future events which may or may not have had their genesis in the defendants' alleged wrongdoing in the past. This fear relates to a specific event which may or may not occur in the future. Such fear can hardly be characterized as *general* mental anguish for harm *caused* in the past by the defendants.") (emphasis in original); May 1, 2024 Tr. 45:18–46:4; *Collier v. Simpson Paper Co.*, 133 F.3d 926, 1997 WL 812253 (Table), at *4–5 (9th Cir. Dec. 24, 1997) (affirming dismissal of fear of contracting cancer claim when plaintiffs did not present evidence that they were more likely than not to get cancer due to the alleged exposure).

Plaintiffs' medical records demonstrate that their claims of lasting emotional

distress, including anxiety, PTSD, and other emotional injuries, are insufficiently

related to any continuing or longstanding "actual, direct, imminent, and potentially

life-endangering threat to [their] physical safety." *John & Jane Roes, 1-100*, 985

P.2d at 666. In fact, Plaintiffs were informed by medical providers that any

physical symptoms resulting from exposure would be temporary. For example, in

January 2022, the Feindt family was informed by a medical provider that exposure

to JP-5 "can cause GI irritation & dermal irritation" but that "[s]ymptoms resolve

once exposure stops and petroleum products pass through the GI tract." DX-3224

(Defs.' Composite P.G.F. Med. R.) at 122.

Similarly, medical providers informed Plaintiffs that many of their long-term

medical concerns were likely the result of other causes. For example, in July 2022,

Elizabeth Witt contacted her provider regarding concerns about high levels of

2HIB in her urine and was informed that the chemical of concern was not found in

JP-5 and further that her elevated lab results were due to pregnancy. *See* PX-2264

(Pls.' E. Witt Composite Med. R.) at PX-2264_0042; *see also* April 30, 2024 Tr.

183: 5-9 (E. Witt confirming that no medical provider has ever connected her

psychological symptoms to the November 2021 spill). Likewise, Mrs. Jessup

testified that Beau's neurologist informed her that essential tremor is usually

genetic. April 30, 2024 Tr. 153:12–154:3. The Feindts also received advice that

46

their symptoms likely had other causes. *See* PX-2253 (Pls. P.G.F. Composite Med.

R.) at PX-2253_0110-11 (Jan. 19, 2022 primary care visit noting that provider

informed Major Feindt that since P.G.F.'s initial symptoms had "completely

resolved" additional testing was not necessary because "petroleum does not stay in

the body long enough to be absorbed" and that Major Feindt responded by

accusing the provider of "gaslighting"); DX-3225 (Def.'s P.R.F. Composite Med.

R.) at 14 (June 2022 call with Rocky Mountain Poison Control Center reflecting

advice that "symptoms and timing of onset is vague, not sure they can all be

attributed to this fuel spill.").

Additionally, following the November 2021 spill, B.D.'s medical providers

repeatedly point to his preexisting Chiari I Malformation and other sources as the

reasons behind his ongoing headaches and anxiety, with no mention of the fuel

spill until B.D. needed to participate in his deposition – at which point the anxiety

was tied to meeting with attorneys not the spill itself. *See* DX-3218 (Def.'s B.D.

Composite Med. R.) at 2; PX-2250 (Pls. B.D. Composite Med. R.) at PX-

2250_0021 , PX-2250_0059 & PX-2250_0062. In fact, most of the Bellwether

Plaintiffs have not sought psychological counseling or assistance since the

November spill, and no treating provider – psychological or otherwise – indicated

lasting psychological harms in the months immediately following the spill. *See*

*generally* DX-3212–DX-3228 (composite medical records for each Bellwether

Plaintiff).

As Dr. Smith testified and case law requires, while it is understandable that

the Bellwether Plaintiffs experienced emotional duress surrounding the November

2021 spill, a reasonable person's stress and emotional symptoms would have

begun to abate once they were removed from the risk of harm. May 13, 2024 Tr.

33:16–21; *John & Jane Roes, 1-100*, 985 P.2d at 666. Applying well-established

principles of toxicology, this window of harm lasted at most only 1-2.5 days after

the Bellwether Plaintiffs stopped using the contaminated water. Felton Dep. 71:6

JX-0041 14; JX-0041 at JX-0041_0002-03. By their own accounts about when

they stopped using contaminated water, the latest any Bellwether Plaintiff would

have been experiencing physical symptoms was December 12, 2021, as the Feindts

stopped using the water on December 9, 2021, and all other Bellwether Plaintiffs

ceased using the water days prior in accordance with the public directives. In

recognition of the uncertainty in the immediate aftermath of the spill, but respectful

of the science, medical documentation, and the well-publicized information related

to short-term health effects and risks, *see* DX-3076 (December 5, 2021 Guidance

to Health Providers), the latest that the Bellwether Plaintiffs can link their stress,

anxiety, and other claimed manifestations of emotional distress to due to exposure

to contaminated water was the end of December 2021.[17]

Finally, while Hawaii law permits parents to recover for emotional distress that they experienced as a result of their child's injuries, *see, e.g.*, *Doe Parents No. 1 v. State Dep't of Educ.*, 100 Haw. 34, 70, 58 P.3d 545, 581 (2002), *as amended* (Dec. 5, 2022), there are limitations on such recovery. Given that humans, by nature, are inclined to experience emotional reactions to events involving their close relatives, courts have been clear that *"[t]he emotional distress for which monetary damages may be recovered, however, ought not to be that form of acute emotional distress* or the transient emotional reaction to the occasional gruesome or horrible incident to which every person may potentially be exposed." *Kaho'ohanohano v. Dep't of Hum. Servs., State of Haw.*, 117 Haw. 262, 178 P.3d 538, 583 (2008) (emphasis in original) (citation omitted). A negligent defendant cannot be held financially responsible for emotional distress where there is no link to the negligent conduct. *See id.* at 583 ("[I]n general, courts are prompted to limit recovery for emotional distress because (1) it is temporary and often trivial, (2) it may be imagined and is easily feigned, and (3) it may seem unfair to hold defendants, whose *actions were merely negligent, financially responsible for harm that appears remote from the actual conduct*.") (quoting *Doe Parents No. 1*, 58

---

[17] Stress from the public health advisory (*e.g.*, no running water) are dealt in the loss of enjoyment category. *See infra* at 102–05.

49

P.3d at 580) (emphasis in original).

Where, as here, there is no scientific or medically viable link between the claimed physical symptoms of the minor Plaintiffs to which the parent Plaintiffs point as a source of their enduring emotional distress, the Court should not award the parent Plaintiffs any additional damages. Moreover, given the – at most – acute nature of the minor Plaintiffs' physical symptoms (which, again, the United States submits is unsupported by scientific evidence given the Plaintiffs' exposure dose and duration and credible expert opinion, *see supra* 21–42), the Court should follow the guidance in *Kaho'ohanohano* that such acute emotional distress does not warrant monetary damages. 178 P.3d at 583.

**IV.    Plaintiffs Have Not Satisfied Their Burden with Respect to their Special Damages Claims for Future Health Costs, Tutoring Costs and Lost Wages.**

"Special damages are 'the natural but not the necessary result of an alleged wrong[,]' . . . and are 'often considered to be synonymous with pecuniary loss and include such items as medical and hospital expenses, loss of earnings, and diminished capacity.'" Order Granting Def.'s Mot. in Limine 2 (ECF No. 461) 9 (quoting *Bynum v. Magno*, 106 Haw. 81,101 P.3d 1149, 1153-54 (Haw. 2004)). As with general damages, Plaintiffs bear the burden of proving causation as to special damages. *Id*. As detailed below, Plaintiffs have not satisfied their causation burden for the following three categories of special damages they seek: (1) Mrs.

Freeman's future costs for a driver ($17,240 for two years for a total of $34,840,

Ex. A to Stipulation re: Trial Decl. of Margot Burns (ECF No. 530-1) 56); (2)

future mental health related costs for thirteen of the seventeen Bellwether Plaintiffs

and tutoring for N.F. and K.F.; and (3) Mr. Feindt's and Mrs. Freeman's lost wages

claims.

### A. Plaintiffs Have Not Proven Causation for Mrs. Freeman's Driver.

Plaintiffs seek $34,840 for two years of providing Mrs. Freeman a driver but

have not presented any admissible expert testimony that her inability to drive was

caused by the November 2021 spill. *See supra* at 36–42. Consequently, Plaintiffs

have not satisfied their burden of proof as to this category of special damages and

the Court should not award it. *See* Order Granting in Part Partial Mot. for Summ J.

("Summ. J. Order) (ECF No. 411) 15–17 (dismissing future care special damages

when unsupported by admissible expert testimony).

### B. Plaintiffs Have Not Proven that the November 2021 Spill Caused Their Claimed Future Mental Health Services and Tutoring Costs.

Both sides' experts agree that several of the Bellwether Plaintiffs have

current psychological diagnoses. The true dispute is the *cause* of those injuries.

Plaintiffs contend that the spill is a "substantial contributor" to those diagnoses

and, thus, seek to hold the United States liable for all costs of future treatment. The

United States, on the other hand, offers Dr. Smith's testimony that—while some

Plaintiffs experienced some time-limited stress and anxiety during the spill and its

aftereffects that tapered off in the months that followed—none of the Bellwether

Plaintiffs have any psychological injuries caused by the spill that require future

treatment.

Plaintiffs rely on the testimony of Drs. Vargo and Clark. However, their

etiological opinions are based on unsound methodologies that undermine their

causal analysis. Dr. Vargo, for instance, provided a truncated version of the PTSD

Checklist that asked about recent symptoms, but omitted questions about their

cause. *See, e.g.*, May 2, 2024 Tr. 53:5–56:3. This left Dr. Vargo entirely unaware

of classic traumas, like intimate-partner violence and sexual assault. *See id.* at

60:25–63:25. Instead of using this standardized assessment to obtain a trauma

history, Dr. Vargo instead relied on the examinee's own unexplored assessment of

the cause. *See, e.g., id.* at 65:5–9 ("I specifically asked whether or not these

individuals were experiencing any psychological symptoms within their life

history, and they reported that they were not.").[18] Thus, Dr. Vargo built her

etiological opinions solely on the basis of one question, one answer, and a

perfunctory interview. It is simply unreliable to for Dr. Vargo to not consider—or

---

[18] In addition to the methodological problems, Dr. Vargo's testimony on this point
is factually not credible. For instance, she testified that she "asked [Mrs. Jessup]
whether or not she was experiencing symptomatology related to past abuse, and
she said no." *Id.* at 61:10–17. However, just a few months later, Mrs. Jessup told
Dr. Smith that she experienced a number of symptoms on a weekly basis—like
"disturbing or unwanted thoughts"—that she said were "in regards only to the
trauma" she had with a past intimate partner. Smith Decl. ¶¶ 298–300.

even inquire about—past traumas when determining the cause of a PTSD

diagnosis, which clearly are "absolutely relevant" to Dr. Vargo's opinions. *Id.*

60:10–22. Dr. Vargo herself admits that these events can impact mental health, *id.*

at 59:23–60:1 & 62:15–18, and they are asked about on the full-length PTSD

Checklist that Dr. Vargo declined to administer, PX-1672 (PTSD Checklist for

DSM-5) at PX-1672_0002. However, Dr. Vargo willfully "ignore[d this]

significant quantity of other important facts," and this kind of "cherry pick[ing]"

has little credibility—especially in comparison to Dr. Smith's far more thorough

analysis and examination. Charles Alan Wright & Arthur R. Miller, 29 Fed. Prac.

& Proc. Evid. § 6268 (2d ed.); *Repub. Party of N.M. v. Balderas*, No. 11-cv-900-

WJ-KBM, 2021 WL 5578869, at *3 (D.N.M. Nov. 30, 2021) (same). *See also*

*Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 558–59 (7th Cir. 2019) ("Veronico's

reliance on an anemic and one-sided set of facts casts significant doubt on the

soundness of her opinion. . . .").

Dr. Clark's opinions also lack credibility due to methodological failures. As

the Supreme Court has instructed, trial courts are to ensure that an expert witness

"employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 152 (1999). Dr. Clark fails this basic test. For his clinical patients, Dr.

Clark always sees new patients in-person for between 60 and 90 minutes. Minor

patients—especially those with complicated histories—tend toward the longer end of that range. May 2, 2024 Tr. 75:19–76:4. These appointments are always in-person because he can get a better sense of an individual that way, including how they carry themselves, how they behave, and generally have a better conversation. *Id.* at 76:6–19. Importantly, these appointments include time directly with the child, who can often report their own feelings, describe their internal subjective state, and indicate symptoms of which parents may not be aware. *Id.* at 77:17-23.

