1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

---------------------------------------

MARTHA JENNIFER CAMP, ADAM CAMP,    )
WILLIAM E. THOMPSON, and JUANITA    ) CIVIL NO.
THOMPSON, individually and on       ) 1:24-cv-00003 LEK-KJM
behalf of all others similarly      )
situated,                           )
                                    )
        Plaintiffs,                 )
vs.                                 )
                                    )
OHANA MILITARY COMMUNITIES, LLC;    )
HUNT MH PROPERTY MANAGEMENT, LLC    )
and DOE DEFENDANTS 1-10,            )
                                    )
        Defendants.                 )
---------------------------------------
HUNT MH PROPERTY MANAGEMENT, LLC,   )
                                    )
        Third-Party Plaintiff,      )
vs.                                 )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Third-Party Defendant.      )
---------------------------------------
CLEOPHAS C. POWELL, on behalf of    ) CIVIL NO.
himself and all similarly situated, ) 1:24-cv-00184 LEK-KJM
                                    )
        Plaintiffs,                 )
vs.                                 )
                                    )
OHANA MILITARY COMMUNITIES, LLC;    )
HUNT MH PROPERTY MANAGEMENT, LLC    )
and DOE DEFENDANTS 1-10,            )
                                    )  Deposition of
        Defendants.                 )    Adam Camp
---------------------------------------
HUNT MH PROPERTY MANAGEMENT, LLC,   )
                                    )
        Third-Party Plaintiff,      )
vs.                                 )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Third-Party Defendant.      )
---------------------------------------

RALPH ROSENBERG COURT REPORTERS, INC.
808-524-2090 courtreporters@hawaii.rr.com

EXHIBIT 6

DEPOSITION OF ADAM CAMP

Taken on behalf of the Defendant and Third-Party Plaintiff via online video conference, commencing at 7:59 a.m. on August 13, 2025, pursuant to Notice.

BEFORE:   SANDRA J. GRAN, CSR NO. 424
          Registered Professional Reporter

Adam Camp                                                    10

just let the attorney get it out.  Maybe I'll rephrase the question if I think it's a good objection, but either way, you'll just ultimately answer the question.  Understood.

            THE WITNESS:  Absolutely.  Do you mind answering -- asking the question again?

MR. WHATTOFF:

    Q.   Of course not.  My question was just getting at the Red Hill facility.  Is your understanding that that was owned and controlled by the United States government?

            MS. HORAN:  Objection.

            THE WITNESS:  All I know about --

            MS. HORAN:  Go ahead.

            THE WITNESS:  All I know about it is that it's on a base.  I don't know who owns it.  I don't know anything outside of that.

MR. WHATTOFF:

    Q.   That's fair.  Do you have any information that suggests that my clients, Ohana or Hunt, had any role in managing or operating, or controlling the Red Hill facility?

    A.   Not to my knowledge, no.  As far as I know, they're just contracted by the government for housing.

    Q.   And Mr. Camp, have you seen any of the reports that have come out, you know, since the Red Hill fuel spill occurred, that document some of the conclusions that the government or other entities have reached about the cause of

Adam Camp                                    13

THE WITNESS:  So my understanding of the whole situation was there was an issue, housing -- there was a lack of -- lack of responding to the situation, and we were put out of our houses.

MR. WHATTOFF:  Okay.

THE WITNESS:  That's my understanding of the situation.

MR. WHATTOFF:

Q.  No, that's fair enough.  And I -- my sort of next kind of set of questions is going to be, you know, what's -- what do you view as like that Ohana or Hunt should have done differently in this case.  So I'll get to that sort of in just a minute or two, but for now, I just want to make sure that you don't have any facts or make any allegations in this case that Ohana or Hunt was somehow involved in the fuel spill that occurred at Red Hill.  That's correct, right?

A.  The way -- my understanding, again, is something happened at Red Hill, and I still had to deal with it down the line in Hunt Communities, and then had to find another place of living for several months.

Q.  Right.  And I guess I just want to kind of drill down on that answer a little bit.  And I understand that you may contend that Hunt or Ohana should have done something differently once this event occurred.  I'm just trying to make clear that, you know, you're not blaming Hunt or Ohana for the

Adam Camp                                                    14

event itself.  That's what I'm trying to drill down on.  Is that correct, Mr. Camp?

MS. HORAN:  Objection:  Form.

THE WITNESS:  Yeah, I'm not -- I'm not trying to blame them for the fuel spill.  I'm just concerned about what we had to deal with on the community side and having to find housing elsewhere.