But when Dr. Clark leaves the clinic and enters the courthouse, he speaks only with the parents, holds his conversations over Zoom, and declines to actually examine the people about whom he opines. *See, e.g.*, *id.* at 91:18–21 & 98:18–19; Clark Decl. (ECF No. 366) ¶ 18.[19] In so doing, Dr. Clark eschews "the core of most mental health evaluations." Paul S. Appelbaum, *Ref. Guide on Mental Health Evid.* in *Ref. Manual on Scientific Evid.* 813, 834 (Fed. Jud. Ctr., 2011 3d ed.).[20] Such examination-less analysis yields conclusions that "are more limited and have a lesser degree of certainty." *Id.* at 878. As such, "the major professional organizations in forensic mental health"—and Dr. Clark himself— "agree that evidence based on sources other than a direct evaluation of the person should be

---

[19] As for the one minor whom Dr. Clark actually spoke to, he can only identify "an open question" about the cause of her depression. Clark Decl. ¶ 78.

[20] *Available* on Westlaw at RMSCIEVID 813.

framed with due regard for its limitations." *Id.*: Clark Decl. ¶ 21 (testifying that "parental interviews can be used but that the limitations in doing so should be noted").

In this case, these "limitations" are more than theoretical. They in fact leave holes in Dr. Clark's analysis. He is unable to consider and differentiate other potential causes of psychological symptoms that he otherwise attributes to the spill, like Beau's post-spill bullying and pre-spill anxiety, or B.D.'s brain surgery and history of anxiety and familial abuse, or every child's experience with COVID. *See* May 2, 2024 Tr. 87:11–89:25 (Beau), 85:1–87:4 (B.D.), & 78:7–13 (COVID). Dr. Clark testified that asking the children about other potential causes could have aided the differentiation analysis that he declined to do. *See, e.g.*, *id.* at 91:14–17 (Beau); 87:1–10 (B.D.). However, because he chose not to actually examine the children, he cannot offer anything on this score.[21]

The same holds for Dr. Clark's opinion that K.F. and D.F. require "tutoring over 60 weeks for educational catch up." Clark Decl. ¶¶ 94–95. Dr. Clark's testimony provides no indication that he reviewed K.F.'s or D.F.'s educational

---

[21] This is not the only litigation in which Dr. Clark has cut these same methodological corners. As he testified, he similarly used parent-only interviews to opine about children in an immigration case. The court there found that his testimony "lacked credibility" because he had not "adequately accounted for some of the other traumas that the examinees may have experienced." May 2, 2024 Tr. 78:14-79:14. He has made the same mistakes here, and as such, his testimony similarly lacks credibility.

records or spoke with their teachers to confirm they in fact are in need of tutoring.

There is also no explanation for how he determined the extent of their educational

deficient and how 60 hours of tutoring would rectify it. His tutoring-related

opinions are quintessential examples of expert *ipse dixit* that should not be

credited. <u>Joiner</u>, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules

of Evidence requires a district court to admit opinion evidence that is connected to

existing data only by the *ipse dixit* of the expert."); *Daubert v. Merrell Dow

Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("the party presenting the expert

must show that the expert's findings are based on sound science, and this will

require some objective, independent validation of the expert's methodology").

   In stark contrast, Dr. Smith provided the full PTSD Checklist—along with

several other psychological assessments that Plaintiffs' experts declined to use—

and personally interviewed each Bellwether Plaintiff, except the very youngest

(and P.G.F., because Major Feindt declined to authorize the interview, Smith Decl.

(ECF No. 360-1) ¶ 158). As such, Dr. Smith is not limited by the methodological

shortcuts that Drs. Vargo and Clark took, and he is able to provide a wide

psychological view—and not just the narrow, aperture offered by the Plaintiffs.

Based on this thorough examination and analysis, Dr. Smith determined that none

of the Bellwethers whom he examined have current psychological injuries, or

require future mental health care, as a result of the spill. Smith Decl. ¶¶ 14–16.

While they likely had stress, anxiety, and emotional distress during the spill and its aftereffects—and even for a few months following—he explained that this would taper off over time. May 13, 2024 Tr. 29:12–30:9 & 33:1–34:2. Also, and as more fully described below, Dr. Smith identified a number of other factors that are actively causing psychological issues for the Bellwethers, including subsequent events (*e.g.*, Beau's bullying), preexisting disorders (*e.g.*, Mrs. Dietz's anxiety), and prior traumas with present effects (*e.g.*, Mrs. Jessup's abuse). These are facts that the Court considers for apportionment purposes. But they also undermine Drs. Vargo's and Clark's credibility in the first instance: Because of their limited methodology, their awareness and analysis of these other potential causes is necessarily constrained.

For these reasons, the Court should credit Dr. Smith's opinions that the Bellwether Plaintiffs are not currently experiencing any psychological injuries caused by the November 2021 spill that would require mental health therapy, and therefore decline to award special damages for such future services.

### C. Mr. Feindt and Mrs. Freeman Have Not Lost Wages Attributable to the November 2021 spill.

The parties agree that Plaintiffs bear the burden of proving the amount of lost wages. *See* Pls.' Br. 9. This includes their claim that that the November 2021 spill caused the lost wages of both Mr. Feindt and Mrs. Freeman. *See Perales v. Gary Blum, M.D.*, 140 Haw. 417, 400 P.3d 618 (Table), 2017 WL 3822016 at *4

57

(Haw. Ct. App. 2017) ("In short, Perales did not present expert medical evidence that the surgeries caused his inability to return to work. Therefore, with regard to Perales's claimed injuries of being unable to return to work and any lost wages associated with his inability to return to work, Perales did not present evidence that the surgeries were a "substantial factor" in bringing about these injuries.").

Plaintiffs recognize that they have not met their burden with respect to their own expert's (Mr. Hoe's) lost wages calculations, as they abandoned his mathematically flawed and factually unsupported opinions. Pls.' Br. 65 & 87. They now seek to "accept" the unchallenged lost wages analysis done by Mr. West, the United States' expert. *Id.* But the United States has not proffered any offer to "accept" because Plaintiffs fail to meet their burden in proving the factual predicate for Mr. West's calculations—*i.e.*, that Mrs. Freeman's and Mr. Feindt's injuries were caused by the November 2021 spill. Am. West Decl. (ECF No. 563-1) ¶¶ 2–3.

### 1. Mr. Feindt Has Not Proven That He Lost $93,009 in Wages.

Mr. Feindt's request of $93,009 in lost wages is unsupported by the record. In responding to Mr. Hoe, Mr. West offered two alternative scenarios for Mr. Feindt's lost wages. Under both alternatives, Ms. West lost wages calculation accounts for two time periods that Mr. Feindt did not work: (1) December 14, 2021 to January 10, 2022; and (2) April 2, 2022 to May 2023 when the Feindts moved to

Colorado. Am. West Decl. ¶¶ 38 &46. Under his first alternative scenario, Mr.

West assumes that Mr. Feindt was out of work during these periods due to the spill

and that his base salary would have remained at $65,000. *Id.* ¶¶ 39–40. Under his

second alternative scenario, that which the Plaintiffs ask this Court to find, Mr.

West assumes that Mr. Feindt was out of work during these periods due to the spill

and that he would have received a $20,000 raise. *Id.* at ¶¶ 41–42.

### a. Mr. Feindt's Month of Unemployment December 2021 to January 2022 Was Not Caused by the November 2021 Spill.

The month Mr. Feindt did not work allegedly due to his family's illness

(December 14, 2021 to January 10, 2022), Pls.' Br. 87, is not attributable to the

November 2021 spill because the Feindt family was not exposed to contaminated

water, much less at levels that could cause these alleged health effects, *see supra* at

13–21, 23–24, 31–35. Consequently, the Court should award Mr. Feindt $0 in lost

wages during this period. Even if the Court were to find otherwise, Mr. West's

calculation of Mr. Feindt's lost wages from this time—which Plaintiffs do not

contest—is $5,209 (Alternative 1) or $5,174 (Alternative 2). Am. West Decl. ¶¶

46, 56.

### b. Mr. Feindt's Lost Wages in Colorado Also Were Not Caused by the November 2021 Spill.

Mr. Feindt's unemployment in Colorado also is not attributable to the

November 2021 spill. First, to the extent Mr. Feindt's lost wages claim during this

period is due to own health issues, Plaintiffs have presented no expert testimony—
and therefore have not satisfied their burden of proof—that these symptoms
alleged long-term symptoms were caused by the November 2021 spill. *See* Summ.
J. Order15–17 (dismissing future care special damages when unsupported by
admissible expert testimony); *Perales*, 2017 WL 3822016 at *4.

Second, the cause of Mr. Feindt's lost wages during this time period was his
family's decision to relocate. But this occurred a month after the Hawaii
Department of Health (HDOH)—the third-party regulator—declared their drinking
water "safe" "for all purposes" and that "no contamination remains" on March 1,
2022 after extensive flushing and confirmatory sampling. *Compare* JX-0017
(HDOH March 1, 2022 Press Release: "All Navy water system users in . . . Zone
A2 [Ford Island] . . . may now use water for all purposes including drinking,
cooking, and oral hygiene . . . The decision to amend the health advisory and
declare the water in Zones A2 and D1 safe was made after DOH's multiple lines of
evidence confirmed that no contamination is entering the Navy water system and
no contamination remains in Zones A2 and D1."); DX-3007 (supporting
documentation for amending health advisory as to Zone A2—Ford Island), *with* A.
Feindt Decl. ¶ 61 ("we left Hawaii for Colorado at the end of April to early May
2022"). Under these circumstances, Mr. Feindt's decision to quit his job at the Golf
Sim in April 2022 and relocate to Colorado was not a reasonable effort to mitigate

60

damages. *See Reimer v. Kuki'o Golf & Beach Club, Inc.*, No. CIV. 12-00408 LEK-BM, 2014 WL 1643260, at *3 (D. Haw. Apr. 22, 2014) ("In contract or in tort, the plaintiff has a duty to make every reasonable effort to mitigate his or her damages") (quoting *Tabieros v. Clark Equip. Co.*, 85 Haw. 336, 944 P.2d 1279, 1316 (Haw. 1997) (internal punctuation omitted)).

Even if this Court were to find that Mr. Feindt's unemployment in Colorado was due to the fuel spill, the Court should only award Mr. Feindt $69,613 for this period as Plaintiffs' figure is based on the implausible conclusion that Mr. Feindt would have received a $20,000 raise, but for quitting the Golf Sim in April 2022. Beyond Mr. Feindt's assertion, the only mention of this purported future raise in the record is an email prior to the November 2021 spill, wherein Mr. Feindt's boss states that his performance and commitment must improve. PX-1002 (Nov. 4, 2021 email from B. McAllister regarding Mr. Feindt closing the Sim during business hours and the need for Mr. Feindt "to tighten up operations"). The Court should view Mr. Feindt's assertion with skepticism, especially since Mr. Feindt refused the request of this own expert (Mr. Hoe) to contact Mr. McAllister to verify this alleged raise and Plaintiffs did not present testimony to corroborate the alleged raise. May 7, 2024 Tr. 44:24–45:1. Further, Mr. Feindt acknowledged at trial that he had expected to receive the raise upon his one-year anniversary at the Golf Sim, that he was employed there for more than a year, and that he never received the

61

raise. April 29, 2024 Tr. 218:10–19. Given the recorded performance concerns that predated the November 2021 spill, the record confirms that Mr. Hoe's assumption of a raise was "'rosy' and perhaps more in line with wishful thinking." *See* Order Denying Mot. in Limine No. 4 (ECF No. 459) at 4 (quoting *Dykzeul v. Charter Commc'ns, Inc*., CV 18-5826 DSF (GJSx), 2021 WL 4522545, at *7 (C.D. Cal. Feb. 3, 2021).

### 2. Mrs. Freeman's Lost Wages Were Not Caused by the November 2021 Spill.

As with Mr. Feindt's lost wages claim, Plaintiffs' abandon their own expert's analysis of Mrs. Freeman's lost wages claim, and instead try to "accept" the larger of Mr. West's lost wages analysis that assumed Mrs. Freeman could not work due to her injuries from the November 2021 spill. Pls.' Br. 65.[22] For three reasons, Plaintiffs have not proven this factual predicate, and therefore the Court should award Mrs. Freeman $0 in lost wages.