MR. WHATTOFF:

Q.  Fair enough.  And like I said, in just a minute, I'll give you an opportunity to kind of explain exactly what your position is there.  Before we get there, though, I just have one other kind of point of clarity I want to make sure about your claims.  The other thing I want to talk just momentarily about is the Joint Base Pearl Harbor-Hickam Water Distribution System.  You're not aware of any facts or any evidence that would suggest that Ohana or Hunt had any management or operation, or control over the Joint Base Pearl Harbor-Hickam Water Distribution System, correct?

A.  To my knowledge, not -- I can't determine that 'cause I just -- I honestly just lived there.

Q.  Got it.  And again, there's going to be a bunch of questions here where like I have to just establish, hey, is this an area where Mr. Camp has knowledge or doesn't have knowledge, and you may say -- and I think -- so a lot of this is just me making sure these aren't avenues that I should

Adam Camp                                                    18

you just don't really have any other details about sort of whose duties were what and who was providing what services or any facts like that. Is that correct, Mr. Camp?

A.    That is correct. I knew it as one and the same.

Q.    All right. So I said I was going to ask you about this, and I definitely want to get your explanation on this. So I think that we've established that, from your understanding at least, neither Hunt nor Ohana had any role in the Red Hill fuel spill. They did not have any management or oversight over the Joint Base Pearl Harbor-Hickam Water System, but you nevertheless have filed a lawsuit against them. So, in general, could you explain to me what the basis is for why you think they have some responsibility?

A.    So the reason why this all started on our end is because I feel like Hunt could have done more -- or Ohana-Hunt could have done more in facilitating a response to a situation that was possibly out of their control. Where had it been providing safe drinking water, providing a reduction in rent, or no rent at all during the time it was -- it was going on because they didn't supply us with a safe place to live. And, you know, with my family of four and my dogs having to drink the water and having maintenance come by and say, Ah, everything is okay, until later it's like, Oh, no longer consume the water. We were output and the Navy was fortunate enough to put us into hotels, and that's kind of

Adam Camp                                    .  19

where we went.  And we couldn't go back to our own home, we couldn't use our own things, couldn't enjoy the safe, comfort living lifestyle that we had before this whole thing happened.

Q.   Okay, that's helpful.  And I -- is there anything specific that you could identify that you contend that Ohana or Hunt failed to do in connection with this Red Hill situation?

A.   I believe not giving us the insight at first that there was an issue until it was -- it was immediate, Hey, don't drink it anymore.  They could have conducted better testing and not charged us rent for a place we couldn't live in.  We couldn't enjoy the facilities.  We couldn't enjoy our own apartment.  I feel like us paying for something and then having to come out of pocket to pay for a completely different living situation shouldn't fall on us; it should fall on the people responsible, along with the people that are responsible for giving us safe and affordable housing.

Q.   Okay.  And let me find an exhibit here.  I'm going to put on screen a release that's dated November 29th, 2021. We'll go ahead and mark this as Exhibit 22, which is a bit out of order, but I have some other exhibits I'm going to backfill this with.  And I just kind of want to cut to this because you had brought up the timing issue.  Have you seen this document marked as Exhibit 22 before?

(Exhibit 22 marked for identification)

Adam Camp                                                23

approximately at or about November 29, 2021, maybe it was a few days after or maybe it was a few days before, you had information from the Hawaii Department of Health about their position on the water.  Is that fair to say?

MS. RODRIGUEZ:  Objection:  Asked and answered.

THE WITNESS:  So my understanding, again, is -- I can't really recall the dates and the timelines.  I do know that when my family moved into -- December is when it was all being taken seriously, yeah.

MR. WHATTOFF:

Q.   Okay.  I guess one of the reasons I'm trying to drill down on this taming is because you had suggested that Ohana or Hunt should have done something differently with respect to providing notice.  They should have maybe given earlier notice or acted more quickly.  But I guess it's fair to say you don't really recall the sequence of events that occurred in that November or December time period with respect to any notifications.

A.   I believe that there was a lot of notifications and a lot of emails, but none of it was clear to us that we were being affected.  It may have said at the time -- it may -- it seemed that it wasn't affecting us yet or that it was another housing community.  It wasn't clear that it was us directly that was affected.  We didn't get any personal letters on the door.  We didn't get any personal emails assigned to Radford

Adam Camp                                                        24

Terrace, the community that I was living in.  It was a blanket email or a blanket statement saying that the water may be contaminated, further investigations are going on, and it wasn't -- it didn't make it clear enough to us that, Hey, don't drink the water, it's not safe, until much later.