---

[22] Plaintiffs make much about the reliability of Mrs. Freeman's business account records as a measure of her work, but their own expert, Mr. Hoe, relied on them for just that exact purpose. *Compare* Pls.' Br. 64, *with* Am. Hoe Decl. (ECF No. 519) ¶¶ 85, 91, 94 & 96 (chart lists "Bank Statement" as the source for December 2021 and January 2023 to June 2023 revenues). Plaintiffs also raise a red herring that bank statements may contain loans, Pls.' Br. 64, but do not indicate where in Mrs. Freeman's bank statements there are such loans. That is because there are none. DX-3192 (N. Freeman bank records from Oct. 2021 to July 2023). Instead, the records show regular payments from BetterHelp and Squarespace—a common application used for immediately processing payments from clients. DX-3192.

First, Plaintiffs argue that these lost wages are "due to her and her family's weekly doctor visits, hospitalizations, and their continued experience of negative impacts from the fuel leak," Pls. Br. 62-63, but no admissible expert testimony has established these alleged long-term health effects are due to the November 2021 spill. Summ. J. Order 15–17 (dismissing future care special damages when unsupported by admissible expert testimony); *Perales*, 2017 WL 3822016 at *4.

Second, even under Plaintiffs' temporality-alone approach to causation (which the Court should not accept, *see supra* at 27–31), the timing of Mrs. Freeman's lost wages further indicates that they were not caused by the November 2021 spill. Mrs. Freeman continued to work from November 2021 through October 2022, which aligns her business account records. April 29, 2024 Tr. 128:20–129:10, 129:21–25; DX-3192 (N. Freeman bank statements). In other words, she did not stop working until nearly a year after her exposure and over eight months after moving off-island. Am. N. Freeman Decl. (ECF No. 572) ¶ 9 (ceased drinking the water on November 29, 2021) & 53 (moved on February 2, 2022).

Third, Mrs. Freeman's trial testimony indicates that she returned fully to work on October 2023, which is even sooner than Mr. West assumed it would take Mrs. Freeman to rebuild her business. April 29, 2024 Tr. 129:17-25; Am. West Trial Decl. ¶¶ 87–105. Rather than the nine (Alternative 1: January 2024) and twenty-one months (Alternative 2: January 2025) after rebranding and restarting

63

her business in April 2023 that Mr. West assumed, Am. West Decl. ¶¶ 87–105,

Mrs. Freeman was able to fully return to work in six months (October 2023).

Given that Plaintiffs have the burden of proof and production as to Mrs.

Freeman's lost wages claims, the ambiguity as to the size of Mrs. Freeman's

rebuilt business (and how it compares, including whether it exceeds her pre-

November 2021 baseline) further weighs against her lost wages claim. Plaintiffs

did not present evidence of the magnitude of Mrs. Freeman's resumed business

activity either in the form of bank statements after July 2023 (DX-3192) or

testimony from Mrs. Freeman or Mr. Hoe. Moreover, the United States was unable

to question Mr. West as to how this revised assumption would affect his analysis

because Plaintiffs strategically elected to waive their cross examination of Mr.

West. May 10, 2024 Tr. 22:18–24. Mrs. Freeman's business started only in August

2021 and remotely seeing patients located in Florida, April 29, 2024 Tr. 122:9–17,

122:24–123:6, but now she has added capacity around the time she went back to

work to accept clients in additional states, including California (where she now

lives) and Texas, *id.* 132:8–11.

Even if this Court were to find that any decrease in Mrs. Freeman's earnings

was caused by the November 2021 spill, the lost earnings should cease in October

2023, when Mrs. Freeman went back to work. April 29, 2024 Tr. at 129:17–25.

Neither Mr. Hoe nor Mr. West did this analysis. Plaintiffs have not met their

burden of proving Mrs. Freeman's lost wages attached to the facts as they offer no

analysis of lost wages ending when Mrs. Freeman returned to work. Mr. West's

analysis found that should it have taken Mrs. Freeman to January 2024 to recoup

her lost wages then the lost wages would have been $52,219. Subtracting three

months of lost wages, Mrs. Freeman's lost wages would be at most $47,941,

assuming Plaintiffs had proven causation (which they have not).

## V.    Plaintiffs' Damages Must Be Apportioned Among All Causes of Their Injuries.

The Court directed the parties "to address the issue of apportionment as to

Plaintiffs," including Mr. Feindt, Mrs. Dietz, Mrs. Jessup, Beau Jessup, and B.J.

(also referred to as B.J.J. and the Jessup Daughter). Post-Trial Br. Order 2.

Plaintiffs declined to fully address this issue with respect to emotional distress,

arguing that *Montalvo* does not apply. Pls. Br. 154. Plaintiffs are wrong, *Montalvo*

apportionment applies to all damages, and numerous Bellwethers have other,

unrelated causes of the physical symptoms and emotional distress.

### A. *Montalvo* Apportionment Applies to All Causes—Even Preexisting Ones—and all Damages—Even Emotional Distress.

As this Court is aware, Hawaii law requires that injuries be causally

apportioned between (a) the tortious conduct at issue and (b) any other active

causes for the same sorts of injuries. If apportionment cannot be done, even

roughly, then the damages must be divided equally among all potential causes.

*Montalvo v. Lapez*, 77 Haw. 282, 884 P.2d 345, 363 (Haw. 1994). Subsequent

causes must be part of this apportionment process, as are active preexisting

conditions, as well. *See, e.g.*, *id.* at 362–63 (explaining that preexisting conditions

must be apportioned if they are not "dormant," "latent," or "fully recovered" from,

which are generally expert questions). While Hawaii recognizes the "eggshell

skull" doctrine, *id.* at 357, *Montalvo* applies that idea to the facts at hand. As the

Supreme Court of Hawaii has recognized, when dealing with a plaintiff's

preexisting condition, "the defendant is liable for *aggravation* of the condition,"

but not the underlying condition itself. *Id.* at 362 n.16 (emphasis added). The idea

behind apportionment is simple: "The policy to be upheld is that the defendant

should not be made to pay for injuries he did not cause." *Id.* at 362 (cleaned up).

Plaintiffs claim that *Montalvo* apportionment "is unavailable to a defendant

under Hawaii law for emotional distress damages." Pls.' Br. 154. This would make

the United States responsible for *all* emotional distress, even from wholly

preexisting issues or subsequent events. *See, e.g.*, Smith Decl. ¶¶ 284–85, 287,

298, & 300 (describing Mrs. Jessup's prior trauma, listing symptoms that she

attributes "only to th[at] trauma," and describing how it is still impacting her

today). Plaintiffs' view would also make the United States liable for the emotional

distress of long-term medical issues that this Court has already ruled were not

caused by the Red Hill spill.

66

To support their expansive proposition, Plaintiffs do not cite to *Montalvo* itself. Indeed, nothing in that case differentiates between physical and emotional injuries for apportionment. By its terms, *Montalvo* applies to "all damages legally caused" by the tortious conduct at issue and requires meting out between all "various causes" in play. 884 P.2d at 363. Moreover, *Montalvo* also considered "loss of enjoyment of life" damages, which are precisely the kind of noneconomic, "mental anguish" and emotional distress type damages that Plaintiffs argue are exempt from apportionment. 884 P.2d at 364–67.

Rather than citing to binding Hawaii case law, Plaintiffs instead rely on *Mueller v. Department of Public Safety*. There, the court found emotional distress injuries are not subject to *Montalvo* apportionment. *Mueller v. Department of Public Safety,* 570 F. Supp. 3d 904, 910 (D. Haw. 2021) (Gilmour, J.). Neither Plaintiffs nor *Mueller* quote any language from *Montalvo* for that proposition— because none exists. Rather, *Mueller* reasoned in the negative: "Defendants have not cited to, and the Court has been unable to locate, any cases where a court has found that apportionment is available where the harm is limited to emotional distress." *Id.*

At the outset, Plaintiffs' claims here are *not* "limited to emotional distress." *Id.* They seek recovery for their physical symptoms as well. Thus, by *Mueller*'s own terms, non-apportionment does not apply here.

67

Beyond that, the United States directs the Court to two cases where courts have applied *Montalvo* apportionment to emotional distress damages. First, in *Gretzinger v. Univ. of Hawaii*, the Ninth Circuit affirmed this Court's admission of other-cause apportionment evidence, in recognition of mandatory *Montalvo* allocation. 156 F.3d 1236 (Table), 1998 WL 403357, at *1 (9th Cir. July 7, 1998) (mem.). A student alleged that a professor had harassed her, causing PTSD and psychological injury. She brought a claim for intentional infliction of emotional distress, and she did not claim any other non-psychological injury.[23] At trial, this Court admitted evidence of other causes of that same emotional distress, including a "prior sexual assault" that the student had suffered. *Id.* The Ninth Circuit affirmed, holding that this Court "properly allowed [the professor] to rebut [the student's] claim with evidence that [her] distress had other potential sources." *Id.* at *2. Moreover, the Ninth Circuit confirmed that such apportionment is necessary under Hawaii law, under a straightforward application of *Montalvo*:

> Finally, [the student] argues that, as a matter of law, damages could not have been apportioned between the emotional distress caused by [the professor's] alleged harassment and other sources of distress. However, the case was tried under Hawaii law, which does in fact recognize apportionment of damages.

---

[23] While there were initially allegations of assault in a university complaint, no such allegations were made in the lawsuit itself, and the case was tried on the student's IIED claim and the professor's counterclaims. *Gretzinger*, 1998 WL 403357 at *1. As such, this is a case was limited to emotional distress. *Contra Mueller*, 570 F. Supp. 3d at 910.

*Id.* (citing *Montalvo*). Thus, the Ninth Circuit has applied *Montalvo* apportionment to purely emotional distress damages.

Second, in *Raymond v. Wilcox Memorial Hospital*, a plaintiff alleged assault, battery, and intentional infliction of emotional distress against a hospital for providing care against his will. The court instructed the jury specifically on *Montalvo* apportionment, specifically asking for "an apportionment of damages" between the conduct at issue, any preexisting injury, any aggravation of that injury, and any of the defendant's own conduct. No. 15-00212 ACK-WRP, 2019 WL 3022187, at *3 (D. Haw. July 10, 2019) (Kay, S.J.). "If you are unable to determine" the apportionment, this Court instructed, "you may make a rough apportionment." *Id.* If the jury is unable to do that, "then you must divide the damages equally" between the causes. *Id.* Thus, like the Ninth Circuit did in *Gretzinger*, this Court has applied *Montalvo* apportionment to emotional distress damages.

Neither the *Mueller* decision, nor the briefing on the issue, address *Gretzinger*. Other parts of *Mueller* appear inconsistent with Hawaii law. For instance, *Mueller* states that when it is "impossible to apportion damages . . ., then the defendants are liable for the entire amount[.]" 570 F. Supp. 3d at 910. But *Montalvo* says precisely the opposite: "If the jury is unable to apportion, even

roughly, then it must divide the damages equally among the various causes." 884

P.2d at 363.[24]

### B. Other Causes of the Bellwether Plaintiffs' Alleged Physical Symptoms

Because Plaintiffs have failed to establish scientific causation for their

alleged injuries, none of those injuries should be apportioned to the spill. But even

if this Court were to find Plaintiffs meet their burden of causation for some acute

effects, many of the alleged physical symptoms pre-dated the November 2021 spill

or did not begin for months after the exposure ceased. *See* Ex. A. at 1–2, 4–6, 8–

15, 17–20, 22–28, 30, 32–33.

Further, Dr. Bird conceded that although he was aware of several preexisting

conditions, such as B.D.'s Chiari syndrome (causing chronic headaches) and

Patrick Feindt, Jr.'s history of migraines and chronic GI distress, he did not

---

[24] *Mueller* also states that "whether apportionment is reasonable is a legal [question] to be decided by the judge, not the jury." 570 F. Supp. 3d at 910. Not so. *Montalvo* itself specifically states that these are jury questions. *See, e.g.*, 884 P.2d at 300 ("*The jury* must deal with the post-accident incidents separately . . .." (emphasis added)). Hawaii state courts have sent these issues to juries for decision. *See, e.g.*, *Weite v. Momohara*, 124 Haw. 236, 240 P.3d 899, 918–22 (Haw. Ct. App. 2010) (discussing the verdict "where the standard *Montalvo* instruction is given to the *jury*" (cleaned up and emphasis added)). And this Court has done the same. *See, e.g.*, *Raymond*, 2019 WL 3022187 at *3 ("*The jury* was instructed to award damages exclusive of those attributable to any pre-existing condition . . . ." (emphasis added)). In this bench trial, the line between judge and jury questions is moot. Nevertheless, this is useful to show that *Mueller* misinterprets *Montalvo* in a number of ways that this Court should not follow.

consider it "necessary" to consider pre-existing conditions, May 3, 2024 Tr. 22:5–

17 & 22:18–23:1. Plaintiffs offer no evidence that either of these conditions were

"dormant" before the November 2021 spill – indeed the record indicates Plaintiffs

complained of these symptoms in the months leading up to the spill. *See, e.g.*,

April 29, 2024 Tr. 209:9–24 (Mr. Feindt's headaches began when he moved into

his home in May 2021 – months before the spill); May 1, 2024 Tr. at 20:4–13.