Q.    Okay.  Well, let me just ask you about this communication right here.  The headline is "Hawaii Department of Health advises Navy water system consumers not to drink, consume tap water."  Do you think there is something vague or ambiguous with respect to that?

A.    No, absolutely not.  But like I said before, I did not see this specific document.  I saw other emails from different entities, because I get Navy, I get Ohana Military Community emails.

Q.    Okay.  So are there any specific emails from Ohana or Hunt that you contend were inappropriate in some way?

A.    I don't -- at the time, again, I was just going off the information that was provided to us in the emails.  I don't feel like in the beginning it was taken as serious as it should have been.  Again, that email was dated after us already consuming water and taking responsibility and trying to find other means of living.  And again, in December is when my family moved to hotels.  If it happened before that, then we should have been, again, notified more sternly, as far as letters in the mail.  Emails don't always -- you know, I get

Adam Camp                                                        25

them -- I get thousands of emails in my inbox and going through each one to try and determine if it's the same one -- because we get a lot of newsletters, we get a lot of different information from Ohana.  At no point could I really decipher which email was important and which email was not important, so you would just click through them to remove that little red checkmark from your inbox.

Q.    Okay.  So I guess it sounds like, Mr. Camp, you just didn't read all of the emails that came in related to the Red Hill situation?

A.    Correct.  Because at the time, I didn't know there was much of an issue.

Q.    Okay, all right.  And I appreciate this.  Part of what we're doing at this point in the deposition is just kind of establishing kind of what your positions are, and then we'll drill down into all of the stuff.  I definitely want to ask you, for instance, about your deployment and when you were on base, when you were off base.

Mr. Camp, are you still there?  It looks like you might have froze.

A.    Yeah, I'm back.  So I'm currently deployed right now on a ship, so service may be a little unstable at times. After my last question, I didn't hear anything after that.

Q.    Okay.  I think that's okay.  I'll just restart, and I don't -- you're coming through loud and clear, so just maybe

Adam Camp                                                                82

away from your home when you're doing the shake down?

A.    Yes, that's correct.

Q.    Okay.  So based on that, it looked like you were on shake down from December 1st to December 8th, and then back for a few days, and then deployed from December 11th, I think, until sometime after March 2022.  Is that correct?

A.    That is correct, yes.

Q.    Okay.  Now, I guess what that means is -- you know, we were talking about whether the Red Hill issues impacted you or not, and I can show you -- Why don't I show you one more text?  I'm switching back to that La Familia text chain, and on that December 1st date, there's the chain that says -- I think this is your wife speaking -- "Adam is driving me crazy because he says there's no smell and it's all in my head.  His mom is backing him up, so I'm starting to feel like I'm crazy.  There's definitely a smell."  And I think you kind of testified to this already a little bit, Mr. Camp, but there was a time period when you didn't smell it, and then there was a time period later on when you did perceive that there was gasoline in the home.  And so I guess would it be then, in that time period after the shake down and before the deployment, that you would have smelled the gasoline smell in your home?

A.    I can't determine exactly what day it was.  Obviously, we have this text.  I don't know when this text was

C E R T I F I C A T E

STATE OF HAWAII            )
                          )    SS.
COUNTY OF MAUI            )

          I, SANDRA J. GRAN, do hereby certify:

          That on August 13, 2025, at 7:59 a.m., appeared
before me ADAM CAMP, the witness whose deposition is contained
herein; that prior to being examined, he was by me duly sworn
or affirmed pursuant to Act 110 of the 2010 Session of the
Hawaii State Legislature.

          That the deposition was taken down by me in machine
shorthand and was thereafter reduced to typewritten form under
my supervision; that the foregoing represents, to the best of
my ability, a true and correct transcript of the proceedings
had in the foregoing matter.

          That pursuant to Rule 30(e) of the Hawaii Rules of
Civil Procedure, a request for an opportunity to review and
make changes to the transcript:

          _X__ Was made by the deponent or a party (and/or
               their attorney) prior to the completion of the
               deposition.
          ____ Was **not** made by the deponent or a party (and/or
               their attorney) prior to the completion of the
               deposition.
          ____ Was waived.

          I further certify that I am not an attorney for any
of the parties hereto, nor in any way concerned with the
cause.

          DATED this 23rd day of August, 2025, in Maui,
Hawaii.

_____
SANDRA J. GRAN, RPR, HI CSR 424