Further, Dr. Bird' assertion that the November 2021 spill exacerbated certain

preexisting conditions lacks any factual support regarding changes in severity or

frequency of symptoms, and in some cases is belied by Plaintiffs' medical records.

*Compare, e.g.*, Bird Decl. ¶96(g) (opining that the November 2021 spill caused an

"exacerbation of [P.R.F.'s] asthma") *with* PX-2254 (Pls.' P.R.F. Composite Med.

R.) at PX-2254_0132 (Feb. 23, 2024 office visit noting that P.R.F. has "been

treated for asthma since early 2022 . . . and the diagnosis of asthma is not yet

confirmed"). Nor do Plaintiffs' offer any evidence that the myriad of preexisting

conditions detailed in Exhibit A were dormant. *Compare* Pls. Br. 153–154 *with* Ex.

A.

Further, Dr. Bird conceded that he made no effort to apportion any injury

between these pre-exiting conditions and those allegedly caused by the spill. May

3, 2024 Tr. 22:24–23:1 (Dr. Bird: "If there's a preexisting condition, I cannot

apportion what is new versus what was pre-existing"). Such a failure is

inconsistent with the binding requirements of *Montalvo*, and the Court must apportion any injury between the spill and the recognized pre-exiting conditions.

### C. Other Causes for the Bellwether Plaintiffs' Emotional Distress

#### 1. Other Causes for Mr. Feindt's Emotional Distress

Substantial portions of Mr. Feindt's emotional distress—particularly the ongoing distress to which he testified—are caused by non-spill factors. For instance, Mr. Feindt has a chronic pain condition that, by his own direct testimony, impacts his emotional state: "I'm in pain all the time, and the pain makes me grouchy. I'm definitely not fun to be around anymore." P. Feindt Decl. ¶ 98. Dr. Smith also testified about this pain and its emotional impact, and it is noted in contemporaneous medical records. *See* Smith Decl. ¶¶ 136–46 & DX-3214 (Def.'s Patrick Feindt, Jr. Composite Med. R.) at 23 (noting "mood disorder due to known physiological condition, unspecified" and "other specified mental disorders due to physiological condition"). Mr. Feindt has lived with this "intolerable," "disabling," "never ending," and "10 out of 10" pain for years. Smith Decl. ¶ 138. As described by Dr. Smith, this pain has caused Mr. Feindt to suffer from Post-Traumatic Stress Disorder. *See id.* at ¶ 137.[25]

---

[25] Plaintiffs' psychological expert, Dr. Vargo, instead attributes Mr. Feindt's PTSD to the spill itself. However, her etiological opinion is not credible. *First*, her trial testimony does not even mention Mr. Feindt's pain condition, so she could not have appropriately considered whether it was the cause of any of his psychological

While Plaintiffs and Mr. Feindt attribute this chronic pain to the spill, this Court has already ruled as a matter of law that it is not. *See supra* at 36–37. Moreover, some of this pain began years before the spill, including pain that Mr. Feindt self-described as "severe." *See, e.g.*, DX-3214 at 134 (February 2020 medical record regarding reports of neck pain since 2016 and left arm pain since 2018; at that time, Mr. Feindt "rate[d] his neck pain is severe and [h]is left arm pain is moderate") & 150 (March 2019 medical record regarding neck pain that is 5 out of 10 and occurs all day). Other pain began five months after Mr. Feindt's exposure (if any) ceased, *e.g.*, Kosnett Decl. ¶ 146-47, and continues even today, *e.g.*, P. Feindt Decl. ¶ 98). As such, it is both a preexisting and subsequent cause of emotional distress (though *Montalvo* requires apportionment of pre and post causes alike). None of the emotional distress arising from Mr. Feindt's chronic pain

---

issues. *Second*, Dr. Vargo provided only minimal tests that did not ask about any pain conditions, and none of her assessments had validity scales. *See* Smith Decl. ¶¶ 129–30 & 133. Dr. Smith, by contrast, provided this more fulsome battery of testing, and the results were important in his rationale. *See id.* at ¶¶ 138–41. *Third*, substantial psychological impact from the spill—but not the chronic pain condition—simply does not make any sense. As Dr. Smith explained, while the spill and its aftereffects "likely caused stress at the time, that prior experience would not cause an ongoing, chronic psychological impact. Ongoing, chronic pain, however, would." *Id.* at ¶ 143. As such, the Court should not credit Dr. Vargo's opinion and should instead follow Dr. Smith's more thorough and reasonable analysis. In the alternative, should the Court view both the spill and the pain condition as contributing to Mr. Feindt's PTSD diagnosis, the Court should allocate substantially more of the damages to the pain condition, as Mr. Feindt lived with that for long before—and long after—the spill.

condition can be attributed to the United States.

Mr. Feindt's pain condition has also led to other consequences which themselves are emotionally distressing. For instance, in May 2022—over five months after Mr. Feindt's exposure (if any) ceased, *see supra* at 14 & n.3—Mr. Feindt had back, flank, and testicular pain. He underwent a hernia repair surgery later that spring. P. Feindt Decl. ¶ 74; *see also id* at ¶¶ 75–78. No emotional distress from this invasive medical treatment—or the pain leading to or arising from it—can be apportioned to the United States. The same is true for any emotional distress arising from the other Feindt family member's long-term medical conditions. *See, e.g.*, P. Feindt Decl. ¶ 101 ("I have been worried about our kids. I worry that they will never get better. I worry that health will take over our lives . . . ."). While these worries are natural and understandable, they are not attributable to the spill. Rather, they are the result of the family's other long-term health issues for which Plaintiffs have failed to show causation as a matter of law.

Most notably and uniquely to Mr. Feindt, his pain has impacted his relationship with the game of golf: "The pain leaves me less desire to play the game that I loved and worked so hard to master over the last 30 years." P. Feindt Decl. ¶ 84; *see also* April 29, 2024 Tr. 196:10-23 (Major Feindt: "He loves the game of golf . . . . [H]e took a lot of pride in the golf and the game of golf and growing the game of golf[.] . . ."); Vargo Decl. (ECF No. 388) ¶ 55(c) (noting a

"markedly diminished interest or participation in significant activities (i.e., golf)").

Again, while the inability to play the game that he loves is understandably

emotionally distressing, neither that loss nor the pain that caused it is attributable

to the November 2021 spill, and therefore neither is the associated emotional

distress. As such, the United States cannot be held responsible for it.

### 2.  Other Causes for Mrs. Dietz's Emotional Distress

Mrs. Dietz also has a number of other causes for her emotional distress—

none of which Plaintiffs have presented admissible expert testimony were caused

by the November 2021 spill. *See, e.g.*, Summ. J. Order 15-17 (dismissing future

care special damages when unsupported by admissible expert testimony). For

example, in March 2022—months after the family's alleged exposure—Mrs.

Dietz's son, B.D., underwent brain surgery for a preexisting condition. This serious

procedure was understandably quite distressing for Mrs. Dietz: "Surgery terrified

me, but we had to do something to help him, we were desperate." R. Dietz Decl.

¶ 52. Soon after, Mrs. Dietz's daughter, V.D., underwent both a tonsillectomy and

adenoidectomy. As Mrs. Dietz testified, "The idea of another surgery worried me,

but I knew we had to do what was best for V.D." *Id.* at ¶ 55. There is no admissible

expert testimony that any of these surgeries were caused by the November 2021

spill.

This was in the midst of Mrs. Dietz's own health issues, including "excruciating pain," "cysts bursting," and a "partial hysterectomy." *Id.* at ¶ 56 at. Between those issues—as well as new migraines and eczema—Mrs. Dietz "became so stressed [that she] stopped sleeping. [She] average[s] 5-6 hours of actual sleep time a night, often waking in panic." *Id.* at ¶¶ 58–59. More recently, Mrs. Dietz has also worried about her father-in-law's potential lung cancer. *See* Smith Decl. ¶ 67. Taken together, Mrs. Dietz's experiences with and responses to these challenges (*e.g.*, excessive worry, sleeplessness) matches with her preexisting anxiety and PTSD.[26] *See, e.g.*, Smith Decl. ¶ 68 ("These early traumatic experiences undoubtedly were psychologically damaging to her and others. It is very likely that she had symptoms of PTSD as a very young child and for years since then—including before the Red Hill water contamination."); *see also id.* at ¶¶ 60–66 (describing Mrs. Dietz's prior traumas).

---

[26] In Dr. Vargo's view, Mrs. Dietz "had no active mental health diagnosis at the time immediately prior to the Red Hill water contamination." Vargo Decl. ¶ 56(b). However, Dr. Vargo was entirely unaware of substantial prior trauma in Mrs. Dietz's life, and she declined to administer the version of the PTSD checklist that would have asked about such events. *See, e.g.*, May 2, 2024 Tr. 53:6–56:3. Dr. Vargo's testimony does not even make mention of these surgeries that terrified Mrs. Dietz. As such, Dr. Vargo's myopic view—limited by what the Plaintiff herself *thinks* are the psychological causes and symptoms, *id.* at 69:2–9—simply is not credible. Instead, the Court should credit Dr. Smith's more thorough and reasoned opinions, which are informed by a wide range of facts to which Dr. Vargo chose not to look at.

Mrs. Dietz's long-term health concerns predominate her emotional-distress testimony. While these worries are understandable and genuine, they are not attributable to the spill. Any emotional distress arising from these facts cannot be held against the United States. Similarly, Mrs. Dietz's anxiety and PTSD diagnoses predate the spill. They were active at the time and still today. Accordingly, they are neither "dormant" nor "fully resolved," and they must be apportioned out of any emotional-distress award. *Montalvo*, 884 P.2d at 362–63. While the Court can take these facts in consideration when determining how the spill impacted Mrs. Dietz, the United States cannot be held responsible for the diagnoses themselves or for their long-term psychological treatment.

### 3. Other Causes of Mrs. Jessup's Emotional Distress

Like other Bellwether Plaintiffs, Mrs. Jessup has other ongoing sources of emotional distress that require apportionment. Most notably, and tragically, Mrs. Jessup was subjected to years of physical and sexual abuse by a former intimate partner. *See, e.g.*, Smith Decl. ¶¶ 284–85. Mrs. Jessup currently lives near this abuser, and she is "very worried that she may happen to see him[.]" *Id.* at 287. In one harrowing incident, she once had to call 911, and firefighters were on their way to their home. Because the abuser lives in the area *and works as a firefighter*, Mrs. Jessup was afraid that he would be one of the first responders. *Id.* at 288. As Dr. Smith explained, this "trauma has haunted [Mrs. Jessup] for years and caused

adverse and long-lasting mental health problems," including "anxiety, panic attacks, depression, sleep difficulties, and guilt" along with being "hypervigilant" being near where her abuser lives. *Id.* at ¶ 312.

Importantly, this *past* trauma is causing *present* symptoms. For instance, on the Structured Trauma-Related Experiences and Symptoms Screener—a standardized psychological assessment that Dr. Smith gave but Dr. Vargo did not—Mrs. Jessup reported a number of ongoing symptoms on a weekly basis, including "feeling on edge, watchful, or on guard," "disturbing or unwanted thoughts," and feeling "tense, sweaty, or sick to her stomach." *Id.* at ¶¶ 299 & 300 (describing symptoms in the preceding month). As Mrs. Jessup explained to Dr. Smith, these ongoing symptoms were "in regards only to the trauma related experiences with [her] ex-boyfriend."[27] *Id.* at ¶¶ 298 & 300. Mrs. Jessup's ongoing emotional distress from this past trauma is tragic, but they are not the result of the United States' conduct. Indeed, because Mrs. Jessup had and has ongoing psychological injuries from this trauma, and these conditions are not "dormant" or "latent," *Montalvo* specifically requires their exclusion from any damages award. 884 P.2d at 362–63.

---

[27] Dr. Vargo, by contrast, chose not to provide this particular assessment to any of the Bellwether Plaintiffs. Instead, she provided a truncated version of the PTSD Checklist that asked about recent symptoms, but omitted questions about their cause. *See, e.g.*, May 2, 2024 Tr. 53:6–56:3. *See supra* at 51–53.

Mrs. Jessup also testified to the substantial and ongoing emotional distress that she experiences due to her children's long-term medical issues. For instance, "[o]ne of [her] biggest fears right now is that Beau's neurological symptoms will not resolve but instead progress into something even more debilitating." S. Jessup Decl. ¶ 76. She testified of her son's tremors, "[h]is hands shake all the time, and I can see how this scares him. It scares me too[.] . .." *Id.* Mrs. Jessup worries about her daughter's ongoing gynecological issues. *See, e.g.*, April 30, 2025 Tr. 150:22–151:5. While the children's medical issues are tragic, and Mrs. Jessup's resulting concern is understandable, neither is caused by the spill. While the Jessups themselves attribute these long-term health issues to the spill, the Court has already ruled that, as a matter of law, Plaintiffs have failed to prove causation for such long-term health issues. *E.g.*, May 2, 2024 Tr. 101:9–102:19; Post-Trial Br. Order 2. As such, any emotional distress related to Mrs. Jessup's long-term health concerns about her children cannot be properly attributed to the United States.

### 4. Other Causes for the Jessup Children's Emotional Distress

As noted above, the two older Jessup children—Beau and B.J.J.—have ongoing, long-term health concerns that Plaintiffs have not established were caused by the November 2021 spill, and therefore neither is the associated emotional distress. Beau, for instance, has ongoing hand tremors. These, standing alone, are understandably concerning. Sadly, they also may impact his future plans. As his

79

mother testified, "We worry that he will be rejected from the Navy because of his neurological condition[.] . . . I tear up every time I think about it because I know he doesn't have a plan B." S. Jessup Decl. ¶ 76; *see also* April 30, 2024 Tr. 164:17–20 (Beau Jessup: "I'm worried about my future and my family, because obviously, as seen, I have the tremors that I've recently learned disqualified me from the job."). This makes Beau feel "very self-conscious" as well as "embarrassed and angry" when his tremor and stutter is noticed at school. *Id.* at 165:17–21; Beau Jessup. Decl. ¶ 24. His sister, B.J.J., has similar concerns regarding her ongoing menstrual issues and "severe periods." May 2, 2024 Tr. 37:5–23. As she testified, "I'm worried about my health. I'm worried that I won't be able to have kids one day because my hormones are all screwed up." B.J.J. Decl. ¶ 27. While the Jessups attribute these underlying health concerns to the spill, the Court has already ruled that, as a matter of law, they are not. May 2, 2024 Tr. 101:9–102:19 (The Court noting that "as a matter of law . . . I have made rulings that the Plaintiffs have not shown [Beau's tremor] to be caused by the water contamination"); Post-Trial Br. Order 2. As such, any emotional distress arising from these medical worries cannot be apportioned to the United States.[28]

---

[28] Dr. Clark only mentions these issues in passing. *See, e.g.*, Clark Decl. ¶ 71. Moreover, he conflates psychological symptoms arising from the spill and arising from his health concerns (as well as his longstanding and preexisting anxiety). For example, the Court asked Dr. Clark to apportion between "depression and the

The older Jessup children also have ongoing distress regarding their high school, from which Beau just graduated and where B.J.J. will still attend. Beau, for instance, suffered from severe bullying and social isolation. *See, e.g.*, Smith Decl. ¶¶ 320 ("At Liberty High School [where he attended post-spill], another male student had bent B.B.J. over a table and simulated sodomizing him in front of other students."); 323 ("When he began the 11th grade, he didn't know anyone at his school."); 330 ("He has been isolated and lonely partially due to his inability to gain acceptance by his peers.").[29] His sister, B.J.J., similarly has issues adjusting to her school. *See, e.g.*, B.J.J. Decl. ¶ 19 ("Kids at my public school are not nearly as nice as my friends at my private school in Hawaii. They just seem to be wired differently."); Clark Decl. ¶ 78 (stating that B.J.J. "has struggled to fit in" at her new school). While these challenges are sympathetic, they are also part of moving from one place to another. While the Jessups may contend that they only moved

---

trauma from the water contamination" versus Beau's emotional distress from his neurological condition which, as a matter of law, "Plaintiffs have not shown that to be caused by the water contamination." May 2, 2024 Tr. 101:9–102:19. Dr. Clark responded by rejecting the premise of the question and conflating the tremors, the spill, and Beau's preexisting anxiety. He found all of "those three things triggered Beau's depression" and he "see[s] that as really the result of or the consequence of the water crisis." *Id.*

[29] Dr. Clark knew that Beau had been "bullied a bit," but he did not know the full extent. May 2, 2024 Tr. 87:22–88:13. Though he admits that such bullying is "emotionally difficult" and "increases the risk of mood and anxiety symptoms," *id.* at 87:12–21, Dr. Clark chose not to ask any follow-up questions of Beau's mother—or *any* questions of Beau himself.

because of the spill, they elected to do so months after HDOH—the third-party

regulator—declared their drinking water "safe" "for all purposes" and that "no

contamination remains" after extensive flushing and confirmatory sampling, which

was not a reasonable effort to mitigate damages. *Compare* Stipulated Facts

Regarding the Water System (ECF No. 548) ¶ 5 (Jessups lived in Zone F2); JX-

0020 (HDOH March 11, 2022 Press Release) at JX-0020_00001-2 ("All Navy

water system users in Zones . . . F2 . . . may now use water for all purposes

including drinking, cooking, and oral hygiene . . . The decision to amend the health

advisory and declare the water in Zones F1, F2, H2, and H3 safe was made after

DOH's multiple lines of evidence confirmed that no contamination is entering the

Navy water system and no contamination remains in Zones F1, F2, H2, and H3.");

DX-3010 (supporting documentation for amending health advisory as to Zone F2),

*with* S. Jessup Decl. ¶ 63 ("We moved out of our house on May 14, 2022); *see also*

*Reimer*, 2014 WL 1643260, at *3 ("[i]n contract or in tort, the plaintiff has a duty

to make every reasonable effort to mitigate his [or her] damages"). In addition,

Mrs. Jessup's testimony made clear that they knew and expected to leave due to

Chief Petty Officer Jessup's military service. In fact, the Jessup family had been

scheduled to leave the island years before, but their tour was extended only due to

COVID. April 30, 2024 Tr. 132:7–20. While the Jessup children's change of

schools and resulting social challenges are certainly distressing, they are not fairly

attributable to the November 2021 spill.

### 5. Other Causes of Other Bellwether Plaintiffs' Emotional Distress.

The Court specifically requested apportionment analysis on the Bellwether

Plaintiffs noted above. Further, the United States wishes to identify other

apportionment issues for a number of other Bellwether Plaintiffs.

First, Mrs. Freeman testified at length regarding her emotional distress

regarding her children's long-term health problems. *See, e.g.*, Am. N. Freeman

Decl. ¶ 103 (testifying that her children "continue to suffer from debilitating

conditions . . . that prevent [them] from returning to the lives [they] once knew").

While these worries and concerns are certainly understandable, they are not

attributable to the spill. Again, while the Bellwether Plaintiffs themselves may

contend that these were caused by exposure, the Court has already ruled that, as a

matter of law, that has not been proven. As such, any emotional distress

experienced by Mrs. Freeman arising from her children's long-term health

concerns cannot be held against the United States.

Second, and also regarding Mrs. Freeman, she suffered from substantial

trauma in her past, including intimate-partner violence and sexual abuse.[30] *See,*

---

[30] As with other Plaintiffs, Dr. Vargo did not consider Mrs. Freeman's prior trauma
history. *See, e.g.*, Smith Decl. ¶¶ 204–05.

*e.g.*, Smith Decl. ¶¶ 184–85. Like Mrs. Jessup and Mrs. Dietz, this prior trauma

unfortunately has present consequences. As Dr. Smith testified, "[s]he is still not

fully recovered from the physical and sexual trauma that she experienced as an

adult." *Id.* at ¶ 207; *see also id.* at ¶ 187 ("[S]he is still affected by people standing

behind her.") & ¶ 193 ("[S]he continues to report many psychological symptoms

associated with anxiety, depression, and stress."). Indeed, Mrs. Freeman had and

still has PTSD and other psychological injuries attributed to this trauma and other

non-spill causes. *See id.* at ¶¶ 211–14. As such, these are active and not "fully

recovered" conditions that require apportionment. *Montalvo*, 884 P.2d at 362–63.

Third, Mr. Aubart and Mrs. Witt similarly suffered from preexisting and

ongoing psychological injuries and conditions unrelated to the spill. For instance,

at the time of the spill, Mr. Aubart was in the midst of a years-long pro se litigation

against the United States Army for employment claims. The litigation resolved in

2023, which improved Mr. Aubart's stress, *see, e.g.*, Kosnett Decl. ¶ 47, though he

is still pursuing a related administrative his claim and these disputes have impacted

him. *See, e.g.*, Smith Decl. ¶¶ 36–38 & 52(d). As Dr. Smith explained, this

experience left Mr. Aubart with intense feelings of "hatred and resentment," *id.* at

¶ 52(d), and with a trauma-related disorder, *id.* at ¶ 54. Similarly, Mrs. Witt suffers

from a longstanding and preexisting anxiety disorder, which she has treated with

Zoloft for years.[31] *See, e.g.*, *id.* at ¶¶ 390–91. While this anxiety condition may be

expected to make Mrs. Witt's experience during the spill worse, her medical

records tell a different story. Indeed, her "dose of Zoloft remained unchanged from

when she began taking it and continuing through 2022. It never increased during

the period of the water contamination nor was there a need for additional

medications to address any stress." *Id.* at ¶ 392. This shows two things: First, some

baseline portion of Mrs. Witt's stress during the spill was due to her ongoing

anxiety disorder and, as such, should be apportioned out under *Montalvo*. Second,

whatever emotional distress she did experience during the spill was not substantial

enough to impact her treatment.

Finally, COVID caused distress to the Bellwether Plaintiffs—and everyone

as a whole—for years, including during the specific time period at issue here. Dr.

Smith testifies to the society-wide impacts of the pandemic, *id.* at ¶¶ 25–32, and to

the individual ways in which COVID impacted the Bellwethers, *id.* at ¶ 33. Even

Plaintiffs' own psychological experts testified to the fact that the pandemic could

and often did cause psychological symptoms. *See, e.g.*, May 2, 2024 Tr. 43:12-

44:16 (Vargo) & 77:24-78:10 (Clark). Despite that, Drs. Vargo and Clark hardly

---

[31] Despite copious medical records on this point, Dr. Vargo contends that Mrs. Witt did not have any preexisting psychological conditions. *See* Vargo Decl. ¶ 56(f). She is patently wrong, as Mrs. Witt herself testified. *See, e.g.*, Witt Decl. ¶ 13 ("have suffered from anxiety off and on since middle school, and these circumstances were particularly traumatic for an anxious person.").

considered and never inquired as to this obvious co-occurring cause of emotional

distress. *See, e.g.*, *id.* at 52:11-14 (Vargo) & 78:11-13 (Clark). While COVID-

related emotional distress in 2021 may not be as pronounced as, say, that from

prior physical abuse, it is nonetheless a common thread that all Bellwether

Plaintiffs experienced—particularly the minors, many of whom would have been

in remote school. *See* Smith Decl. ¶ 33.

In conclusion, *Montalvo* requires the Court to apportion physical and

emotional injuries it concludes that Plaintiffs have proved were caused by the

November 2021 spill amongst the various causes and there are numerous

alternative causes for these injuries, especially for Plaintiffs' emotional distress.

## VI.   The United States Is Entitled to Offsets for Payments It Has Made—or for Which It Is Reasonably Probable That It Will Make—to Plaintiffs.

"A payment made by a tortfeasor or by a person acting for him to a person

whom he has injured" is not a collateral source—*i.e.*, "is credited against his tort

liability, as are payments made by another who is, or believes he is, subject to the

same tort liability." Restatement (Second) of Torts § 920A (1979) (cited in *Bynum*

*v. Magno*, 101 P.3d at 1154). To be sure, there is "no indication that Congress

meant the United States to pay twice for the same injury" when it enacted the

Federal Tort Claims Act. *Brooks v. United States*, 337 U.S. 49, 53 (1949). In this

case, the United States asserts two categories of offsets: (1) future TriCare health

care benefits for three of the six Bellwether Plaintiff families (Jessup, Feindt, and

Dietz); and (2) per diem payments the United States already made to the

Bellwether Plaintiffs immediately after the November 2021 spill.

### A. Tricare is Not a Collateral Source and the United States Has Satisfied the Requirements for Offset of Reasonably Probable Future Payments.

The parties agree that past TriCare payments are not "collateral," and the

United States is therefore entitled to offsets for past care. *See* Pls.' Br. 157; *see*

*also Murphy v. United States*, Civil No. 06-00304 BMK, 2009 WL 454627, at *6

(D. Haw. Feb. 23, 2009) ("The vast majority of courts to consider this issue . . .

have concluded that TriCare/CHAMPUS benefits are *not* a collateral source,

holding that they are benefits derived from general revenues of the United States."

(emphasis in original and quoting *Lawson v. United States*, 454 F. Supp. 2d 373,

414 (D. Md. 2006))). For a case with such extensive alleged medical injuries, the

absence of any claim for past medical costs is likely attributable to the fact that the

United States has paid for these expenses already through TriCare.

If the Court were to award special damages for future mental health services

(which it should not, *see supra* at 51–57), the parties disagree whether the

Bellwether Plaintiffs' future medical benefits under TRICARE should offset such

damages.[32] *See generally* Pls.' Br. 157-60. As detailed below, the United States has

---

[32] If the Court agrees with the United States that Plaintiffs have not proven that the November 2021 spill caused the need for such future services, *see supra* at 51–57, then this issue is moot, and the Court need not address it.

offered sufficient evidence to establish that TriCare will cover substantial portions of the future care recommended for the Jessup, Feindt, and Dietz families.

Plaintiffs assert that if the Court awards offsets for future TriCare benefits, the Court would be engaging in "impermissible speculation" because, *inter alia*, the United States has not presented evidence that the government will "*in fact* pay for any future care for the Plaintiffs." Pls.' Br. 159-60 (emphasis in original). This overstates the burden placed on the United States to prove it is entitled to future offsets, *see Siverson v. United States*, 710 F.2d 557, 560 (9th Cir. 1983) (identifying burden on government to prove what plaintiff "may receive, or be entitled to receive, in the future."), and would make doing so an impossible task. The future is inherently speculative, which is why Plaintiffs themselves must only prove that future medical costs are reasonably probable. *See Mew Sun Leong v. Honolulu Rapid Transit Co.*, 52 Haw. 138, 472 P.2d 505, 508 (Haw. 1970) ("'Reasonable medical certainty' is not required for future expenses. All that is required is probability." (citation omitted)). It is also speculative that the Bellwether Plaintiffs will in fact use any monies this Court awards for mental health services to in fact obtain such services, but that uncertainty alone is not a bar to Plaintiffs' recovery of these damages. To apply different standards of probability to future damages versus future offsets would be asymmetrical and unfair.

Courts have held that future medical care costs can be offset by Department of Defense health care programs, such as TriCare. *See, e.g.*, *Dempsey v. United States*, 32 F.3d 1490, 1495 (11th Cir. 1994) (offsetting future medical costs by CHAMPUS—TriCare's predecessor—in the case of a retiree's dependent); *Short v. United States*, 908 F.Supp. 227, 239 (D. Vt. 1995) (same for veteran's future care). In *Warren v. United States*, Judge Seabright highlighted why some other courts have found offsets for future TriCare benefits too speculative, specifically: (1) it is not certain the benefits will vest because the military member must continue to serve until retirement and (2) the TriCare program is subject to change in the future. 669 F. Supp. 3d 987, 1028–29 (D. Haw. 2023). These concerns are factual gaps that the United States has addressed in the present case, not an insurmountable bar to offsets for future benefits. *See Harvey v. United States*, Civil Action No. 3:09CV122-S, 2013 WL 2898785, at *3 (W.D. Ky. June 13, 2013) (concerns over whether future offset is appropriate "can be adequately addressed through testimony which may be offered by the plaintiff on the issue," including "whether and to what extent [the Plaintiff] may be entitled to TRICARE benefits in the future," and "whether she wishes to avail herself of such benefits. The United States may establish that these benefits would continue to be available.").

As a threshold matter, the United States has established that TriCare benefits have vested or nearly vested for the servicemembers of three of the six Bellwether

families. Dr. Richard Ruck, Chief Medical Officer for TriCare Health Plan at the

Defense Health Agency, testified that based on their service milestones, Chief

Petty Officer Jessup, Major Feindt, and Chief Petty Officer Dietz have secured or

nearly have secured future TriCare coverage for their spouses and children. *See*

Ruck Decl. (ECF No. 359-1) ¶¶ 29–31. Specifically, Mr. Jessup obtained 20 years

of service upon retiring from the Navy in March 2023. *Id.* ¶ 29; *see also* Pls.' Br.

159 n.31. Major Feindt—having reached 18 years of service—has statutorily

secured TriCare coverage. April 29, 2024 Tr. 176:15–19; *see also* Ruck Decl. ¶ 30

(citing 10 U.S.C. § 632(a)(3)); 10 U.S.C. § 632(a)(3) (providing that Army majors

with 18 years of service are entitled to remain through full retirement with benefits,

even if not promoted). And lastly, Chief Petty Officer Dietz testified that he will

continue to serve and will retire through the military in 2027, *see* May 1, 2024 Tr.

66:21–24, and reaffirmed this intention upon re-cross, *id.* at 67:15–25. As such, the

future medical costs of these servicemembers' spouses and children will be

covered by TriCare. Even if TriCare is payor of last resort, as Plaintiffs argue it is

for Chief Petty Officer Dietz, this underscores the fact that their future care will be

covered by health insurance and will greatly reduce, if not obviate, any out-of-

pocket costs borne by Plaintiffs.

　　Additionally, the United States has offered evidence that the limited future

care recommended by Plaintiffs' experts is and will continue to be covered by

TriCare. Ms. DeLeon, a Nurse Consultant/Subject Matter Expert for the TriCare

Health Plan Clinical Oversight and Integration Section of the Defense Health

Agency, itemized Plaintiffs' recommended care with the corresponding federal

regulation and TriCare Policy Manual Section that provides coverage for such

care. *See* Am. DeLeon Decl. Ex. B (ECF No. 562-2) (referencing 32 C.F.R.

§ 199.4(c)(3)(ix) and TriCare Policy Manual 6010.60-M, April 2015, Change 125

(Mar. 18, 2024)). Despite this, Plaintiffs broadly assert that the United States

"cannot provide evidence regarding what services TRICARE will *in fact* pay for in

the future or the amount that TRICARE will *in fact* pay for those services." Pls.'

Br. 159–60 (emphasis in original). But Ms. DeLeon's testimony does just that,

affirming that "all of the provisions of the life care plans for the Jessup, Dietz, and

Feindt Bellwether Families would be covered." Am. DeLeon Decl. (ECF No. 562-

1) ¶ 16. Indeed, she testified that "the type of care regularly provided to TRICARE

benefits and not likely to be removed from TRICARE benefits in the future." *Id*.

Unlike some cases that have denied offsets for future TriCare coverage, the

United States has limited its TriCare offset argument to the three Bellwether

Plaintiff families who have or nearly have secured TriCare coverage through

retirement of their service member family member. *Compare supra* at 89–90, *with*

*Galbreath v. United States*, Civil No. CV 20-00373 LEK-KJM, 2022 WL

18717579, at *2 (D. Haw. Feb. 17, 2022) (eight years from securing TriCare

coverage through retirement), *clarified on denial of reconsideration*, Civil No. CV 20-00373 LEK-KJM, 2022 WL 18717578 (D. Haw. Mar. 29, 2022).

Likewise, the limited future care sought here does not project as far into the future as care at issue in cases in this district where future care was not offset by TriCare coverage. *See Warren*, 669 F. Supp. 3d at 1016–22 (six-year-old would need Gattex, parenteral nutrition, and skilled nursing until age 18); *Campano v. United States*, CIVIL NO. 15-00439 KSC, 2018 WL 1182571, at *1 (D. Haw. Mar. 7, 2018) (Plaintiff would need hemodialysis, multiple renal transplants, and immunosuppressant medication for life), *amended in part*, CIVIL NO. 15-00439 KSC, 2018 WL 4346879 (D. Haw. Mar. 27, 2018); *Galbreath*, 2022 WL 18717579, at *1 (full medical care required for remainder of minor's life).

Here, Plaintiffs' recommended future care—per their own experts—consists of a finite number of therapy sessions that would occur once or over a set period of time. The limited nature of this care further belies Plaintiffs' speculation concerns. Plaintiffs' own life care expert, Ms. Burns, projected future care to terminate in 2027 at the latest. *See generally* Am. Burns Decl. Ex. A (ECF No. 549-1) at 8 Tab D. This timeline is especially important for the Minor Bellwether Plaintiffs because TriCare coverage can terminate when they turn 21. *See* Ruck Decl. ¶ 15. However, Ms. Burns costed the care for P.G.F., P.R.F., B.J. and Beau Jessup to end prior to any of the Minor Bellwether Plaintiffs turning 21. *See* Burns Decl. Ex.

A at 8-9 (P.G.F.'s care costed through 2027); 11–12 (P.R.F.'s care costed through 2025); 14-16 (Beau Jessup's care costed through 2025); 18–20 (B.B.J.'s care costed through 2025). Plaintiffs' other life care expert, Ms. Fricke, did not specify an end date for B.D.'s recommended care. However, B.D. sees a therapist on a bi-weekly basis, *see* Clark Decl. ¶ 8; *see also* PX-2250 at PX-2250_0013 (noting return appointment in 2 weeks), and at this rate, and even at a less frequent rate, B.D. would complete all 48 recommended sessions well before he turns 21.

In terms of specific coverage, the Dietz family uses TriCare Select and the Feindt and Jessup families use TriCare Prime.[33] Under TriCare Select, the Dietz family would pay at most 25% of the therapy session cost—regardless of whether a provider is in-network.[34] If the Jessup or Feindt families see an in-network provider, or an out-of-network provider with either a referral or an authorization (a standard health insurance requirement), they will pay at most $37 per session.[35]

---

[33] B. Dietz Decl. (ECF No. 390) ¶ 41 (noting that the family uses TriCare Select); S. Jessup Decl. ¶ 84 (noting that the family uses TriCare Prime); DX-3224 at 27 & 158 (noting TriCare Prime coverage for P.G.F in October 2022 and June 2023, respectively).

[34] *See* https://www.tricare.mil/comparecosts. A court can take judicial notice at any time. Fed. R. Evid. 201(d). A court can take judicial notice of a government's website. *See, e.g.*, *EVO Brands, LLC v. Al Khalifa Group LLC*, 657 F. Supp. 3d 1312, 1321 (C.D. Cal. 2023) (citing to *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010) (taking judicial notice of information on the websites of two school districts because they were government entities)).

[35] *See id.*; *see also* https://tricare.mil/Costs/POS. All of the Plaintiffs would be in "Group A" option because they enlisted in service before 1/1/2018.

93

Importantly, the cost for this care does not change whether the service member is

in Active Duty of retired. As such, the United States requests that any damages the

Court awards are offset by the following amounts:

| Plaintiff Name | Total Care Cost[36] | Covered by Plaintiff | Covered by TriCare | Total Offset |
|---|---|---|---|---|
| Richelle Dietz | $18,899 | $3,779.80 20% | $15,119.20 80% | $15,119.20 |
| B.D. | $12,768 | $2,553.60 20% | $10,214.40 80% | $10,214.40 |
| Patrick Feindt Jr. | $4,908 – 24 CBT Sessions at $204.50 per unit | $888 – $37 per unit | $4,020 | $8,287.50 |
| | $4,908 – 24 Psychotherapy Sessions at $204.50 per unit | $888 – $37 per unit | $4,020 | |
| | $284.50 – 1 Psychology Evaluation | $37 – $37 per unit | $247.50 | |
| P.G.F. | $4,908 – 24 Individual Sessions at $204.50 per unit | $888 – $37 per unit | $4,020 | $12,060 |
| | $9,816 – 48 Family Sessions at $204.50 per unit | $1,776 – $37 per unit | $8,040 | |
| P.R.F. | $277 – 1 Psychology Evaluation | $37 – $37 per unit | $240 | $240 |

---

[36] Total Care Costs are based on present day calculations done by Ms. Burns and Ms. Fricke but do not account for the discount rate analysis done by Mr. West. *See generally* Am. West Decl.

| Plaintiff Name | Total Care Cost[36] | Covered by Plaintiff | Covered by TriCare | Total Offset |
|---|---|---|---|---|
| Sheena Jessup | $10,244 – 48 Individual Sessions at $213 per unit | $1,776 – $37 per unit | $8,468 | $12,952.50 |
| | $5,112 – 24 CBT Sessions at $213 per unit | $888 – $37 per unit | $4,224 | |
| | $297.50 – 1 Psychology Evaluation | $37 – $37 per unit | $260.50 | |
| B.J.J. | $8,520 40 Individual Sessions at $213 per unit | $1,480 – $37 per unit | $7,040 | $9,412.50 |
| | $2,556 – 12 Family Sessions at $213 per unit | $444 – $37 per unit | $2,112 | |
| | $297.50 – 1 Psychology Evaluation | $37 – $37 per unit | $260.50 | |
| Beau Jessup | $297.50 – 1 Psychology Evaluation | $37 $37 per unit | $260.50 | $4,484.50 |
| | $5,112 – 24 Psychology Sessions at $213 per unit | $888 – $37 per unit | $4,224 | |

Thus, the United States' offset position is not as broad as Plaintiffs contend. And the United States has adduced unchallenged evidence filling factual gaps that have prevent other courts from applying TriCare offsets. For the same reasons plaintiffs in a case can recover future health care expenses that are reasonably probable (and not necessarily certain or that they are even required to spend on such health care), the United States is entitled to offset future medical costs by the TriCare coverage that is reasonably probable to occur.

## B.  The United States' Per Diem Payments Should Offset—and the Free Hotel Benefit Should Mitigate—Any Award for Inconvenience and Annoyance.

Members from each of the Bellwether Families testified to receiving thousands of dollars in per diem payments for meals, incidental costs, and generalized disruption of daily life. These payments are sometimes referred to as Temporary Lodging Assistance ("TLA"). TLA benefits are tied to the number of dependents and are authorized in "unusual or extraordinary" situations "related to . . . the location of the member's dependents." 37 U.S.C. § 405(b) & (d)(1)(A).

Mr. Aubart received at least $6,370.56 in hotel reimbursements, *see* DX-3036, and testified to receiving approximately $24,000 in per diem payments, *see* May 3, 2024 Tr. 91:7-12. Mrs. Jessup testified that her family received $27,101.80 in per diem payments. April 30, 2024 Tr. 132:21–133:24; DX-3032. Mr. Feindt did not dispute that his family received $18,000 in per diem payments. April 29, 2024

97

Tr. 216:11-216:25; *see also* DX-3024 at DX-3024_00015 ($7,330.80 advance in

per diems paid for Mr. Feindt, P.G.F., and P.R.F. for December 13, 2021, to

January 11, 2022); *id.* at DX-3024_00001 ($3,270.38 in additional per diems paid

for Mr. Feindt, P.G.F., and P.R.F. for December 13, 2021, to January 20, 2022);

DX-3022 at DX-3022_0001 ($7,176 in additional per diems paid for Mr. Feindt,

P.G.F., and P.R.F. for January 21, 2022, to February 14, 2022). Mr. Feindt also

acknowledged that the United States reimbursed him for the cost of the hotel stay,

April 29, 2024 Tr. 217:1–11, which the record reflects amounted to over $6,000,

DX-3026 at DX-3026_0004-24. Mrs. Witt testified that her family received

roughly $6,000-$7,000 in per diem payments. April 30, 2024 Tr. 183:17–23. Mrs.

Freeman testified that she received $6,247.50 in per diem payments, April 29,

2024 Tr. 117:16–21, and that the United States also paid for her family's hotel

room from December 3, 2021, to February 2, 2021, *id.* 116:7–117:9. Chief Petty

Officer Dietz testified that he received $8,925 in per diem payments. May 1, 2024

Tr. 51:4–53:19; DX-3057 ($5,355 TLA reimbursement); DX-3058 ($3,570 TLA

reimbursement). Plaintiffs do not offer evidence of competing per diem amounts.

The Court should therefore offset the Bellwether Plaintiffs' recovery by the

amount of these per diem payments. For simplicity and because the adult

Bellwethers presumably directed how these funds would be spent, the United

States has offset them per diem amounts from the adult Bellwether Plaintiffs'

recoveries below. Moreover, because these benefits relate to "the location of the [service]member's dependents," 37 U.S.C. § 405(d)(1)(A), it is fair for the Court to consider these already-paid amounts in assessing those dependents' damages.

## VII.   Compensatory Damages: The United States' Rationale

If a Plaintiff can establish causation, Hawaii law provides for compensatory damages, which "'compensate the injured party for the injury sustained' . . . in hopes of 'restor[ing] a plaintiff to his or her position prior to the tortious act.'" Order Granting Defendant's Motion in Limine 2 (ECF No. 461) 9 (quoting *Bynum v. Magno*, 101 P.3d at 1153-54). Punitive damages are not recoverable under the FTCA. *See, e.g.*, *Nurse v. United States*, 226 F.3d 996, 1004 (9th Cir. 2000) (plaintiff "has no right to either punitive damages or attorney's fees in her FTCA claims") (citing 28 U.S.C. § 2674)).

As requested, in Exhibit B hereto, the United States responds to Plaintiffs' chart of compensatory damages. *See* Post-Trial Br. Order 2. Before doing so, the United States first details the general principles and comparable cases that it relies upon in reaching its damages framework. The United States hopes that the Court's use of this or a similar framework will facilitate the parties' use of the Court's decision for these 17 Bellwether Plaintiffs to resolve the thousands of remaining claims in this docket. *See generally* Joint Submission on Using the Results of the *Feindt* Bellwether Trial to Resolve Remaining Claims (ECF No. 590).

The United States' proposed approach results in general damages awards
(prior to any offsets) of: (1) $10,000 - $65,670 for the adult Bellwether Plaintiffs;
(2) $5,000-$36,459 for the minor Bellwether Plaintiffs above the age of 6 at the
time of the November 2021 spill; and (3) $$5,000-$25,000 for the minor
Bellwether Plaintiffs at or below the age of 6 at the time of the spill.

Such general damages awards are in the range of comparable cases
involving short-term exposures (*i.e.*, days) similar to what occurred in this case.
*See supra* at 14 & n.3. For example, in *Cairns v. Dunlap Towing Co.*, after a bench
trial, the Western District of Washington awarded plaintiff $35,000 in general
damages (approximately $62,000 in May 2024 dollars[37]). Judgment, ECF No. 21,
2:00-cv-01562-TSZ (W.D. Wash. Nov. 9, 2021). The plaintiff suffered nausea,
abdominal discomfort and cramping, diarrhea, rash, headaches, and bloodshot eyes
after drinking water that contained antifreeze for approximately 10 days while
working aboard a tug. Pls.' Trial Br., ECF No. 16, *Cairns* (Oct. 23, 2001) at 2–8 &
16 (listing physical symptoms and concerns). The *Cairns* plaintiff's symptoms
dissipated after the exposure ceased, but he remained concerned about his long-
term effects from the exposure, going so far as to contact the U.S. Environmental

---

[37] Inflation-adjusted values based upon the U.S. Bureau of Labor Statistics' CPI
Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm, which was
also used by Plaintiffs. *See* Pls.' Br. 148 n.28. May 2024 is the most recent month
available.

Protection Agency to determine the severity of his exposure. *Id.* at 6–8. Unlike the Bellwether Plaintiffs, however, the *Cairns* plaintiff received psychological therapy immediately after his exposure to cope with his resulting anxiety, was prescribed anti-anxiety and anti-depressant medication to treat his anxiety due to the exposure, and was diagnosed with major depressive disorder and post-traumatic stress disorder. *Id.* at 14–16.

Other cases involving short-term environmental exposures are also within the range of general damages the United States presents in this case. For example, in 2015, two plaintiffs who were exposed to tetramethylammonium hydroxide when responding to a truck accident, which allegedly resulted in severe headaches, eye pain, vomiting, nausea, respiratory injuries, and emotional distress/anxiety, settled their claims for approximately $31,000 (approximately $41,000 in May 2024 dollars) and approximately $20,750 (approximately $27,500 in May 2024 dollars) in general damages. *See Broecker v. Hanes*, 16 Idaho Verd. Stlmnt. Rpts. 14, 2015 WL 10015309 (Or. Cir. Ct. Dec. 2015). In addition, a 2001 Hawaii arbitration proceeding awarded a plaintiff $10,000 ($17,936 in May 2024 dollars) in general damages after the plaintiff was exposed to pesticides on a single day, allegedly resulting in chemical poisoning, headaches, emesis, and emotional distress. *See Collins v. Willocks Constr. Corp.*, JVR No. 479331, 2001 WL 36113300 (Sept. 2001).

The United States details further below the bases for its proposed general and specific damages amounts outlined in the charts at the end of this Section VI.

## A. Impairment and Pain and Suffering (Past and Future)

For the reasons discussed above, *see, e.g.*, *supra* at 36–42, Plaintiffs have not provided admissible or qualified expert opinion that Beau Jessup's tremor, D.F.'s tremor, and Mrs. Freeman's long-term health effects were caused by the November 2021 spill, and therefore the Court should deny Plaintiffs' requests for damages for these alleged long-term health effects.

With respect to the Feindts' claims for past pain and suffering for even alleged short-term health effects, the Court should deny Plaintiffs' requests because (1) the science demonstrates that contaminated water did not reach the Feindts on Ford Island, *see supra* at 13–18; (2) the Feindts' timeline between cessation of drinking the water and onset of alleged short-term symptoms conflicts with both basic toxicological principles of when JP-5 is removed from the human body and the experiences of the other Bellwethers who allege onset nearly immediately after exposure, *see, e.g.*, *supra* at 14, n.3, 23–24 & 27–31.

The other Bellwether Plaintiffs' remaining past pain and suffering are based on acute symptoms allegedly caused by the November 2021 spill, such as vomiting, stomach pain, nausea, and headaches. *See, e.g.*, Pls.' Br. 3–4, 14–21. Although the United States maintains that the Bellwether Plaintiffs were not

102

exposed to a sufficient dose to cause even their alleged acute effects (*see supra* at

31–35), if the Court were to award damages for such acute effects, it should do so

in the range of food poisoning cases and other acute exposure cases that have

comparable symptoms and durations—*i.e.*, $15,000 for pain and suffering. *See,*

*e.g.*, *Green v. Costco Wholesale Corp.*, JVR No. 165705, 1995 WL 778684

(October 1995) ($5,000 was awarded in arbitration for pain and suffering

(approximately $10,450 in May 2024 dollars) in Hawaii food poisoning case

resulting in medical expenses); *Omalza v. Safeway Stores, Inc.*, JVR No. 121922,

1993 WL 598827 (May 1993) (same); *see also Collins*, 2001 WL 36113300 (2001)

($10,000 ($17,936 in May 2024 dollars) arbitration award for general damages

after allegedly suffered chemical poisoning, headaches, emesis, and emotional

distress after being exposed to pesticides).

Here, Plaintiffs' duration of exposure was a matter of days. *See supra* at 14

& n.3. Moreover, JP-5 is removed from the human body within 1-2.5 days, Felton

Dep. 71:6-14 (ECF No. 361-1), and therefore acute effects from exposure "should

resolve rapidly (within 1-2 days) of cessation of exposure," JX-0041 at JX-

0041_00002-03.

### B. Loss of Enjoyment

The HDOH public health advisory was in effect for approximately four

months (November 29, 2021, to March to March 18, 2022, which is the date by

which HDOH declared the drinking water in all the Bellwethers' neighborhoods

"safe" "for all purposes" and that "no contamination remains.")[38]. In *Ayers v. New*

*Jersey*, a jury awarded each plaintiff $16,000 for the "inconveniences, aggravation,

and unnecessary expenditure of time and effort related to the use of the water

hauled to [Plaintiffs] homes, as well as to other disruption in their lives, including

disharmony in the family unit" caused by contamination from a nearby landfill

leaching into Plaintiffs' drinking water and resulting in a public health advisory not

to drink the water for twenty months. 525 A.2d 287, 290 & 293 (N.J. 1987).

Adjusted for inflation, this is approximately $2,500 per month in May 2024 dollars

or a total of $10,000 for the four months in which the HDOH public health

advisory was in effect in this case.

The United States suggest that the Court use this $10,000 figure as its

baseline loss of enjoyment damages award and award loss of enjoyment as follows,

which account for big-picture differences among Plaintiffs:

(1) $15,000 for the adult Bellwethers who were caring for dependents
during this time (Mr. Feindt; Mrs. Jessup; Mrs. Dietz);

---

[38] JX-0005 (issuing initial health advisory) (Nov. 29, 2021); Stipulated Facts
Regarding Water System (ECF No. 548) ¶¶ 1-6 (Bellwethers lived in Zones A2,
D2, D3, F2, and H3); JX-0017_00001-2 ("All Navy water system users in . . . Zone
A2 . . . may now use water for all purposes including drinking, cooking, and oral
hygiene. . . . The decision to amend the health advisory and declare [this zone] safe
was made after DOH's multiple lines of evidence confirmed that no contamination
is entering the Navy water system and no contamination remains . . . .") (Mar. 1,
2022); JX-0020 (same for Zones F2 & H3) (Mar. 11, 2022); JX-0021 (same for
Zone D2) (Mar. 13, 2022); JX-0022 (same for Zone D3) (Mar. 18, 2022).

(2) $10,000 for other Bellwethers twelve years old and older as of November 2021 (*e.g.*, Mr. Aubart; Mrs. Witt; Beau Jessup; B.J.J.);

(3) $5,000 for Bellwethers under twelve years old as of November 2021 (P.G.F., P.R.F., B.D., V.D., N.F., K.F., D.F., N.J., D.J.; and

(4) Double loss of enjoyment award if the Plaintiff relocated off-island prior to HDOH declaring the water safe again (*i.e.*, the Freemans).[39]

These variations reflect that: (1) caring for minors without running water came with increased burdens; (2) minors under the age of twelve did not shoulder the same sort of responsibilities as adults and older kids; and (3) relocating off-island prior to HDOH declaring the water "safe" "for all purposes" resulted in additional loss of enjoyment. This framework results in a range of loss of enjoyment awards of $30,000 to $5,000 per Bellwether Plaintiff.

Although the health advisory was disruptive to the Bellwethers' lives, it did not remove all enjoyment from their lives during these four months—they still were able to do things they enjoyed (such as hiking, going to the beach, engaging socially, visiting with family), but it may have been more burdensome to do so without running water back at home. April 30, 2024 Tr. 173:12:21; May 2, 2024 Tr. 31:1-10; ; PX-2255 (Pls.' N. Freeman Composite Med. R.) at PX-2255_1490

---

[39] The Feindts and Jessups relocated after the HDOH declared their water "safe" "for all purposes" and that "no contamination remains," *see supra* at 60, 81–82, 102–03 & n.38, and so any resulting loss of enjoyment from the relocation is not reasonably attributed to the November 2021 spill.

(Mrs. Freeman's oldest daughter visited from Florida in mid-December 2021). In addition, the United States took steps to ameliorate these burdens, including providing: (1) free bottled water, *see, e.g.*, May 2, 2024 Tr. 28:10–18; Witt Decl. (ECF No. 397) ¶ 25; (2) free hotel rooms, *e.g.*, JX-0028_00049 (¶ 301); *see supra* at 96–98; and (3) per diem payments to cover meals and other incidentals, *see supra* at *id.*

Finally, the Feindt and Jessup Bellwethers should not receive increased damages for relocating off-island because they did so after the HDOH declared their neighborhood's drinking water "safe" "for all purposes" and that "no contamination remains." *See supra* at 60, 81–82, 102–03 & n.38; *Reimer*, 2014 WL 1643260, at *3 ("[i]n contract or in tort, the plaintiff has a duty to make every reasonable effort to mitigate his [or her] damages") (quoting *Tabieros*, 944 P.2d at 1316).

### C. Mental Anguish and Emotional Distress

The Bellwether Plaintiffs seek mental anguish and emotional distress damages in the range of $75,000 to $250,000. Pls.' Br. Ex. A (ECF No. 595-1). While the United States acknowledges that the events were distressing for the Bellwether Plaintiffs, the amounts sought are out of step with comparable cases. Further, the steps that the Bellwether Plaintiffs have taken belie the steps that contend must be done in the future.

None of the Bellwethers started care under a mental health professional for over a year after the November 2021 spill. This includes Mrs. Freeman, who claims among the most in mental anguish and emotional distress damages and is also a mental health professional with presumably easier access to such resources than other Plaintiffs. *See* Am. N. Freeman Decl. ¶ 26; Smith Decl. ¶¶ 180 & 208. Mrs. Witt's dose of anti-anxiety medication remained the same before, during, and after the public health advisory regarding the November 2021 spill. *See* Smith Decl. ¶¶ 391-92; DX-3217 at 27 & 32 (regarding Zoloft prescription history). While one can experience emotional distress without seeking mental health services or increasing anti-anxiety medication, the absence of such interventions is indicative of the relative severity of the emotional distress experienced at the time.

In contrast, in the cases Plaintiffs rely upon, such indicia of severe emotional distress were present. For example, in *Carter v. United States*, which was reversed on appeal, the plaintiff: (1) began receiving Xanax (a tranquilizer) within two days of the incident to reduce her anxiety from the incident; (2) she remained on the medication through trial six years later; (3) after the incident, saw psychiatrists who quadrupled her pre-incident anxiety medication or prescribed alternative anxiety medications; and (4) received treatment at an outpatient mental-health

107

clinic. 725 F. Supp. 2d 346, 352 (E.D.N.Y. 2010), *aff'd in part, rev'd in part*, 494

F. App'x 148 (2d Cir. 2012).[40]

The damages for mental anguish and emotional distress that Plaintiffs seek

($75,000 to $250,000) are in the realm of damages courts award when plaintiffs

experience and even witness firsthand the death of a loved one—something that

did not occur in this case. For example, in *Holcombe v. United States*, Pls.' Br.

159, the court awarded $250,000-$2,000,000 in mental anguish for the death the

immediate family members killed in a mass shooting. *See, e.g.*, 584 F. Supp. 3d

225, 291–98 (W.D. Tex. 2022). In *Hambrook v. Smith*, Judge Kay awarded

plaintiffs $50,000 (approximately $65,000 in May 2024 dollars) each for the

emotional distress of witnessing their husband/father's drowning death firsthand.

No. 14-00132 ACK-KJM, 2016 WL 4408991, at *40 (D. Haw. Aug. 17, 2016).

In addition, Plaintiffs' demand fails to allocate the emotional distress from

other causes, as required by Hawaii law. *See supra* at 67–69. A proper accounting

---

[40] Plaintiffs' citation to *Schmidt v. United States* for an emotional distress
comparable is unpersuasive, as the Court does not separately address emotional
distress and instead focuses on pain and suffering from a car collision. No. 1:18-
CV-88-DAE, 2020 WL 12947480, at *9 (W.D. Tex. Oct. 8, 2020). Moreover, a
number of the key facts regarding the plaintiff's psychological injuries were
redacted by the court, further undermining any comparison value.

of these other causes results in substantial reductions in Plaintiffs' mental anguish and emotional distress demand.

There is striking disconnect in Plaintiffs demanding damages for their mental anguish and emotional distress over 4 to 28 times their own experts' opinions as to the cost of mental health services these Bellwethers need to address their alleged emotional distress. The United States instead recommends that the Court use the Mr. West's costing of the future mental health services recommended by Plaintiffs' experts (Drs. Vargo and Clark) as a proxy for the Bellwether Plaintiffs' emotional distress, as it captures—in the Plaintiffs' own view—the variations amongst the Bellwethers (to be clear, any need for these future mental health services were not caused by the spill, *see supra* at 51–57, and, even if they were, they should be offset by TriCare for many of the Bellwethers, *see supra* at 86–96).[41] If anything, since this approach does not apportion among other causes for the purported need for therapy before using these costs as a proxy, this proxy approach is favorable to the Plaintiffs.

---

[41] The lone deviation is the removal of the $277 that Mr. West calculated for P.R.F., since Ms. Burns' (Plaintiffs' expert) pricing of one session for P.R.F. conflicted with Dr. Clark opinion that no therapy was needed for P.R.F. *See* Clark Decl. ¶ 98 ("P.R.F.: No therapy needed at this time."). For K.F. and N.F., the costs of tutoring ($8,350) were subtracted from Mr. West's calculations, leaving only the therapy costs of $11,459. *See* Am. West Decl. Ex. K (ECF No. 563-12) at 7 & 9.

Plaintiffs' experts also recommended no additional therapy for five minors who were at or under five years of age at the time of the November 2021 spill, which is consistent with these minors being too young at the time to experience the emotional distress others experienced. *See* Clark Decl. ¶¶ 96, 98, 99, & 104 (no current therapy needed for D.F., P.R.F., V.D., and D.J., respectively); Am. Burns Decl. ¶ 505 (explaining that she did not cost Dr. Clark's care recommendations for N.J. because they were "already being provided by the school district for [N.J.'s] preexisting autism.").[42] *See also* May 1, 2024 Tr. 57: 2–6 ("Q: And you didn't see any emotional or psychological changes in your daughter, VD, following the spill? A [Mr. Dietz]: No. She was just under 3 years old at the time. She was still young."); May 2, 2024 Tr. 21:23–22:6 ("Q: Mr. Jessup, could you describe any continuing emotional distress you've observed in the rest of your children . . . A: I mean, obviously with my son, [D.J.], being, you know, 3 and my son [N.J.] being 7 but autistic, I don't think have a full understanding of, you know, what was going on at that point in time, so I'm not going to speak to their emotional distress."); April 29, 2024 Tr. 199:20–21 (due to P.R.F's age before ability to "start developing core memories," Major Feindt testifying, "I pray to God that my son never remembers this").

---

[42] In November 2021, (1) D.F. was five; (2) P.R.F. was one; (3) V.D. was three; (4) N.J. was four; and (5) D.J. was less than one. Am. N. Freeman Decl. ¶¶ 1–2; P. Feindt Decl. ¶ 4; R. Dietz Decl. ¶ 1; S. Jessup Decl. ¶¶ 1 & 4.

This approach results in a range of mental anguish and emotional distress awards of no more than $5,273 to $25,640. Am. West Decl. ¶ 2–3. This is consistent with the inflation-adjusted emotional distress awards in *Ayers v. New Jersey*. 525 A.2d 287, 291 & 294 (N.J. 1987) ($40 to $14,000 (approximately $124 to $43,000 in May 2024 dollars) per plaintiff for the emotional distress resulting from being exposed to contaminated drinking water for six years). This is also consistent with there being several additional causes of the Bellwether Plaintiffs' emotional distress that were unaccounted for in Plaintiffs' demand of $75,000 to $250,000, including that the largest source of Beau Jessup's emotional distress arises from the tremor (and its impact on his future career prospects) that was not caused by the November 2021 spill. *See supra* at 79–82.

### D. Mental Health Treatment and Tutoring

As discussed above, none of the Bellwether Plaintiffs require mental health services or tutoring due to the November 2021 spill, and therefore the Court should not award the special damages Plaintiffs seek for these services. *See supra* at 51–57. Even if the Court were to award such damages, it should offset them for the Jessup, Feindt, and Dietz Bellwether Plaintiffs by the amount that TriCare is reasonably probable to cover (specific amounts specified in the chart below). *See supra* at 86–96.

111

### E.  Lost Wages

In their closing brief, Plaintiffs abandon their economists' calculation of the

lost wages for Mr. Feindt and Mrs. Freeman and instead adopt the high-end

estimates from the United States' expert. Pls.' Br. 65 & 87. But Mr. West's

calculations assumed that these lost wages were the result of alleged injuries from

the November 2021 spill. *See* Am. West Decl. ¶¶ 2–3. As detailed above, Plaintiffs

did not establish this predicate, and so they have not proven that they are entitled to

damages for lost wages. *See supra* at 57–65. Moreover, at best Plaintiffs can only

recover a fraction of the lost wages Mr. West calculated, as discussed above and

summarized in the charts below.

### F.  Per Diem Offsets

The United States contends that the Court should credit the per diem

payments the United States has made (*see supra* at 96–98) against the adult

Bellwether's recovery, as the payments were made to the adults and not the minors

and presumably the adults decided how to spend these funds. These per diem

offsets are specified in Exhibit B.

### CONCLUSION

In conclusion, the United States' requests the Court adopt the foregoing

damages framework for each of the Bellwether Plaintiffs.

Dated:  June 25,2024                          Respectfully submitted,

112

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General, Civil Division

CHETAN PATIL
Deputy Assistant Attorney General
Torts Branch

J. PATRICK GLYNN
Director

CHRISTINA FALK
Assistant Director

*/s/ Caroline W. Stanton*
CAROLINE W. STANTON
       DC Bar # 1010918
ERIC REY
ROSEMARY YOGIAVEETIL
ALANNA HORAN
LUCAS WHITE
ANNA ELLISON
Trial Attorneys
United States Department of Justice
Civil Division, Torts Branch Environmental
Tort Litigation
1100 L Street, NW
Washington, DC 20006
Phone: 202-307-0554
E-mail: caroline.w.stanton@usdoj.gov

*Attorneys for Defendant*
*United States of America*

113

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2024, I electronically filed the foregoing

using the Court's Electronic Case Filing system, which will send notice to all

counsel of record.


*/s/ Caroline W. Stanton*
CAROLINE STANTON